**WAGSTAFFE, VON LOEWENFELDT**
**BUSCH & RADWICK LLP**
JAMES M. WAGSTAFFE (95535)
FRANK BUSCH (258288)
101 Pine Street, Suite 725
San Francisco, CA 94111
Telephone: (415) 357-8900
Fax: (415) 357-8910
wagstaffe@wvbrlaw.com
busch@wvbrlaw.com

**OLSHAN FROME WOLOSKY LLP**
LORI MARKS-ESTERMAN (*pro hac vice to be submitted*)
THEODORE J. HAWKINS (*pro hac vice to be submitted*)
1325 Avenue of the Americas
New York, New York 10019
Telephone: (212) 451-2300
Fax: 212-451-2222
lmarksesterman@olshanlaw.com
thawkins@olshanlaw.com

*Counsel for Petitioner Alpine Partners (BVI) L.P.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| In re Application of<br><br>ALPINE PARTNERS (BVI) L.P.<br><br>Petitioner, for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery For Use In a Foreign Proceeding. | Case No. 5:22- 80123<br><br>**PETITIONER'S APPLICATION FOR AN ORDER OF JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782** |

1

## **TABLE OF CONTENTS**

2  APPLICATION ................................................................................................................. 1

3  PRELIMINARY STATEMENT ...................................................................................... 1

4  FACTUAL BACKGROUND............................................................................................ 5

5      A.    Petitioner and NFH ........................................................................... 5

6      B.    The Merger ....................................................................................... 6

7      C.    The Merger Was Unfair to Minority Shareholders and
   Substantially Undervalued NFH's Shares ...................................... 8

8      D.    The Cayman Islands Appraisal Proceeding .................................. 10

9      E.    Discovery in the Cayman Islands Appraisal Proceeding.............. 10

10      F.    The Discovery Sought From The Vivo Entities ........................... 11

11  ARGUMENT................................................................................................................... 11

12    I.    PETITIONER SATISFIES THE THREE STATUTORY
   REQUIREMENTS OF 28 U.S.C. § 1782............................................... 13

13      A.    Respondents Reside in this District ............................................. 13

14

15      B.    The Discovery Sought Is "For Use" In a Foreign Proceeding................. 14

16      C.    Petitioner is an "Interested Person" ............................................. 15

17    II.    THE INTEL DISCRETIONARY FACTORS WEIGH STRONGLY
   IN FAVOR OF PERMITTING THE DISCOVERY PETITIONER

18      SEEKS .................................................................................................... 16

19      A.    Respondent is Not A Party to the Appraisal Proceeding.......................... 16

20      B.    The Cayman Islands Court Will Be Receptive to the Evidence
   Sought .......................................................................................... 17

21      C.    Petitioner Is Not Circumventing Any Foreign Restrictions .................... 19

22      D.    The Subpoena Is Not Unduly Burdensome ............................... 21

23          1.    The Subpoena is Properly Limited In Scope ............................... 21

24          2.    A Rule 30(b)(6) Deposition is Appropriate Here ......................... 22

25      E.    Expedited Review of Petitioner's Application Is Warranted .................. 23

26  CONCLUSION................................................................................................................ 24

27

28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.*,
  785 F. Supp. 2d 434 (S.D.N.Y. 2011) ...................................................................24

*Akebia Therapeutics, Inc. v. FibroGen, Inc.*,
  793 F.3d 1108 (9th Cir. 2015) ............................................................................21

*de Leon v. Clorox Co.*,
  No. 19-MC-80296-DMR, 2020 WL 4584204 (N.D. Cal. Aug. 10, 2020) ............18, 25

*Euromepa, S.A. v. R. Esmerian, Inc.*,
  51 F.3d 1095 (2d Cir. 1995) ...........................................................................22, 28

*First Am. Corp. v. Price Waterhouse LLP*,
  154 F.3d 16 (2d Cir. 1998) ................................................................................27

*Gorsoan Limited v. Bullock*,
  652 Fed. Appx. 7 (2d Cir. 2016)..........................................................................25

*Gushlak v. Gushlak*,
  486 Fed. App'x 215 (2d Cir. 2012) ......................................................................24

*HRC-Hainan Holding Co., LLC v. Yihan Hu*,
  No. 19-MC-80277-TSH, 2020 WL 906719 (N.D. Cal. Feb. 25, 2020) .....................28

*Illumina Cambridge Ltd. v. Complete Genomics, Inc.*,
  No. 19-MC-80215-WHO(TSH), 2020 WL 820327 (N.D. Cal. Feb. 19, 2020) .........19, 25

*In Matter of Appl. of Action & Protection Foundation*,
  2014 WL 2795832 (N.D. Cal. June 19, 2014)........................................................18

*In re Accent Delight Int'l Ltd.*,
  16-MC-125, 2018 WL 2849724 (S.D.N.Y. June 11, 2018) .......................................28

*In re Accent Delight Int'l Ltd.*,
  869 F.3d 121 (2d Cir. 2017) ...............................................................................19

*In re Appl. of Temporary Services Ins. Ltd*,
  2009 WL 2843258 (W.D.N.Y Aug. 28, 2009) .......................................................20

*In re Application of Biomet Orthopaedics Switzerland GMBH*,
  742 Fed. App'x (3d Cir. 2018) ............................................................................22

*In re Application of Joint Stock Co. Raiffeinsenbank*,
  2016 WL 6474224 (N.D. Cal. Nov. 2, 2016) .....................................................25, 28

ii

*In re Bayer AG*,
  146 F.3d 188 (3d Cir. 1998) ..........................................................................8, 17, 26

*In re del Valle Ruiz*,
  939 F.3d 520 (2d Cir. 2019) ...................................................................................19

*In re Ex Parte Appl. of Ambercroft Trading Ltd.*,
  2018 WL 2867744 (N.D. Cal. June 11, 2018).....................................................24, 28

*In re Ex Parte Appl. Of Haruki Hattori*,
  No. 21-mc-80236-TSH, 2021 WL 4804375 (N.D. Cal. Oct. 14, 2021).......................23

*In re Ex Parte Appl. Varian Med. Sys. Int'l AG*,
  2016 WL 1161568 (N.D. Cal. Mar. 24, 2016) .........................................22, 24, 26

*In re Guido Gianasso*,
  2012 WL 651647 (N.D. Cal. Feb. 28, 2012) ...........................................................17

*In re Gushlak*,
  No. 11–MC–218 (NGG), 2011 WL 3651268 (E.D.N.Y. Aug. 17, 2011) .................27

*In re Khrapunov*,
  2017 WL 5625931 (N.D. Cal. Nov. 22, 2017) .........................................................21

*In re Med. Corp. Seishinkai*,
  No. 21-MC-80160-SVK, 2021 WL 3514072 (N.D. Cal. Aug. 10, 2021) ...........17, 18

*In re Mother's Milk, Inc.*,
  5:20-MC-00004-M, 2020 WL 2514315 (S.D.N.Y. May 15, 2020) ...........................28

*In re Mut. Assistance of Local Court of Wetzlar, Germany*,
  2018 WL 2183966 (E.D. Cal. May 11, 2018) ..........................................................18

*In re Penner*,
  2017 WL 5632658 (D. Mass. Nov. 22, 2017) ..........................................................24

*In re Pioneer Corp. v. Technicolor, Inc.*,
  2018 WL 4961911 (C.D. Cal. Sept. 12, 2018) ...................................................18, 20

*In re Platinum Partners Value Arbitrage Fund L.P.*,
  583 B.R. 803 (Bankr. S.D.N.Y. 2018)......................................................................23

*In re Republic of Ecuador*,
  2010 WL 3702427 (N.D. Cal. Sept. 15, 2010) ...................................................17, 28

*In re Request for Judicial Assistance from the Seoul Dist. Criminal Court*,
  555 F.2d 720 (9th Cir. 1977) ...................................................................................19

*In re Watanabe*,
  No. 22-mc-80060-VKD, 2022 WL 961746 (N.D. Cal. Mar. 30, 2022)......................24

iii

*In Re Woori Bank*,
   No. 21-mc-80084-DMR, 2021 WL 2645812 (N.D. Cal. June 28, 2021) ...................................20

*Intel Corp. v. Advanced Micro Devices, Inc.*,
   542 U.S. 241, 124 S. Ct. 2466, 159 L. Ed. 2d 355 (2004)..................................................... passim

*Investment Vehicles v. KPMG, L.L.P.*,
   798 F.3d 113 (2d Cir. 2015) .....................................................................................................19

*IPCom GMBH & Co. KG v. Apple Inc.*,
   61 F. Supp. 3d 919 (N.D. Cal. 2014) ...................................................................................17, 24

*IS Prime Limited v. Glassdoor, Inc.*,
   No. 21-mc-80178-DMR, 2021 WL 5889373 (N.D. Cal. Dec. 13, 2021) ..................................25

*Knaggs v. Yahoo! Inc.*,
   No. 15-MC-80281-MEJ, 2016 WL 3916350 (N.D. Cal. July 20, 2016) ...................................28

*Matter of Degens*,
   No. 20MC237JGKRWL, 2020 WL 4252725 (S.D.N.Y. July 24, 2020)....................................25

*Mees v. Buiter*,
   793 F.3d 291 (2d Cir. 2015) ................................................................................................19, 25

*Minatec Finance S.A.R.L. v. SI Grp. Inc.*,
   Civ. No. 1:08–CV–269, 2008 WL 3884374 (N.D.N.Y. Aug. 18, 2008)...................................27

*Siemens AG v. W. Digital Corp.*,
   2013 WL 5947973 (C.D. Cal. Nov. 4, 2013) ...............................................................17, 22, 25

*Ukrnafta v. Carpatsky Petroleum Corp.*,
   C.A. No. 3:09-mc-265 (JBA), 2009 WL 2877156 (D. Conn. Aug 27, 2009) ...........................22

STATUTES

28 U.S.C. § 1782..................................................................................................................... passim

Rule 30(b)(6) .........................................................................................................................6, 27, 28

OTHER AUTHORITIES

Cayman Islands Companies Act § 238 .......................................................................2, 8, 9, 10, 15

*Corporate Morality and Management Buyouts*,
   41 WASH. & LEE L. REV ...........................................................................................................13

*In The Matter of Nord Anglia Education, Inc.,* FSD 235 OF 2017 .........................................9, 23, 27

*In the Matter of Nord Anglia Education, Inc.*, FSD 235 OF 2017 at ¶ 49 .................................23, 27

*Lyxor Asset Mgmt S.A. v. Phoenix Meridian Equity Ltd.*, 2009 ........................................23

*Phoenix Meridian Equity Limited v Lyxor Asset Management S.A. and Scotiabank & Trust (Cayman) Limited*...........................................................................................................26

PETITIONER'S APPLICATION FOR AN ORDER OF JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782
6272722-11

**APPLICATION**

Alpine Partners (BVI) L.P. (**"Petitioner"**) respectfully submits this application pursuant to 28 U.S.C. § 1782 (the **"Application"**) seeking an order: (a) granting Petitioner leave to serve a subpoena (the **"Subpoena"**) on Vivo Capital LLC (**"Vivo"**), Vivo Capital Fund IX (Cayman), LLC and Vivo Capital Fund IX (Cayman), L.P. (**"Vivo LP,"** and together, the **"Vivo Entities"** or **"Respondents"**), (b) directing the Vivo Entities to produce the narrowly-tailored materials described in the Subpoena within thirty (30) days of service of the Subpoena; (c) directing the Vivo Entities to provide a witness to appear for a Rule 30(b)(6) deposition in compliance with the Subpoena on a mutually agreeable date within a reasonable time after their confirmation of the final production of documents in response to the Subpoena; and (d) granting any and all other relief to Petitioner as deemed just and proper.

Petitioner respectfully asks the Court to provide the Vivo Entities with the opportunity to raise any objections to this Application within two weeks after Petitioner serves the Application and files proof of service.

**PRELIMINARY STATEMENT**

Petitioner respectfully submits this Application to take limited discovery from three related corporate entities that are found in this District for use in connection with an appraisal proceeding in the Cayman Islands (the "**Appraisal Proceeding**").  The Appraisal Proceeding was filed in the Grand Court of the Cayman Islands (the **"Grand Court"**) on March 28, 2022. Petitioner was previously a shareholder of New Frontier Health Corporation (**"NFH"** or the "**Company"**), a publicly-traded Cayman Islands company that was delisted from the New York Stock Exchange and taken private on January 26, 2022. As set forth below, the Grand Court in the Appraisal Proceeding is tasked with determining the fair value of Petitioner's shares of NFH, and the information Petitioner seeks from the Vivo Entities will significantly assist the Grand Court with that mandate.

Petitioner's shares were forcibly sold through what amounted to a management-led buyout of the Company (the **"Merger"**). Through the Merger, NFH's publicly traded shares were canceled in exchange for the right to receive $12.00 per ordinary share (the **"Merger Price"**). The Merger

1

was coercive and unfair to minority shareholders, both with respect to the Merger Price, which undervalued NFH's shares, and the conflicted process through which the Merger was approved. The Merger was led by three of the Company's managers—Mr. Wu, Mr. Leung, and Ms. Lipson—who were installed in 2019, and collectively controlled 43.4% of the Company's common stock. Teaming up with the Company's major shareholders, including Vivo, the buyer group that took the Company private (the **"Buyer Group"**) controlled 66.13% of the Company's common stock. In addition, other shareholders (who collectively held 4.11% of the Company's voting power) contracted in advance to exchange their shares for shares of the holding company that would control the Company following the Merger. Thus, more than 70% of the Company's shareholders were predetermined to vote for the deal. These investors—the overwhelming majority of NFH's shareholders—were not required to sell their shares for the Merger Price. Rather, they were able to roll their shares into the newly formed company. In other words, only 30% of the Company's investors had their shares forcibly sold for $12.00 per ordinary share.

The Merger process was riddled with conflicts and devoid of protections for minority investors. The Company's President, Mr. Wu, acted as a lead negotiator on behalf of the Buyer Group, adverse to the Company—a significant conflict. No effort was undertaken to shop the Company to competing bidders to ensure that NFH shareholders received fair value for their shares—rather, the Special Committee acceded to the wishes of the Buyer Group which sought to privatize the Company themselves and had no interest in selling to others. In addition, the Merger was pushed through without the consent of minority investors, and the deal featured mechanisms to ensure the Merger would be approved on terms the Buyer Group dictated. Notably, the Merger was not subject to a majority-of-the-minority condition. Moreover, the Buyer Group never budged from the $12.00 per ordinary share offer provided by the initial members of the Buyer Group that signed a consortium agreement (the **"Consortium Agreement"**) agreement in February 2021.

NFH filed the Appraisal Proceeding in the Grand Court pursuant to section 238 of the Companies Act (**"Section 238"** or **"s.238"**) on March 28, 2022, to obtain a judicial determination of the fair value of the Petitioner's shares and require the Company to pay the determined fair value instead of the Merger Price.

1   Through this Application, Petitioner seeks narrowly-tailored discovery pursuant to

2 28 U.S.C. § 1782 from the Vivo Entities, which funded the Company's acquisition of a Chinese

3 hospital operator in 2019; were significant shareholders with 10.85% of the Company's stock; and

4 maintained a director on the Company's Board both before and after the Merger.  In light of the

5 unique and significant role the Vivo Entities played with respect to the Merger Process, Petitioner

6 seeks narrowly-tailored discovery from them for use in the Appraisal Proceeding concerning the

7 valuation of the Company, the rationale for the going-private Merger, and the process through

8 which the Merger was negotiated.  The evidence sought through this Application will bear directly

9 on the central dispute at issue in the Appraisal Proceeding.

10   Section 1782 authorizes this Court to order discovery from any person or entity that resides

11 or is found in this District to assist with pending or contemplated proceedings before foreign

12 tribunals. Section 1782's broad applicability and "modest prima facie elements" reflect

13 "Congress's goal of providing equitable and efficacious discovery procedures." *In re Bayer AG*,

14 146 F.3d 188, 195 (3d Cir. 1998).

15   As described below, Petitioner's Application meets all of the statutory requirements of

16 Section 1782: (i) the Vivo Entities are "found" in the Northern District of California because they

17 are either organized under California law or maintain their headquarters in this District; (ii) the

18 requested discovery is "for use" in a foreign proceeding, namely the Appraisal Proceeding; and (iii)

19 Petitioner, as a claimant, is a party to the Appraisal Proceeding in the Cayman Islands.

20   In addition, each of the Supreme Court's factors that guide this Court's exercise of

21 discretion under Section 1782 tip decisively in favor of granting Petitioner's Application. *See Intel*

22 *Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264, 124 S. Ct. 2466, 2482, 159 L. Ed. 2d

23 355 (2004) ("*Intel*").

24   *First*, Petitioner seeks discovery from "nonparticipants" in the foreign action.  *Id.* The Vivo

25 Entities are not parties in the Appraisal Proceeding and will not be subject to discovery in the

26 Cayman Islands.

27   *Second*, Petitioner has shown that the Grand Court will be receptive to Section 1782

28 assistance. As discussed in the attached declaration of Rocco Cecere (the **"Cecere Declaration"**),

Petitioner will have the right to acquire and present evidence gathered under Section 1782 to the Grand Court in support of its claims. Likewise, as discussed in the Cayman appraisal decision, *In The Matter of Nord Anglia Education, Inc.,* FSD 235 OF 2017,[1] the Cayman Court will accept and consider the evidence sought here, given its critical importance in determining the fair value of NFH's shares.

   *Third,* the Application does not circumvent any foreign discovery restrictions in the Cayman Islands. There is no prohibition against obtaining non-party discovery through Section 1782 in aid of appraisal proceedings or other civil proceedings in the Cayman Islands.

   *Fourth*, the proposed discovery requests are not overly burdensome. Rather, the Subpoena is narrowly tailored to seek information directly relevant to the critical issues in the Appraisal Proceeding—namely, evidence addressing (1) the true value of Petitioner's NFH shares and (2) the process that NFH undertook to negotiate the Merger.

   Finally, as described in the accompanying Cecere Declaration, Petitioner requests Respondent's compliance without delay. Expedition of this Application and Respondent's time to comply with the Subpoena will permit sufficient time for (a) this Court's resolution of Petitioner's Section 1782 Application and any objections to the requested discovery; (b) Respondent's collection, review, and production of responsive documents; (c) Petitioner's counsel's review of documents produced by Respondent prior to the requested deposition of Respondent; and (d) Petitioner's timely submission of relevant documents to the Grand Court prior to the deadline for submission of evidence.

   Accordingly, in the event the Court grants Petitioner's Application, Petitioner respectfully asks the Court to direct the Vivo Entities to produce responsive documents within thirty days after service and submit to a deposition on a mutually beneficial date within a reasonable time after Respondent's confirmation of final production of documents.

---

[1] A copy of the decision is attached as Exhibit 8 to the expert declaration of Mr. Cecere.

PETITIONER'S APPLICATION FOR AN ORDER OF JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782
6272722-11

1

**FACTUAL BACKGROUND**

2

    A.       **Petitioner and NFH**

3

    Petitioner is a fund that invested in NFH and owned NFH ordinary shares immediately

4

before the effective date of the Merger that is the subject of the Appraisal Proceeding.  Cecere

5

Decl. ¶ 2.[2]

6

    NFH is an operator of hospitals in China.  *Id.* ¶ 9.  Before the Merger, NFH was a publicly-

7

traded Cayman Islands corporation.  *Id.* ¶ 10. The Company, initially named New Frontier

8

Corporation, was formed in 2018 as a special purpose acquisition company.  In 2019, the Company

9

acquired United Family Healthcare ("**UFH**"), a leading private healthcare provider offering

10

comprehensive premium healthcare services in China, and changed its name to "New Frontier

11

Health Corporation." The public offering price to take NFH public was $10 per share.  *Id.* ¶ 9.

12

    Three managers were installed to run the Company when it acquired UFH in 2019—

13

Roberta Lipson (CEO), Carl Wu (President), and Kam Chung Leung (Chairman of the Company's

14

board).  Together, Ms. Lipson, Mr. Wu, and Mr. Leung beneficially owned approximately 43.4%

15

of the Company's stock prior to the Merger. *Id.* ¶ 11. Public filings show that Mr. Leung and Mr.

16

Wu held a substantial portion of their shares of NFH through New Frontier Public Holding Ltd

17

("**NFPH**"), a company that Mr. Leung and Mr. Wu formed "solely for the purpose of investing in

18

securities" of NFH.  *Id.* ¶ 12.

19

    Vivo is an investment firm focused on the healthcare industry. *Id.* ¶ 13. The Company

20

sponsored the acquisition of UFH in 2019. Vivo LP and Vivo LLC were members of the Buyer

21

Group, and Vivo LP owned 10.85% of the Company prior to the Merger. *Id.* Vivo's Co-CEO and

22

Managing Partner, Shan Fu, served as a Company director before the Merger, and he remains a

23

director of the Company.  *Id.*

24

25

26

27

28

---

[2] "Cecere Decl." refers to the accompanying declaration of Rocco Cecere submitted in support of
Petitioners' Application.

**B.    The Merger**

In late 2020, NFPH—the investment company controlled by Mr. Wu and Mr. Leung—began to consider the possibility of a potential going-private transaction with respect to the Company.  (Definitive Proxy and Consent Solicitation Statement of the Company, dated December 2, 2021 (the **"Proxy"**) at 32.[3]).  *Id.* ¶ 15.  After preliminary discussions with existing shareholders of the Company in December 2020 and January 2021, NFPH and eleven other large Company shareholders entered into the Consortium Agreement on February 9, 2021, in which they agreed to work together to seek to take the Company private. *Id.* ¶ 16. Signatories to the Consortium Agreement included Mr. Leung, Ms. Lipson, Mr. Wu, and Vivo LP. *Id.* On the same day, NFPH submitted a proposal on behalf of the Buyer Group to acquire all outstanding shares of the Company for $12.00 per ordinary share.  *Id.* ¶ 17.

On February 25, 2021, the Company's Board of Directors (the **"Board"**) established a Special Committee to act for the Board with respect to the proposed going-private transaction with the Buyer Group. *Id.* ¶ 18.  Between February 2021 and August 4, 2021, the Special Committee and its advisors negotiated the terms of the proposed Merger between NFH and the Buyer Group. *Id.* ¶ 19. According to the Proxy, Mr. Wu—the President of the Company—acted as a representative of the Buyer Group in negotiations with the Special Committee. *Id.*

Notably, the Buyer Group collectively owned and controlled 58.43% of the voting shares of the Company. And NFPH (itself a member of the Buyer Group) held power to vote an additional 7.76% of the shares held by other investors. *Id.* ¶ 20. Together, the 66.19% of the voting shares held by the Buyer Group and NFPH would be rolled over into the newly formed company and were already contractually committed to vote in favor of the Merger in advance of the vote at the Company's Extraordinary General Meeting (**"EGM"**).  *Id.* ¶ 21. In addition, under the terms of certain rollover agreements (the **"Rollover Agreements"**), sixteen additional shareholders (the

---

[3] Proxy, Ex. (A)-(1) to Schedule 13E3/A, https://www.sec.gov/Archives/edgar/data/1737422/000110465921145918/tm2128451d3_ex-99a1.htm#TOC

PETITIONER'S APPLICATION FOR AN ORDER OF JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782
6272722-11

**"Rollover Shareholders"**) that together held 4.11% of the Company's common shares also contracted in advance to exchange their shares for shares of the holding company controlling NFH following the Merger. *Id.* Thus, the Proxy indicates that over 70% of the Company's voting shares were either committed or predetermined to vote in favor of the Merger. *Id.*  Although the Proxy indicates that the Special Committee was empowered to review and consider the terms and conditions of the Merger Agreement to determine whether the Merger was fair to the Company and its shareholders, the Special Committee ultimately approved a deal that is devoid of protections for minority shareholders. *Id.* ¶ 23. For example, the Special Committee abandoned its request that the Merger be subject to a majority-of-the-minority vote as a closing condition, which would have allowed minority shareholders to weigh in on the fairness of the transaction. *Id.*¶ 23.  In addition, the deal did not feature either a pre-signing market check or a "go-shop" period that would have provided a process for the Company to seek alternative offers. *Id.* ¶ 25. While a sales process to another buyer would have been illusory because the Buyer Group indicated they would not sell to anyone else, the absence of any market check is a critical fact and factor when assessing valuation. *Id.* ¶ 25.

Further, after it was provided with the Company's financial projections, on June 22, 2021, the Special Committee "request[ed] the Buyer Group to submit an improved offer with an increased merger price." *Id.*¶ 24.  The Buyer Group declined to do so, and the Special Committee abandoned this request as well. Thus, on August 4, 2021, the Special Committee determined the proposed merger agreement to be "fair," and the Company executed the merger agreement (the **"Merger Agreement"**) that day. *Id.* ¶ 30.

The Merger was approved during the Company's EGM held on January 7, 2022, and closed on January 26, 2022. Over a third of shareholders who were not committed to the Merger in advance voted against the deal. *Id.* ¶ 29.

As a result of the Merger, each of the Company's ordinary shares (other than those owned by the Company and the Buyer Group) were canceled and converted automatically into the right to receive $12.00 per share.

**C.**   **The Merger Was Unfair to Minority Shareholders and Substantially Undervalued NFH's Shares**

Petitioner and other former NFH minority stockholders believe the Merger price significantly undervalued NFH shares and that the Merger was coercive and unfair to NFH's minority shareholders.

*First*, the Merger was essentially a management buyout of the Company, a category of transaction that is inherently suspect. As one commentator has noted, "management buyout transactions violate . . . prohibitions against insider trading and otherwise provide management an unfair informational advantage in purchasing public companies."[4]  This is because "management has access to information concerning the value and future earnings of public companies not available to the general public."[5]  Further, "[t]he charge of insider trading becomes more egregious when the management group owns a controlling block of corporate shares prior to a buyout transaction and can unilaterally set the price which outside investors will receive for minority shares."[6]  Here, just two years after going public through a merger with a SPAC, Company insiders who collectively controlled 43.4% of the Company's common stock decided to take the Company private. Cecere Decl. ¶ 11. They teamed up with Vivo, among other shareholders, whose CEO was a director of the Company and which controlled another 10.85% of the Company's common stock. *Id.* ¶ 66.

*Second*, the Buyer Group ensured that over 70% of the Company's common stock was predetermined to vote in favor of the Merger in advance of the Company's EGM, allowing the Buyer Group to push the Merger through without the consent of minority shareholders. The Buyer Group collectively controlled 66.13% of the Company's common stock, and it was expressly agreed under the terms of the Merger and various supporting agreements that the Buyer Group and the Rollover Shareholders, who collectively controlled 70.3% of the Company's voting shares, were not required to cash out their shares in exchange for the Merger consideration.  Thus, unlike

---

[4] Stuart Robin Kaplan, *Corporate Morality and Management Buyouts*, 41 WASH. & LEE L. REV. 1015, 1016 (1984).
[5] *Id.*
[6] *Id.*

PETITIONER'S APPLICATION FOR AN ORDER OF JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782
6272722-11

the Company's minority shareholders, the shares held by the Buyer Group and the Rollover

Shareholders would be converted into shares of the surviving company, allowing them to continue

to be invested in the private, post-merger Company. Cecere Decl. ¶ 22.

*Third*, the Special Committee abandoned its request for a "majority-of-the-minority" vote

**("MoM")** as a closing condition. *Id.* ¶ 23. Such a condition would have required the proposed

transaction to be approved by a majority of shareholders *not* a part of the Buyer Group or Rollover

Shareholders. Without the protection of a MoM condition, the Buyer Group had the power to

impose the transaction on the minority shareholders without their consent. *Id.* ¶ 66.

*Fourth*, although Mr. Wu, President and a director of the Company, was charged with

fiduciary duties to the Company, he nonetheless acted as a lead negotiator on behalf of the Buyer

Group, in a position of potential conflict with his duties to the Company. *Id.* ¶ 19.

*Fifth*, the Merger Agreement did not provide for a competitive sales process. The Special

Committee decided not to conduct a pre-signing market check, did not request a "go-shop" period,

and indeed included an affirmative "no-shop" covenant in the Merger Agreement—requiring

Company representatives to immediately stop discussions or negotiations concerning any

alternative transaction to the Merger. *Id.* ¶ 25. This was because the management insiders who

orchestrated and controlled the sale were clear that they would not sell the Company to anyone

else. The absence of any market check on the proposed transaction is a key factor in assessing the

fairness (or lack thereof) the valuation. *Id.* ¶ 25.

*Sixth*, the Merger Agreement also called for payment of a termination fee between

$31,500,000 and $63,000,000 if the transaction was not consummated, significantly incentivizing

the Company to close the going-private deal with the Buyer Group and not to pursue a competing

offer. *Id.* ¶ 26.

With respect to the Merger Price, the Proxy details that on June 22, 2021, the Special

Committee asked the Buyer Group to submit an improved offer, however, the Buyer Group never

budged from the $12.00 per share offer from the initial members of the Buyer Group that signed

the Consortium Agreement in February 2021. *Id.* ¶ 24. The fact that the Special Committee still

approved the deal without any increase in the Merger Price indicates it was insufficient and that the Special Committee did not adequately protect minority investors.

### D.   The Cayman Islands Appraisal Proceeding

For the purposes of the Appraisal Proceeding, the Grand Court is under a statutory obligation, pursuant to Section 238, to decide the fair value of the dissenting shareholders' shares. As described in the accompanying declaration of Rocco Cecere (the **"Cecere Declaration"**), the parties to the Appraisal Proceeding—the Dissenting Shareholders and NFH—will submit evidence, expert testimony, and legal briefs to the Grand Court, which will weigh the evidence and decide on the fair value of Petitioner's shares. Cecere Decl. ¶ 38-42.

As set forth in greater detail in the Cecere Declaration, in assessing fair value in the Appraisal Proceeding, the Grand Court will examine the fairness (or lack thereof) of the process that led NFH's Board to approve the Merger. In doing so, the Grand Court will consider among other things, (i) the process by which the NFH board and/or Special Committee negotiated and approved the Merger price, and (ii) the valuations of the Company, including those created by company insiders and those who benefitted from the transaction.

### E.   Discovery in the Cayman Islands Appraisal Proceeding

As set forth in detail in the Cecere Declaration, there is no automatic discovery in Section 238 proceedings similar to the U.S.-style pre-trial discovery. *See* Cecere Decl. 37. Instead, the Court may order any party to the proceeding to provide discovery of "documents which are in their possession, custody or power relating to any matter in question between them in the action." *Id.*; Grand Court Rules ("**GCR**") Order 24 rule 3.  Discovery of non-parties, particularly those such as the Vivo Entities that are outside the Court's jurisdiction, is limited and rarely used. Cecere Decl. ¶¶ 46-7.

In light of the limited tools available to order discovery against non-parties to the proceedings, Cayman courts have held that 28 U.S.C. §1782 can be used to gather discovery in connection with Cayman Islands proceedings.  As explained by Mr. Cecere, Cayman Courts have considered the use of 28 U.S.C § 1782 in connection with Cayman Islands proceedings and have

1   held that it is permissible for a litigant to exercise any rights it may have under 28 U.S.C. § 1782 to

2   obtain relevant evidence for use in Cayman Islands proceedings." *Id.* ¶ 54.

3       Moreover, Cayman courts expect the parties to obtain the evidence they believe is necessary

4   to prosecute their case. *Id.* ¶ 39. Thus, there is no requirement to obtain permission from a Cayman

5   court before seeking relevant evidence abroad. *Id.* ¶ 62. Nonetheless, Petitioner intends to inform

6   the Grand Court and the other parties to the Appraisal Proceeding of the filing of this Section 1782

7   Application once the 1782 Application has been served." *Id.* ¶ 63.

8       **F.      The Discovery Sought From The Vivo Entities**

9       Petitioner seeks limited discovery from the Vivo Entities targeted squarely at issues central

10  to the Appraisal Proceeding. As noted above, Vivo, through its affiliates, owned 10.85% of NFH's

11  stock prior to the Merger; was a party to the initial Consortium Agreement in which several major

12  investors agreed to make an offer to purchase the Company; installed its co-CEO as a director of

13  NFH; and was ultimately a member of the Buyer Group that acquired the minority shares and took

14  the Company private.

15      Petitioner's Section 1782 Application seeks narrowly tailored discovery from the Vivo

16  Entities concerning: (i) the fair value of the Company; (ii) the negotiations leading to the approval

17  of the Merger; (iii) the Merger Consideration, (iv) the agreements executed in connection with the

18  Merger, including the Consortium Agreement; and (v) the actual or potential conflicts of interest

19  that existed when the Merger was negotiated (the "**Requested Discovery**"). The Requested

20  Discovery will significantly assist the Grand Court evaluate the Merger and come to an informed

21  determination of the fair value of the NFH shares subject to the Merger.

22                              **ARGUMENT**

23      Section 1782 of Title 28 of the United States Code permits United States district courts to

24  grant discovery for use in a pending foreign proceeding or a foreign proceeding. *Intel Corp. v.*

25  *Advanced Micro Devices, Inc.*, 542 U.S. 241, 243 (2004). The statute states in relevant part:

26          The district court of the district in which a person resides or is found
            may order him to give his testimony or statement or to produce a
27          document or other thing for use in a proceeding in a foreign or
            international tribunal . . . . The order may be made . . . upon the
28          application of any interested person.

28 U.S.C. § 1782.

Section 1782's broad applicability and "modest prima facie elements" reflect "Congress's goal of providing equitable and efficacious discovery procedures." *In re Bayer AG*, 146 F.3d 188, 195 (3d Cir. 1998). Moreover, applications under Section 1782 are often handled *ex parte* since parties "will be given adequate notice of any discovery taken pursuant to the request and will then have the opportunity to move to quash the discovery or to participate in it." *See, e.g., IPCom GMBH & Co. KG v. Apple Inc.*, 61 F. Supp. 3d 919, 922 (N.D. Cal. 2014) ("It is common for parties to file *ex parte* applications, as parties); *In re Med. Corp. Seishinkai*, No. 21-MC-80160-SVK, 2021 WL 3514072, at *2 (N.D. Cal. Aug. 10, 2021) ("Applications made under 28 U.S.C. § 1782 are typically considered on an ex parte basis")

An application made pursuant to Section 1782 must satisfy three threshold statutory requirements: (1) the discovery is sought from someone who resides or is found within the District; (2) the discovery is for use before a foreign tribunal; and (3) the applicant is an "interested person." *In re Republic of Ecuador*, 2010 WL 3702427, at *2 (N.D. Cal. Sept. 15, 2010); *see also In re Guido Gianasso,* 2012 WL 651647, at *1 (N.D. Cal. Feb. 28, 2012).

If these statutory requirements are met, the court then considers four discretionary "*Intel*" factors in deciding whether to grant a Section 1782 application: (1) whether the person from whom discovery is sought is a "nonparticipant in the matter arising abroad"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance;" (3) whether the request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States;" and (4) whether the request is "unduly intrusive or burdensome." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264-65 (2004).

None of these factors should be given more weight than the others, and no one factor is dispositive. *In re Mut. Assistance of Local Court of Wetzlar, Germany*, 2018 WL 2183966, at *3 (E.D. Cal. May 11, 2018). The discretionary factors "involve overlapping considerations, are considered collectively by the court in exercising its discretion, and are not stand-alone categorical

imperatives." *In Matter of Appl. of Action & Protection Foundation*, 2014 WL 2795832, at *5 (N.D. Cal. June 19, 2014). Indeed, in considering these factors, the Court is required to keep in mind "the twin aims of Section 1782: providing efficient assistance to participants in international litigation, and encouraging foreign countries by example to provide similar assistance to our courts." *In re Pioneer Corp. v. Technicolor, Inc.*, 2018 WL 4961911, at *4 (C.D. Cal. Sept. 12, 2018) (internal quotations and citations omitted).

## I.   PETITIONER SATISFIES THE THREE STATUTORY REQUIREMENTS OF 28 U.S.C. § 1782

Petitioner satisfies the three threshold statutory requirements of Section 1782: (1) the Vivo Entities are found in the Northern District of California; (2) the requested documents are for use in a foreign proceeding; and (3) as a claimant, Petitioner is an "interested person" in the foreign proceeding.

### A.   Respondents Reside in this District

Section 1782's first statutory prerequisite—that an entity "reside or be found" in a district—is satisfied when the entity is either headquartered or incorporated in the state.  *See In re Med. Corp. Seishinkai*, 2021 WL 3514072, at *2 ("[T]he subpoena seeks discovery from Google, which is located in this District."); *de Leon v. Clorox Co.*, No. 19-MC-80296-DMR, 2020 WL 4584204, at *5 (N.D. Cal. Aug. 10, 2020) (holding that a person was "found" pursuant to Section 1782 when they were a resident of the district); *Illumina Cambridge Ltd. v. Complete Genomics, Inc.*, No. 19-MC-80215-WHO(TSH), 2020 WL 820327, at *3 (N.D. Cal. Feb. 19, 2020) ("A business entity is 'found' in the judicial district where it is incorporated or headquartered."); *In re del Valle Ruiz*, 939 F.3d 520, 528 (2d Cir. 2019) ("We hold, accordingly, that § 1782's 'resides or is found' language extends to the limits of personal jurisdiction consistent with due process.").

Here, all the Vivo Entities maintain their principal place of business at 192 Lytton Ave., Palo Alto, CA 94301; they are thus "found" in this District for the purpose of Section 1782.  *See* Declaration of Lori Marks-Esterman Decl. ¶¶ 8-10.  Vivo is also "found" in this district because it is a California Limited Liability Company. *Id.* Accordingly, the first statutory requirement is satisfied with respect to each Respondent.

### B.   The Discovery Sought Is "For Use" In a Foreign Proceeding

The second statutory requirement is that the discovery sought is intended for use in a foreign proceeding. *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 258 (2004).  A Section 1782 application establishes the "for use" requirement by showing that the requested discovery may be submitted and "rel[ied] on" by the foreign tribunal.  *Certain Funds, Accounts and/or Investment Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 118 (2d Cir. 2015) (quoting *Intel*, 542 U.S. at 257-58).

To establish that the information sought is "for use" in a foreign proceeding, Petitioner must merely show that it has "the procedural right to submit the requested documents to" the foreign tribunal.  *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 132 (2d Cir. 2017).  Significantly, a Section 1782 petitioner is not required to demonstrate that the information sought would be discoverable or admissible in the foreign proceedings. *In re Request for Judicial Assistance from the Seoul Dist. Criminal Court*, 555 F.2d 720, 723 (9th Cir. 1977) ("[F]ederal courts, in responding to [§ 1782] requests, should not feel obliged to involve themselves in technical questions of foreign law relating to . . . the admissibility before [foreign] tribunals of the testimony or material sought."). Instead, the district court considers "the *practical ability* of an applicant to place a beneficial document—or the information it contains—before a foreign tribunal." *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 131 (2d Cir. 2017) (emphasis supplied); *Mees v. Buiter*, 793 F.3d 291, 298 (2d Cir. 2015) (materials sought can "be employed with some advantage or serve some use in the proceeding").

Here, as discussed in the Cecere Declaration, the Cayman Courts have considered the use of 28 U.S.C § 1782 in connection with Cayman Islands proceedings and have held that it is permissible for a litigant to exercise any rights it may have under the statute to obtain relevant evidence. Cecere Decl. ¶ 40; *see Qihoo 360 Technology Co., Ltd* (unreported, October 9, 2017 CICA) ("The sole task of the Court is to determine the fair value of the dissenters' shares. To do that, it needs full information.")). Given the significant role the Vivo Entities played as initial backers of NFH as a public company, significant shareholders, Board seat holders, and members of

1  the Buyer Group of the Company, the Grand Court is very likely to accept and consider the

2  Requested Discovery.

3        Moreover, there are no restrictions imposed under Cayman Islands' law limiting the ability

4  of parties in the Appraisal Proceeding to submit relevant documentary or testimonial evidence

5  obtained pursuant to Section 1782. Cecere Decl. ¶¶ 54-62.

6        Finally, the Requested Discovery is intended for use in the Appraisal Proceeding filed on

7  March 28, 2022. Cecere Decl. ¶ 34, 64. The Requester Discovery is therefore plainly "for use" in

8  the Appraisal Proceeding under Section 1782, and Petitioner has thus satisfied the second statutory

9  requirement. *See In re Appl. of Temporary Services Ins. Ltd*, 2009 WL 2843258, at *2 (W.D.N.Y

10  Aug. 28, 2009) (finding discovery sought for use in the Cayman proceeding satisfied this prong).

11        **C.    Petitioner is an "Interested Person"**

12        Finally, Section 1782 requires petitioners seeking discovery to show that they possess a

13  reasonable interest in the foreign proceedings. "Litigants are included among, and may be the most

14  common example of, the 'interested person[s]' who may invoke § 1782." *Intel*, 542 U.S. at 256; *In*

15  *Re Woori Bank*, No. 21-mc-80084-DMR, 2021 WL 2645812 at *3 (N.D. Cal. June 28, 2021)

16  ("Applicants are plaintiffs in the [foreign] Action, which makes them litigants and clearly

17  'interested persons' within the meaning of section 1782."); *In re Pioneer Corp. v. Technicolor,*

18  *Inc.*, 2018 WL 4961911, at *5 (C.D. Cal. Sept. 12, 2018) ("An 'interested person' includes, but not

19  limited to, parties in a foreign proceeding") (citing *Intel* at 256); *Akebia Therapeutics, Inc. v.*

20  *FibroGen, Inc.*, 793 F.3d 1108, 1110–11 (9th Cir. 2015) (a party to foreign proceedings "has a

21  'reasonable interest' in obtaining judicial assistance and, therefore, may apply for judicial

22  assistance pursuant to § 1782").  Because Petitioner is a claimant in the Appraisal Proceeding, it is

23  an "interested person" under Section 1782.

24        All of the statutory prerequisites necessary to commence a 1782 action are thus satisfied

25  here.

26

27

28

1

2

## II.   THE *INTEL* DISCRETIONARY FACTORS WEIGH STRONGLY IN FAVOR OF PERMITTING THE DISCOVERY PETITIONER SEEKS

3

4

Once the statutory threshold requirements of Section 1782 are met, the district court should

5

consider, in its discretion, whether to order the requested discovery.  To do this, the district court

6

looks to the four "*Intel* factors." *See Intel*, 542 U.S. at 264. *See In re Khrapunov*, 2017 WL

7

5625931, at *2 (N.D. Cal. Nov. 22, 2017). As noted above, these factors are: (1) whether the

8

person from whom discovery is sought is a "nonparticipant in the matter arising abroad"; (2) "the

9

nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity

10

of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance;"

11

(3) whether the request "conceals an attempt to circumvent foreign proof-gathering restrictions or

12

other policies of a foreign country or the United States;" and (4) whether the request is "unduly

13

intrusive or burdensome." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264-65

14

(2004).

Each of the *Intel* factors weighs in favor of granting the Application.

15

### A.   Respondent is Not A Party to the Appraisal Proceeding

16

The first *Intel* factor asks whether the party from whom discovery is sought is a party to the

17

foreign proceeding. The reason for this inquiry is because "when the person from whom discovery

18

is sought is a participant in the foreign proceeding . . . the need for § 1782(a) aid generally is not as

19

apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising

20

abroad." *Intel*, 542 U.S. at 264. As Mr. Cecere explains in his declaration, the Vivo Entities will not

21

be parties in the Appraisal Proceeding and therefore will not be subject to party discovery in the

22

Cayman Islands.  Cecere Decl. ¶¶ 45-6.  Further, as Vivo resides in the United States, the Grand

23

Court will not have jurisdiction to compel discovery from it. *Id.* ¶¶ 51-2.  Notably, both Vivo LP

24

and Vivo LLC appear to be special purpose entities formed to hold Vivo's investment in NFH.

25

Marks-Esterman Decl. ¶ 11.  Moreover, as discussed in the Cecere declaration, the scope of

26

discovery available from non-parties to the Appraisal Proceeding is limited. Cecere Decl. ¶¶ 45-53.

27

28

1    As the Vivo Entities will not be parties to the Appraisal Proceeding and Cayman procedural

2  law does not provide Petitioner any efficient means by which it can obtain the discovery sought in

3  its Application, this first *Intel* factor weighs in favor of granting the Application. *Ukrnafta v.*

4  *Carpatsky Petroleum Corp.*, C.A. No. 3:09-mc-265 (JBA), 2009 WL 2877156, at *5 (D. Conn.

5  Aug 27, 2009) (granting Section 1782 petition where discovery target was "not a participant, nor

6  [was] it expected to be a participant" in the subject foreign proceedings); *In re Application of*

7  *Biomet Orthopaedics Switzerland GMBH*, 742 Fed. App'x at 696 (3d Cir. 2018) (district court

8  erred in quashing 1782 application where petitioner could not obtain the discovery it needed under

9  German procedure).

10    **B.    The Cayman Islands Court Will Be Receptive to the Evidence Sought**

11    The second *Intel* factor requires courts to consider whether the "nature, attitude, and

12  procedures" of the foreign tribunal indicate that it is receptive to Section 1782 assistance.  This

13  factor "focuses on whether the foreign tribunal is willing to consider the information sought." *In re*

14  *Ex Parte Appl. Varian Med. Sys. Int'l AG*, 2016 WL 1161568, at *4 (N.D. Cal. Mar. 24, 2016).

15  There is a strong presumption that foreign tribunals will be receptive to evidence obtained in the

16  United States. "[W]hen evaluating whether foreign tribunals would accept U.S. assistance," courts

17  do not look for proof that the foreign tribunal will accept the evidence; to the contrary, they "'look

18  for 'authoritative proof that a foreign tribunal would *reject* evidence obtained with the aid of

19  section 1782.'" *Siemens AG v. W. Digital Corp.*, 2013 WL 5947973, at *3 (C.D. Cal. Nov. 4,

20  2013)") (quoting *Euromepa, S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1100 (2d Cir. 1995))

21  (emphasis in original). Thus, the party opposing a Section 1782 application has the burden to

22  present "*authoritative proof* that a foreign tribunal would reject evidence obtained with the aid of

23  section 1782." *In re Ex Parte Appl. Of Haruki Hattori*, No. 21-mc-80236-TSH, 2021 WL 4804375,

24  at *3 (N.D. Cal. Oct. 14, 2021) (emphasis added).  Absent such proof, this factor weighs in favor of

25  granting the application.

26    As discussed in the Cecere Declaration, Cayman courts will consider evidence that has a

27  bearing on determining the fair value of the company at issue. Cecere Decl. ¶¶ 38-44.  Moreover,

28  as set forth in the Cecere Declaration, Cayman courts have specifically held that it is permissible to

17

1   use a Section 1782 application to obtain discovery for use in Cayman Islands proceedings. *See*

2   Cecere Decl. ¶¶ 54-63 & Ex.[7]  Indeed, the Cayman Court of Appeal in *Lyxor Asset Mgmt S.A. v.*

3   *Phoenix Meridian Equity Ltd.*, 2009 CILR 553, expressly held that the right to obtain full

4   discovery, including pre-trial deposition testimony, "is a right conferred by U.S. law—it is not a

5   right conferred by, or *to be withheld under Cayman law*." (emphasis added). *Id.* ¶¶ 55-6, 59 &

6   Ex. (upholding trial court determination to allow the use of discovery obtained through 28 U.S.C. §

7   1782).

8          Similarly, discovery gathered pursuant to 1782 in an appraisal proceeding, *In the Matter of*

9   *Nord Anglia Education, Inc.,* FSD 235 OF 2017, was considered by the Cayman Islands court in its

10  decision that the fair value of the company's shares were above the merger consideration offered to

11  minority shareholders.  In *Nord*, the Cayman court expressly referred to the 2,900 documents

12  produced in the Section 1782 proceeding and stated that such documents "were obviously relevant

13  to advancing a reasoned critique of [a financial advisor's] DCF analysis." *In the Matter of Nord*

14  *Anglia Education, Inc.*, FSD 235 OF 2017 at ¶ 49; Cecere Decl. ¶ 61.

15         Further, multiple United States courts have recognized that Cayman courts are receptive to

16  evidence obtained through Section 1782. *In re Platinum Partners Value Arbitrage Fund L.P.*, 583

17  B.R. 803, 816 (Bankr. S.D.N.Y. 2018) ("In support of this assertion, the Liquidators present

18  unrebutted evidence that, far from being hostile to Cayman litigants seeking evidence under U.S.

19  law, Cayman courts are in fact receptive to evidence obtained through U.S. discovery procedures,

20  even if such evidence may not be discoverable under Cayman law."); *see Gushlak v. Gushlak*, 486

21  Fed. App'x 215, 218 (2d Cir. 2012) (affirming use of Section 1782 applications in connection with

22  Cayman divorce proceedings); *Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l*

23  *(USA) Ltd.*, 785 F. Supp. 2d 434, 439 (S.D.N.Y. 2011) (granting Section 1782 applications seeking

24

25  _____

26  [7] As explained by Mr. Cecere, "Cayman Courts have considered the use of 28 U.S.C § 1782 in
    connection with Cayman Islands proceedings and have held that it is permissible for a litigant to
27  exercise any rights it may have under 28 U.S.C. § 1782 to obtain relevant evidence for use in
    Cayman Islands proceedings." *Id.* ¶ 54.
28

documents for use in Cayman proceedings); *In re Penner*, 2017 WL 5632658, at *3 (D. Mass. Nov. 22, 2017) (finding that the Cayman court "is open to receiving § 1782 discovery").

Thus, in the Appraisal Proceeding, it is very likely that the Court will allow the Petitioner to use the Requested Discovery in evidence in support of its expert's valuation of the Dissenting Shareholders former shareholdings in the Company.  *See In re Ex Parte Appl. of Ambercroft Trading Ltd.*, 2018 WL 2867744, at *4 (N.D. Cal. June 11, 2018); *IPCom GMBH & Co. KG v. Apple Inc.*, 61 F. Supp. 3d 919, 924 (N.D. Cal. 2014) (rejecting the argument that subpoena issued pursuant to Section 1782 should be quashed because there was a "low probability" the information would be relevant to the foreign proceeding); *In re Watanabe*, No. 22-mc-80060-VKD, 2022 WL 961746 at *4 (N.D. Cal. Mar. 30, 2022) ("[I]n the absence of evidence that a [foreign] court would object to Mr. Watanabe's obtaining and using the information sought in the subpoena, or that it would object more generally to the judicial assistance of U.S. federal courts, the Court concludes that this factor weighs in favor of authorizing service of the subpoenas."); *Varian Med. Sys*., 2016 WL 1161568, at *4 ("In the absence of authoritative proof that a foreign tribunal would reject evidence obtained with the aid of section 1782," courts tend to "err on the side of permitting discovery.").

Accordingly, this factor also weighs in favor of granting the Application.

## C.    Petitioner Is Not Circumventing Any Foreign Restrictions

The third *Intel* factor looks to "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265.  This factor examines whether the foreign court actively prohibits the petitioner from gathering the information sought.  The third factor applies only in extreme circumstances where a Section 1782 application would circumvent foreign "proof-gathering restrictions," which are "rules akin to privileges that prohibit the acquisition or use of certain materials."  Thus, "[t]hat a country does not enable broad discovery within a litigation does not mean that it has a policy that restricts parties from obtaining evidence through other lawful means." *Mees v. Buiter*, 793 F.3d 291, 303 n.20 (2d Cir. 2015).  Only if the foreign law "prohibits [petitioner] from availing [it]self of foreign procedural mechanisms such as § 1782" will this *Intel*

factor apply. *Matter of Degens*, No. 20MC237JGKRWL, 2020 WL 4252725, at *5 (S.D.N.Y. July 24, 2020); *see Intel*, 542 U.S. at 261 (holding that § 1782 contains no foreign discoverability requirement" and explaining that "[a] foreign nation may limit discovery within its domain for reasons peculiar to its own legal practices, culture, or traditions—reasons that do not necessarily signal objection to aid from United States federal courts."); *Siemens AG*, 2013 WL 5947973, at *3 ("Even if Siemens is attempting to bypass the technical requirements of German discovery, the Court is unpersuaded that these technical requirements constitute 'foreign proof-gathering restrictions.'"). *See also IS Prime Limited v. Glassdoor, Inc.*, No. 21-mc-80178-DMR, 2021 WL 5889373 at *3 (N.D. Cal. Dec. 13, 2021). Notably, there is no requirement to seek permission from the foreign court, or exhaust one's remedies in the foreign court first. *Gorsoan Limited v. Bullock*, 652 Fed. Appx. 7, 9 (2d Cir. 2016) ("A district court, moreover, may not refuse a request for discovery pursuant to § 1782 because a foreign tribunal has not yet had the opportunity to consider the discovery request."); *see also de Leon v. Clorox Company,* 2020 WL 4584204, at *8 (N.D. Cal. Aug 10, 2020) (no requirement to first seek discovery in foreign tribunal); *Illumina Cambridge Ltd. v. Complete Genomics, Inc.,* 2020 WL 820327, at *6 (N.D. Cal. Feb. 19, 2020) (no exhaustion requirement)*;In re Application of Joint Stock Co. Raiffeinsenbank*, 2016 WL 6474224, at *6 (N.D. Cal. Nov. 2, 2016).

Here, the discovery sought does not attempt to circumvent any proof-gathering restrictions in the Cayman Islands. On the contrary, as Mr. Cecere explains, "Cayman courts expect the parties to obtain the evidence they believe is necessary to prosecute their case" and "[t]hus there is no requirement to obtain permission from a Cayman Islands court before seeking relevant evidence abroad." Cecere Decl. ¶ 62. Further, the Cayman Islands Court of Appeal has held that "*prima facie* a party who can invoke the jurisdiction of the US District Court under § 1782 may choose to do so." *See Phoenix Meridian Equity Limited v Lyxor Asset Management S.A. and Scotiabank & Trust (Cayman) Limited* [2009 CILR 553]; Cecere Decl. ¶ 56-7, 59.

Moreover, as set forth in the Cecere Declaration, there are no feasible or practical means in the Appraisal Proceeding by which Petitioner can obtain the scope of discovery it seeks here. *Id.* ¶ 47. Despite the unique role the Vivo Entities played as financial backers of the Company's public

1  offering, parties to the initial Consortium Agreement, significant shareholders, and ultimately

2  members of the Buyer Group, the Vivo Entities will not be parties to the Appraisal Proceeding.

3  Further the Grand Court will not have the power to compel Vivo to produce the evidence sought

4  because the Grand Court does not have jurisdiction over it. *Id.* ¶ 51-2. Moreover, the scope of

5  discovery available from non-parties to the Appraisal Proceeding in the Cayman Islands is limited.

6  *Id.* ¶ 63.

7        This factor, therefore, weighs in favor of granting the Application.

8       **D.**     **The Subpoena Is Not Unduly Burdensome**

9        The final *Intel* factor looks to whether the discovery requests are "unduly intrusive or

10  burdensome." *Intel*, 542 U.S. at 265. The standard is substantially the same as in ordinary domestic

11  civil litigation under the Federal Rules of Civil Procedure. *In re Bayer AG*, 146 F.3d 188, 195 (3d

12  Cir. 1998) ("The reference in § 1782 to the Federal Rules suggests that under ordinary

13  circumstances the standards for discovery under those rules should also apply when discovery is

14  sought under the statute."); *Varian Med. Sys. Int'l AG*, 2016 WL 1161568, at *5 ("The proper

15  scope of discovery arising out of a § 1782 application is generally determined by the Federal Rules

16  of Civil Procedure.").

17       **1.**     **The Subpoena is Properly Limited In Scope**

18        Here, the Subpoena is narrowly tailored both with respect to the time period and subject

19  matter of the requests.

20        *First*, Petitioner only seeks documents and information relevant to the two critical issues in

21  the Appraisal Proceeding—(i) the valuation of the Company and (ii) the process undertaken to

22  negotiate the terms of the Merger.  These issues will be of paramount importance in the Appraisal

23  Proceeding.  Cecere Decl. ¶¶ 68-71.  As noted above, in the recent appraisal decision, *In the Matter*

24  *of Nord Anglia Education, Inc.,* FSD 235 OF 2017, the Cayman court expressly referred to the

25  2,900 documents concerning that Company's valuation that were produced in a Section 1782

26  proceeding which it found were "obviously relevant" to critiquing a financial advisor's analysis.  *In*

27  *the Matter of Nord Anglia Education, Inc.*, FSD 235 OF 2017 at ¶ 49; Cecere Decl. ¶ 61.  Thus,

28  there can be no dispute that the Requested Discovery outlined in the Subpoena will be critical in

the underlying Appraisal Proceeding—where the Grand Court will again be tasked with determining the fair value of the delisted shares.  *Id.* ¶ 65.

*Second*, the discovery requests are also limited to (1) the period during which the NFH board has reported in public filings that it was negotiating the transaction with the Buyer Group and (2) documents that specifically concern the Company's valuation between the time it acquired UFH in 2019 and the Merger. Cecere Decl. ¶ 8, 68; *see In re Gushlak*, No. 11–MC–218 (NGG), 2011 WL 3651268, at *6 (E.D.N.Y. Aug. 17, 2011) (holding that a Section 1782 request, like any other discovery request, is "reasonably calculated to lead to relevant [material] if there is any possibility that the information sought may be relevant to the subject matter of the action") (internal quotation marks omitted); *First Am. Corp. v. Price Waterhouse LLP*, 154 F.3d 16, 23 (2d Cir. 1998) (finding a subpoena to be reasonable in scope when it sought documents that concern "the precise subject matter of the underlying [proceedings]"); *Minatec Finance S.A.R.L. v. SI Grp. Inc.*, Civ. No. 1:08–CV–269 (LEK/RFT), 2008 WL 3884374, at *8 (N.D.N.Y. Aug. 18, 2008) (granting application with respect to "specifically and narrowly tailored" requests).

*Third*, Petitioner seeks to meet and confer with the Vivo Entities in an effort to exclude any discovery in the Vivo Entities' possession that the Company has agreed to produce in the underlying Appraisal Proceeding or that is publicly available.  Petitioner is not seeking to overburden the Vivo Entities with the production of troves of data—it merely seeks the critical evidence in its possession that cannot be obtained in the underlying proceeding.

### 2.   A Rule 30(b)(6) Deposition is Appropriate Here

Given the central role the Vivo Entities played in this matter, a 30(b)(6) deposition of a corporate representative is appropriate and will significantly aid the Cayman Court in reaching a reasoned decision.  As district courts have noted in other 1782 applications, Rule 30(b)(6) "depositions of corporate officers are standard practice in U.S. civil litigation and are not burdensome," and may properly be ordered in a 1782 Application.  *HRC-Hainan Holding Co., LLC v. Yihan Hu*, No. 19-MC-80277-TSH, 2020 WL 906719, at *15 (N.D. Cal. Feb. 25, 2020) (holding that a 30(b)(6) deposition sought through a 1782 application was appropriate and not burdensome; "the Rules of Civil Procedure themselves ensure that the length, time and place of the deposition do

1  not impose an undue burden.") (internal citation omitted); *Knaggs v. Yahoo! Inc.*, No. 15-MC-

2  80281-MEJ, 2016 WL 3916350, at *8 (N.D. Cal. July 20, 2016) (granting 1782 petitioner's request

3  for a corporate deposition; "Yahoo must designate one or more witnesses to sit for a

4  Rule 30(b)(6) deposition on the foregoing topics."); *In re Mother's Milk, Inc.,* 5:20-MC-00004-M,

5  2020 WL 2514315, at*5 (S.D.N.Y. May 15, 2020) (permitting 30(b)(6) deposition because it

6  would "provide helpful evidence to the Korean court in moving the case forward."); *In re Accent*

7  *Delight Int'l Ltd.*, 16-MC-125, 2018 WL 2849724 (S.D.N.Y. June 11, 2018) (same).

8       Finally, to the extent that the Court believes any request is overly broad, granting the

9  Application will not preclude the Vivo Entities "from bringing a motion to quash or modify" the

10  discovery sought. *See In re Appl. Of Joint Stock Co. Raiffeinsenbank*, No. 16-mc-80203-MEJ, 2016

11  WL 6474224, at *7 (N.D. Cal. Nov. 2, 2016); *In re Republic of Ecuador*, 2010 WL 3702427, at *5

12  ("[T]he Court's ruling here does not preclude Mr. Borja ... from contesting the subpoena based on

13  undue intrusion or burden or based on other grounds (*e.g.*, overbreadth)."); *In re Ex Parte Appl. of*

14  *Ambercroft Trading Ltd.*, 2018 WL 2867744, at *5. If the Court finds any merit to such objections,

15  "it is far preferable for a district court to reconcile whatever misgivings it may have about the

16  impact of its participation in the foreign litigation by issuing a closely tailored discovery order

17  rather than by simply denying relief outright." *Euromepa, S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095,

18  1101 (2d Cir. 1995).

19       Accordingly, all of the *Intel* factors weigh in favor of granting Petitioner's Application.

20       **E.    Expedited Review of Petitioner's Application Is Warranted**

21       In the event the Court grants Petitioner's Application, Petitioner respectfully requests that

22  the Court direct Respondent to produce responsive documents within 30 days of service and submit

23  to a deposition on a mutually beneficial date within a reasonable time after Respondents'

24  confirmation of final production of documents. Petitioner requests Respondents' compliance

25  without delay. Expedition of this Application and Respondent's time to comply with the Subpoena

26  will permit sufficient time for (a) this Court's resolution of Petitioner's Section 1782 Application

27  and any objections to the Subpoena; (b) Respondents' collection, review, and production of

28

1  responsive documents; (c) Petitioner's counsel's review of documents produced by Respondents;

2  and (d) Petitioner's timely submission of relevant documents to the court.

3  <u>**CONCLUSION**</u>

4        For the foregoing reasons, Petitioner respectfully requests that the Court grant its petition

5  for an order pursuant to 28 U.S.C. § 1782, and (a) grant Petitioner leave to serve the proposed

6  Subpoena on the Vivo Entities (b) direct the Vivo Entities to produce all materials described in the

7  Subpoena within thirty (30) days of service; (c) direct to provide a witness to appear for a 30(b)(6)

8  deposition in compliance with the Subpoena on a mutually agreeable date within a reasonable time

9  of the Vivo Entities' confirmation of final production of documents in response to the Subpoena;

10  and (e) grant any and all other relief to Petitioner as deemed just and proper.

11  Dated: May 16, 2022

12

13                       By:   */s/ Frank Busch*

14                           **WAGSTAFFE, VON LOEWENFELDT BUSCH & RADWICK LLP**

15                           James M. Wagstaffe (95535)

16                           Frank Busch (258288)
                         101 Pine Street, Suite 725

17                           San Francisco, CA 94111
                         Telephone: (415) 357-8900

18                           Fax: (415) 357-8910

19                           wagstaffe@wvbrlaw.com
                         busch@wvbrlaw.com

20

21                           **OLSHAN FROME WOLOSKY LLP**

22                           Lori Marks-Esterman

23                           (*pro hac vice to be submitted*)
                         Theodore J. Hawkins

24                           (*pro hac vice to be submitted*)
                         1325 Avenue of the Americas

25                           New York, New York 10019
                         (212) 451-2300

26

27                           *Counsel for Petitioner Alpine Partners (BVI) L.P.*

28