1 | **WAGSTAFFE, VON LOEWENFELDT**
**BUSCH & RADWICK LLP**
2 | JAMES M. WAGSTAFFE (95535)
FRANK BUSCH (258288)
3 | 101 Pine Street, Suite 725
San Francisco, CA 94111
4 | Telephone: (415) 357-8900
Fax: (415) 357-8910
5 | wagstaffe@wvbrlaw.com
busch@wvbrlaw.com
6 |
7 | **OLSHAN FROME WOLOSKY LLP**
LORI MARKS-ESTERMAN (*pro hac vice to be submitted*)
8 | THEODORE J. HAWKINS (*pro hac vice to be submitted*)
1325 Avenue of the Americas
9 | New York, New York 10019
Telephone: (212) 451-2300
10 | Fax: 212-451-2222
lmarksesterman@olshanlaw.com
11 | thawkins@olshanlaw.com

12 | *Counsel for Petitioner Alpine Partners (BVI) L.P.*

13 | **UNITED STATES DISTRICT COURT**

14 | **NORTHERN DISTRICT OF CALIFORNIA**

15 | **SAN JOSE DIVISION**

16 |
17 | In re Application of                                    | **Case No. 22-**
18 | ALPINE PARTNERS (BVI), L.P.
   | **DECLARATION OF ROCCO CECERE**
   | **IN SUPPORT OF PETITIONER'S**
   | **APPLICATION FOR AN ORDER OF**
19 | Petitioner, for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery For Use In a Foreign Proceeding.   | **JUDICIAL ASSISTANCE**
   | **PURSUANT TO 28 U.S.C. § 1782**
20 |

21 | I, Rocco Cecere, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that

22 | the following is true and correct:

23 | 1.      I am an attorney licensed to practice law in the Cayman Islands and admitted to

24 | practice before the courts of the Cayman Islands ("**Cayman Courts**"). I am a Partner of the law firm

25 | of Collas Crill and head of the firm's s.238 merger appraisal team. I am an experienced offshore

26 | commercial litigator with substantial knowledge of Cayman Islands law governing corporate and

27 | cross border shareholder disputes before the Cayman Courts.

28 |

2.     I represent petitioner Alpine Partners (BVI) L.P. ("**Petitioner**") in an appraisal proceeding (the "**Appraisal Proceeding**") pending before the Grand Court of the Cayman Islands (the "**Grand Court**"). Petitioner, along with other former shareholders (the **"Dissenting Shareholders"**) of New Frontier Health Corporation (the "**Company**"), were shareholders of the Company prior to the Company completing its going-private merger on January 25, 2022 (the **"Merger"**).

3.     I submit this declaration in support of Petitioner's application seeking an order pursuant to 28 U.S.C. § 1782 ("Section 1782") to obtain discovery in the United States from Vivo Capital LLC (**"Vivo"**), Vivo Capital Fund IX (Cayman), LLC (**"Vivo LLC"**) and Vivo Capital Fund IX (Cayman), L.P.  (**"Vivo LP"** and together with Vivo and Vivo LLC, the **"Vivo Entities"** or **"Respondents"**) for use in the Appraisal Proceeding (the "**Application**").

4.     This declaration, *inter alia*, (1) provides the factual background of the Appraisal Proceeding and the relief sought therein, and (2) describes the nature of a statutory appraisal proceeding under Cayman Islands law, as well as certain evidentiary matters related to such proceedings.

5.     To the extent that the contents of this declaration are within my personal knowledge, they are accurate and correct.  Insofar as they are not within my personal knowledge, they are true to the best of my knowledge and belief.

I.     **Background**

   A.     **Overview**

6.     As set out in the Company's petition filed in the Grand Court, each Dissenting Shareholder complied with the statutory requirements under section 238 of the Cayman Islands Companies Act ("**Section 238**") to exercise their respective appraisal rights. Section 238 allows shareholders to object to and subsequently dissent from a merger, and demand payment of the fair value of their shares, if they believe that the price offered for their shares is not fair. In accordance

with Section 238, Petitioner filed a petition in the Grand Court on March 28, 2022, commencing the Appraisal Proceeding. The Company also filed a petition in the Grand Court on March 28, 2022, shortly after the Petitioner filed its petition. The purpose of the Appraisal Proceeding is for the Grand Court to determine the fair value of the Dissenting Shareholders' former shareholdings in the Company.

7.      The Merger was a management-led take-private merger transaction orchestrated by the Company's board and senior management, where the buyer group held more than 58% of the Company's voting shares (the **"Buyer Group"**). (Definitive Proxy and Consent Solicitation Statement of the Company, dated December 2, 2021 (the **"Proxy"**) at 12, 15.[1]) In addition, New Frontier Public Holding Ltd ("**NFPH**"), a member of the buyer group, held power to vote an additional 10,237,559 shares held by certain shareholders of the Company, which was 7.76% of the total 131,847,694 outstanding shares. Vivo, through its affiliates, owned 10.85% of the Company's common shares prior to the Merger (Proxy at 62); it was a party to the initial consortium agreement in which several major investors agreed to make an offer to purchase the Company (Proxy at 16); and was ultimately a member of the Buyer Group that acquired the minority shares and took the Company private (Proxy at 3).

8.      Petitioner's Application seeks narrowly-tailored discovery relating to the valuation of the Company, including evidence concerning the negotiations leading to the approval of the Merger. The information sought in this Application will assist the Grand Court in determining the fair value of the Dissenting Shareholders' shares.

---

[1] Proxy, Ex. (A)-(1) to Schedule 13E3/A,
https://www.sec.gov/Archives/edgar/data/1737422/000110465921145918/tm2128451d3_ex-99a1.htm#TOC

DECLARATION OF ROCCO CECERE

6287676-4

**B.    The Relevant Parties and Players**

9.    The Company, a Cayman Islands exempted company, is an operator of hospitals in China.[2]  The Company, initially named New Frontier Corporation, was formed in 2018 as a special purpose acquisition company.  In 2019, the Company acquired United Family Healthcare ("**UFH**"), a leading private healthcare provider offering comprehensive premium healthcare services in China, and changed its name to "New Frontier Health Corporation."[3] The UFH platform consists of a network of seven private hospitals and affiliated ambulatory clinics.[4]  The public offering price to take New Frontier Corporation public was US$10 per ordinary share.[5]

10.    Until shortly after the completion of the Merger, the Company was publicly listed on the New York Stock Exchange ("**NYSE**").

11.    Following the 2019 acquisition of UFH, three managers were installed to run the Company—Roberta Lipson (CEO), Carl Wu (President), and Kam Chung Leung (Chairman of the Company's board) (the "**Directors**"). (Proxy at F-2-3.) Together, the Directors beneficially owned approximately 43.4% of the Company's stock prior to the Merger. (Proxy at 109.)

12.    Public filings show that Mr. Leung and Mr. Wu held a substantial portion of their shares of the Company through NFPH, a Cayman Islands exempted company.[6] According to the Proxy, Mr. Leung and Mr. Carl Wu owned and controlled NFPH, and the Company was formed

---

[2] *See* Proxy at 1, 2, C-1; Press Release, dated 12/19/2019, https://www.globenewswire.com/en/news-release/2019/12/19/1962814/0/en/New-Frontier-Corporation-Completes-Acquisition-of-United-Family-Healthcare.html.
[3] https://www.globenewswire.com/en/news-release/2019/12/19/1962814/0/en/New-Frontier-Corporation-Completes-Acquisition-of-United-Family-Healthcare.html; *see also* Proxy at 1, 2, C-1.
[4] *Id.*; *see also* https://ufh.com.cn/en/.
[5] *See* https://vivocapital.com/Vivo-Capital-to-Sponsor-New-Frontier-Corporations-Acquisition-of-United-Family-Healthcare.
[6] SEC Schedule 13D dated February 16, 2021, https://www.sec.gov/Archives/edgar/data/1737422/000110465921022597/tm216312d1_sc13d.htm.

DECLARATION OF ROCCO CECERE

6287676-4

"solely for the purpose of investing in securities" of the Company. Public filings indicate NFPH was formed in 2018.[7]

13.    Vivo is an investment firm focused on the healthcare industry. (Proxy at 3.) The Vivo Entities were members of the group of initial investors that funded the merger between the Company and UFH.[8] Vivo LP and Vivo LLC were members of the Buyer Group. (Proxy at 3.) Vivo LP owned 10.85% of the Company prior to the Merger. (Proxy at 62.) Vivo's Co-CEO and Managing Partner, Shan Fu, served as a Company director before the Merger, and, to the best of my knowledge as of the date of this Declaration, he remains a director of the Company.[9]

**C.    The Merger**

14.    Two years after the acquisition of UFH, the Company's board and senior management orchestrated what was essentially a management buyout: the Merger was led by the Directors, who collectively controlled 43.4% of the Company's common stock. (Proxy at 109.) They worked together with Vivo, a sponsor of the 2019 acquisition of UFH, whose CEO (Shan Fu) was a director of the Company, and which controlled another 10.85% of the Company's common stock. (Proxy at 3, 62, F-2-4.)

15.    Specifically, in late 2020, NFPH—the investment company controlled by Mr. Wu and Mr. Leung—began to consider the possibility of a potential going-private transaction with respect to the Company. (Proxy at 32.)

16.    NFPH and eleven other large Company shareholders entered into a Consortium Agreement on February 9, 2021, in which they agreed to work together to seek to take the Company

---

[7] *See* SEC Form 3 dated 27, 2018, at https://www.sec.gov/Archives/edgar/data/0001744943/000114420418036187/xslF345X02/tv497466_form3.xml.

[8] *See* https://vivocapital.com/Vivo-Capital-to-Sponsor-New-Frontier-Corporations-Acquisition-of-United-Family-Healthcare.

[9] *See* New Frontier Health Corporation Directors and Advisors, https://www.new-frontier.com/en/directors-and-senior-advisors/.

5

DECLARATION OF ROCCO CECERE

private.  Signatories to the Consortium Agreement included Mr. Leung, Ms. Lipson, Mr. Wu, and Vivo LP. (Proxy at 16.)

17.     On the same day, NFPH submitted a proposal on behalf of the Buyer Group to acquire all outstanding ordinary shares of the Company for $12.00 per share.  (*Id.*)

18.     On February 25, 2021, the Company's Board of Directors (the **"Board"**) established a Special Committee to act for the Board with respect to the proposed going-private transaction with the Buyer Group. The Special Committee engaged Davis Polk & Wardwell LLP as its legal counsel on March 11, 2021, and Duff & Phelps as its financial advisor on March 13, 2021. (Proxy at 16, 32.)

19.     Between February 2021 and August 4, 2021, the Special Committee and its advisors negotiated the terms of the proposed Merger between the Company and the Buyer Group.  According to the Proxy, Mr. Wu, the President of the Company, acted as a lead negotiator for the Buyer Group. (Proxy at 36, 38.)

20.     Notably, the Buyer Group collectively owned and controlled 58.43% of the voting shares of the Company and NFPH (itself a member of the Buyer Group) held the power to vote an additional 7.76% of the shares held by other investors.  Under the terms of a support agreement (the "**Support Agreement**"), the members of the Buyer Group that held equity in the Company agreed to vote in favor the merger agreement.  (Proxy at vi, xi.)

21.     In addition, under the terms of certain rollover agreements (the **"Rollover Agreements"**), sixteen additional Company shareholders (the **"Rollover Shareholders"**) that together held 4.11% of the Company's common shares contracted in advance to exchange their shares for shares of the holding company that would control the Company following the Merger. The Buyer Group, NFPH and the Rollover Shareholders collectively controlled 70.3% of the Company's voting shares, which shares were either contractually committed or likely predetermined to vote in favor of the Merger in advance of the Company's EGM. (Proxy at vi, 15, 67-68.)

Declaration of Rocco Cecere

6287676-4

22.     Further, under the terms of the Merger Agreement and the various supporting agreements, the Buyer Group and the Rollover Shareholders were not required to cash out their shares in the Company in exchange for the Merger consideration. (Proxy at 58-9.) Thus, unlike the Company's minority shareholders, the shares held by the Buyer Group and the Rollover Shareholders would be converted into shares of the surviving company, allowing them to continue to be invested in the private, post-merger Company.

23.     Although the Proxy indicates that the Special Committee was empowered to review and consider the terms and conditions of the Merger Agreement to determine whether the Merger was fair to the Company and its shareholders, the Special Committee ultimately approved a deal that omitted a number of minority shareholder protections. For example, the Special Committee abandoned its request that the Merger be subject to a majority-of-the-minority vote (**"MoM"**) as a closing condition. Such a condition would have required the proposed transaction to be approved by a majority of shareholders *not* a part of the Buyer Group or Rollover Shareholders—allowing minority shareholders to weigh-in on the fairness of the transaction. (Proxy at 36.)

24.     Further, after having been provided with the Company's financial projections, on June 22, 2021, the Special Committee "request[ed] the Buyer Group to submit an improved offer with an increased merger price." (Proxy at 35.) The Buyer Group declined to do so, and the Special Committee abandoned this request as well. (Proxy at 36.) The Buyer Group never moved from the $12.00 per share offer provided for by the initial members of the Buyer Group that signed the Consortium Agreement agreed in February 2021. (Proxy at 19, 21, 40.)

25.     In addition, the merger process was not a competitive sales process. The Special Committee decided not to conduct a pre-signing market check, and also did not request a "go-shop" period, which would have provided a process for the Company to seek alternative offers.  (Proxy at 34.) In addition, the Merger Agreement included an affirmative "no shop" covenant, requiring

7

Company representatives to immediately stop discussions or negotiations concerning any alternative transaction to the Merger. (Proxy at 34.) This was because the management insiders who orchestrated and controlled the sale were clear that they would not sell the Company to anyone else. (Proxy at 58.) The presence of any market check on the proposed transaction is a factor in assessing the fairness (or lack thereof) the valuation.

26.     The merger agreement also called for payment of a termination fee if the transaction was not consummated. (Proxy at 34-5, 40.) Under the terms of the Merger Agreement, the Company would have to pay the Buyer Group's holding company between $31,500,000 and $63,000,000 if the transaction with the Buyer Group did not come to fruition.

27.     On August 4, 2021, the Special Committee determined the proposed merger agreement to be "fair," and the Company executed the merger agreement (the **"Merger Agreement"**) that day. (Proxy at 37-8.)

28.     Under the terms of the merger agreement, a subsidiary of Unicorn II Parent Limited ("**Unicorn II Parent**"), a Cayman Islands exempted company, would merge into the Company, with the Company surviving and becoming a wholly-owned subsidiary of Unicorn II Parent. (Proxy at i.) The Buyer Group would then own and control the Company through a private holding company, Unicorn II Holdings Limited, which would wholly-own Unicorn II Parent. (*Id.*)

29.     Subject to the terms and conditions of the merger agreement, at the effective time of the Merger, each of the Company's ordinary shares (other than those owned by the Company, the Buyer Group and the Rollover Shareholders) would be canceled and converted automatically into the right to receive $12.00 in cash (the "**Merger Price"**). (Proxy at 10.)

30.     The Merger was approved at an EGM of the Company held on January 7, 2022, and closed on January 26, 2022. (Proxy at i, x.)  Given that a statutory majority of 66.6% of votes was required to approve the deal, and that the Buyer Group, NFPH and the Rollover Shareholders

DECLARATION OF ROCCO CECERE

6287676-4

collectively controlled over 70% of the Company's voting shares, the result was a foregone conclusion. It appears from the figures provided in the Company's petition that approximately 11.6% of shareholders dissented. A true and correct copy of the press release announcing the closing of the Merger is attached hereto as **Exhibit 1**.

31.  As a result of the Merger, the trading of shares and warrants of the Company and the NYSE was suspended and the Company became a private company beneficially owned by the Buyer Group. (*See* Proxy at 22.)

32.  Based on the evidence, the Dissenting Shareholders intend to prove that the Merger Price undervalued the Company's shares.

**II.    The Appraisal Proceeding**

33.  Pursuant to Section 238 of the Act, where there has been a merger involving a Cayman Islands company, a shareholder who dissents from the merger in accordance with Section 238 has a statutory right to payment of the "fair value" of their shares.

34.  In the event the company and dissenting shareholder(s) do not otherwise agree upon the price to be paid for the shares, the company must (and any dissenting shareholder may) file a petition with the Grand Court for the determination of the fair value of the relevant shares. In this case, as noted, the Petitioner commenced the Appraisal Proceeding in accordance with Section 238 by filing its petition with the Grand Court on March 28, 2022. The Company filed its own petition shortly thereafter.

35.  At the hearing of the petition, the Grand Court is required to determine the fair value of the dissenting shareholders' shares together with a fair rate of interest, if any, to be paid by the subject company upon the amount determined to be fair value. The Dissenting Shareholders will assert in the Appraisal Proceeding, *inter alia*, that the Merger Price undervalued their shares.

Declaration of Rocco Cecere

6287676-4

36.     In assessing fair value in a Cayman Islands appraisal proceeding, the Cayman Court will consider all relevant documents and information presented to it by the parties, and any other information the court considers to be relevant, not just publicly available information. It is likely that this will include an examination of the fairness of (i) the process by which the Company's board and/or Special Committee negotiated and approved the Merger Price with the Buyer Group, and (ii) objective valuations of the Company calculated by those involved in negotiating and financing the transaction.

**III.    The Scope of Discovery Available in Cayman Appraisal Proceedings**

37.     In Section 238 appraisal proceedings, there is no automatic discovery, but the court may order any party to the proceedings to provide general discovery of "*documents which are in their possession, custody or power relating to any matter in question between them in the action*" (Grand Court Rules ("**GCR**"), Order 24, Rule 3).  The parties to the Appraisal Proceeding are the Company and the Dissenting Shareholders.

38.     Cayman Islands judges do not consider themselves to be experts in valuation.  Instead, they are guided by the valuation experts appointed by the subject company and dissenting shareholders, respectively, who provide their expert opinion and testimony on the fair value of the dissenting shareholders' shares. Accordingly, it is imperative that both the valuation experts and the Court have access to all relevant factual evidence. In *In the Matter of Integra Group* [2016 (1) CILR 192], Jones J accepted that he had to consider "all the evidence that might be helpful." A true copy of the *Integra* decision is attached hereto at **Exhibit 2**.

39.     Accordingly, the Cayman Courts have stated that all documents that may be relevant to the valuation of the shares at issue in a Section 238 proceeding should be provided. In *In the Matter of Qunar Cayman Islands Limited* [2018 (1) CILR 199], the Cayman Islands Court of Appeal

DECLARATION OF ROCCO CECERE

6287676-4

("**CICA**") affirmed the statement by Parker J at first instance that "it should be a general obligation of the Company to search for and produce all documents relevant to fair value." (Exhibit 3 ¶ 45.)

40.     In addition, in *In the Matter of Qihoo 360 Technology Co. Ltd*. [2017 (2) CILR 585], Martin JA stated that (¶ 3):

> [A]*lthough the task of determining the value is one for the court alone, the court will not usually be equipped to derive a value from the financial information without expert assistance. The consequent importance of the expert evidence means that the court must have confidence that the valuations proposed are based on sufficient information…*

The CICA accordingly held that "[t]he sole task of the Court is to determine the fair value of the dissenters' shares. **To do that, it needs full information**." (Emphasis added.) (¶ 19) A true copy of the *Qihoo* decision is annexed hereto at **Exhibit 4**.

41.     In line with the broad scope of discovery, Cayman courts have held that discovery in appraisal proceedings will encompass a substantial amount of evidence on the value of the company. This has been set forth clearly in numerous Cayman Islands decisions, including by the CICA in *Shanda Games Limited* [2018 1 CILR 352] where Martin JA stated:

> *Since the fair value is not necessarily the same as the merger price or the price at which the shares were trading before the market in them was affected by knowledge of the merger, **it is inevitable that the determination will involve an assessment of a substantial quantity of information relating to the financial affairs of the company whose shares are to be valued**. It is unlikely in the extreme that the court will be able to make that assessment without expert assistance. In the ordinary case, as in this one, both the company and any dissenting shareholders will appoint experts; but even in a case where no dissenting shareholder is prepared to participate in the litigation, the company, and perhaps also the court itself, will instruct an expert. In every case, the court's task will be to assess the utility of the expert evidence to the determination of fair value.* (Emphasis added.) (¶ 22).

A true and correct copy of the CICA's judgement in *Shanda Games Limited* is annexed hereto as **Exhibit 5**.

42.     The CICA further noted this in *Qunar, supra,* making clear that the company should provide all materials relevant to fair value to the Cayman Court.  (*See* Exhibit 3 ¶ 45.)

DECLARATION OF ROCCO CECERE

6287676-4

43.     Documents in the hands of persons other than the company may also be highly relevant to the Cayman Court's determination of fair value.  Although the CICA in *Qunar* was considering whether the dissenting shareholders should provide discovery, the CICA made clear that "[w]hat is needed is for the Court, at the end of the day, to get it right, having been exposed to all the material and all the arguments." (¶ 74). The CICA explained that "documentary material which relates to the value of the company at issue, such as reports, analyses, projections and so on about companies in which they invest, their products, their industries, their markets, their competitors" are therefore relevant to this endeavor, and "it matters not whether such material is possessed by the one side or the other, or is simply available as a matter of efficient research. . . ." (¶ 75).  A true and correct copy of the CICA's judgment in *Qunar* is annexed hereto as Exhibit 3.

44.     Whilst the Company in the Appraisal Proceedings has not yet been required to provide any discovery, I note that in section 238 appraisal proceedings, the Cayman courts have emphasised the propensity of companies to give incomplete or deficient discovery. Instances of incomplete company discovery in appraisal proceedings were described by the Chief Justice of the Grand Court of the Cayman Islands in *In the Matter of JA Solar Holdings Co. Ltd.* (Unreported, 18 July 2019). In three section 238 appraisal proceedings, extraordinary orders were made as a result of failures by the relevant company to comply with its discovery obligations. This included the appointment of independent forensic experts in: (i) *In the Matter of Shanda Games Limited* (Unreported, 25 April 2017); and (ii) *Qihoo,* to conduct the discovery process, due to the subject company's failings. The Chief Justice stated in *JA Solar*:

> What this experience suggests, is that companies in section 238 cases have a marked tendency to provide far more limited discovery than what dissenting shareholders seek and what would ordinarily be discovered in contested commercial litigation . . .  In view of the central importance of discovery by companies (and the directions generally) in such cases, I am satisfied that the Court should approach such attempts with scepticism. (¶ 30.)

A true and correct copy of these judgments are annexed hereto as **Exhibits 4, 5, and 6**.

12

DECLARATION OF ROCCO CECERE

6287676-4

IV.    **The Requested Discovery Cannot be Obtained in the Appraisal Proceeding**

45.    As noted above, none of the Vivo Entities are a party to the Appraisal Proceeding.

46.    Whilst third-party documents may be highly relevant to the Grand Court's analysis,[10] the Grand Court in the Appraisal Proceeding has limited power to order discovery from non-parties.

47.    The Grand Court can issue writs of *subpoena ad testificandum* and *subpoena duces tecum* against persons within the jurisdiction of the Grand Court, pursuant to GCR Order 38 rule 14. Vivo, however, is not within the jurisdiction of the Grand Court.

48.    Whilst Vivo LLC and Vivo LP are within the Grand Court's jurisdiction, the scope of documents potentially obtainable under a *subpoena duces tecum* is narrow.  In particular, the "basic purpose" of a *subpoena duces tecum* is to obtain the production of *specific and/or clearly identifiable* documents, *"the existence or likely existence of which is demonstrable and which are necessary for the just disposal of the cause"* (*see e.g. Publishers Representatives Ltd. v. UBS (Cayman Islands) Ltd.* [2000 CILR N-4] and *Wakefield v. Outhwaite* [1990] 2 Lloyd's Rep. 157, Comm. Ct.).

49.    A *subpoena ad testificandum* may be issued to compel a witness to give evidence at trial.  However, it may not be issued to compel the attendance of a witness at any hearing *prior* to trial, except with permission from the Court (*see* The Supreme Court Practice 1999 at 38/19/3).  The *subpoena ad testificandum* procedure under Cayman Islands law is therefore not akin to pre-trial deposition testimony.

50.    The Court may, under GCR Order 39 rule 1, where it appears necessary for the purposes of justice, order a deposition to be taken from persons both within and outside the Cayman Islands, and may order documents to be produced which it considers necessary for the purposes of the deposition.  The exercise of the Court's power under GCR Order 39 rule 1 is discretionary, and the usual grounds on which such an order will be made for a deposition to be taken within the

---

[10] *See, e.g., Qunar* ¶¶ 65, 74–75.

DECLARATION OF ROCCO CECERE

6287676-4

13

jurisdiction are very narrow and include where the witness is too old or ill to attend trial and an earlier deposition is required.

51.      Where the person sought to be deposed is outside the jurisdiction, an application may be made for (i) an order for the issuance of a letter of request to the judicial authorities of the country where that person's evidence is to be taken or, (ii) if the government of that country allows a person to be examined before a person appointed by the Court, for an order appointing a Special Examiner to take the evidence.  The Court's jurisdiction, however, is discretionary, and the Court will only exercise it if satisfied that it is necessary in the sense that the witness can give substantial evidence material to the issue and that the evidence cannot be obtained in other ways.  *See* The Supreme Court Practice 1999 at 39/3/2 citing *Ehrmann v. Ehrmann* [1896] 2 Ch. 611; *Armour v. Walker* (1883) 25 Ch.D. 673, CA; *Lawson v. Vacuum Brake Co.* (1884) 27 Ch.D. 137, CA; Lewis v. Kingsbury (1888) 4 T.L.R. 629. 40.  The Court may issue a letter of request which seeks only documents.  However, the party making the application is not entitled to what is in substance general discovery; rather, "[t]he letter of request must be confined to particular documents, although these may be described compendiously ..." *See per Nicholls V-C in Panayiotou & OR's. v. Sony Music Entertainment* [1994] Ch.142, 153. 41.

52.      Such applications are not common in the Cayman Islands.  It is more common for litigants, especially in Section 238 appraisal proceedings, to use 28 U.S.C. § 1782 to obtain evidence in the United States.

53.      Thus, there is no feasible or practical means in the Appraisal Proceeding by which petitioner can obtain the type and scope of discovery it seeks in these proceedings.

## V.      Receptivity to Judicial Assistance and Admissibility of Evidence

54.      The Cayman Courts have considered the use of 28 U.S.C § 1782 in connection with Cayman Islands proceedings and have held that it is permissible for a litigant to exercise any rights

DECLARATION OF ROCCO CECERE

6287676-4

it may have under 28 U.S.C. § 1782 to obtain relevant evidence for use in Cayman Islands proceedings.

55.    In *Phoenix Meridian Equity Limited v Lyxor Asset Management S.A. and Scotiabank & Trust (Cayman) Limited* 2009 CILR 553, (**Exhibit 7**), the CICA upheld the Grand Court's decision to refuse an injunction to prevent a party from exercising its right under U.S. law to seek evidence under 28 U.S.C. § 1782 for use in proceedings in the Cayman Islands.  The CICA held that adequate protection from the risk of oppression was provided by the Federal Rules of Civil Procedure as applied by the U.S. Courts, and that Cayman law is open to parties pursing applications under 28 U.S.C. § 1782.

56.    The question of the admissibility of the transcripts of depositions obtained under 28 U.S.C. §1782 was also considered by the CICA in *Phoenix v Lyxor*.  The Court said:

> "47 *The use to which the transcripts of depositions taken in New York may be put in the Cayman proceedings is, of course, a matter for the Grand Court. ... no transcript of depositions would be admissible as evidence at trial without an order of the Grand Court. In deciding what order to make in this respect, it will be open to the Grand Court to restrict the use which can be made of the deposition transcripts in the course of any cross-examination of Mr. Rosenberg and Mr. Phlipponneau at the trial.*"

57.    That case concerned an application submitted pursuant to 28 U.S.C. § 1782 seeking the depositions of persons who were the key witnesses for the defendant at trial in the Cayman Islands proceeding, so that the hearsay statements of those witnesses would not ordinarily be admissible in evidence, but could form the basis of cross-examination as evidence of previous inconsistent statements.

58.    In the present case, since Petitioner will not be able to compel Respondents to give evidence at trial, it is unlikely that the deponents will be witnesses at trial.  Thus, the transcripts may be admissible as hearsay statements under the Cayman Islands law provided the requisite notices are given under the provisions of GCR Order 38 Part III.

DECLARATION OF ROCCO CECERE

6287676-4

59.     More recently, in the context of a Section 238 Appraisal Proceeding in *Nord Anglia Education, Inc.* (unreported, 18 April 2019) (**Exhibit 8**), the Grand Court accepted the general proposition that parties are free in appropriate circumstances to pursue Section 1782 applications in the U.S. courts (at [21], citing *Lyxor Asset Management S.A. v Phoenix Meridien Equity Limited* 2009 CILR 553).   In my experience, it is common for dissenting shareholders in Section 238 proceedings to obtain third party discovery under 28 U.S.C. § 1782 for use in Cayman Islands appraisal proceedings.

60.     The Grand Court in *Nord* held that:

> *However, the experience of this case strongly suggests that when this Court fixes a timetable on a Summons for Directions in section 238 cases, the parties have a duty under the Overriding Objective to explicitly address the possibility of section 1782 applications, unless it is common ground that the need to do so does not arise.   While this Court cannot in general terms restrain the parties from making such applications (unless they are unconscionable), suitable standard directions should be able to avoid parallel proceedings being commenced within a timeframe which adversely affecting [sp] the timetable fixed by this Court.*

61.     Indeed, in the *Nord* Appraisal Proceeding, the Grand Court allowed documents produced through Section 1782 applications to be submitted into evidence.   There, the Grand Court expressly referred to the 2,900 documents a U.S. financial advisor produced in a Section 1782 proceeding, which "evidenc[ed] the work that [the financial advisor] did," and "which were *obviously relevant* to advancing a reasoned critique of [the financial advisor's] DCF analysis." *In the Matter of Nord Anglia Education, Inc.,* FSD 235 OF 2017 at ¶ 49, Exhibit 8.

62.     The Cayman Courts expect the parties to obtain the evidence they believe is necessary to prosecute their case.   Thus, there is no requirement to obtain permission from a Cayman Islands court before seeking relevant evidence abroad.   *See* Males J in *Dreymoor Fertilisers Overseas Pte Limited v. Eurochem Trading Gmbh & Ors* [2018] EWCH 2267 (Comm), citing Peter Gross GQ in *Omega Group Holdings Ltd v Kozeny* [2002] CLC 132 ("In general, the English court leaves it to the

DECLARATION OF ROCCO CECERE

6287676-4

parties to obtain the evidence they think necessary for the advancement of their case by the means of their choosing, provided such means are lawful in the country where they are deployed.").

63.    Petitioner intends to inform the Grand Court and the other parties to the Appraisal Proceeding of the filing of this Section 1782 Application, once the Application has been served.

## VI.    Petitioner's Request for Discovery in Aid of the Appraisal Proceeding

64.    The Petitioner now seeks in this Application narrowly-tailored discovery for use in the Appraisal Proceeding relevant to the determination of fair value of the Dissenting Shareholders' former shareholdings, including the process leading to and the rationale for the going-private Merger. Specifically, Petitioner seeks documents and testimony from the Vivo Entities concerning the value of Petitioner's former shareholdings and the process that led the Special Committee to approve the Merger.

65.    The information sought in this Application bears directly on the fair value of the Dissenting Shareholders' shares and will assist the expert retained by the Dissenting Shareholders (including Petitioner), the Company's expert, and the Grand Court in its determination of fair value.

66.    As set forth above, the Vivo Entities were part of the group of investors that initially took the Company public.  It appears from the Proxy that Vivo controlled 10.85% of the Company's stock prior to the Merger, and through their affiliate, were parties to the Consortium Agreement.  In addition, Vivo LLC and Vivo LP were members of the Buyer Group that acquired the minority shares and took the Company private.  Further, Shan Fu—who was a Company director both before and after the Merger—is also a Managing Partner and Co-CEO of Vivo.[11]

67.    Importantly, as set forth above, none of the Vivo Entities are parties in the Appraisal Proceeding.  Therefore, they will not be subject to general discovery in the Appraisal Proceeding,

---

[11] *See* Proxy at F-3-4; New Frontier Health Corporation Directors and Advisors, https://www.new-frontier.com/en/directors-and-senior-advisors/.

DECLARATION OF ROCCO CECERE

6287676-4

despite the key role they played in the Merger.  And, as noted, there are no feasible or practical means in the Appraisal Proceeding by which Petitioner can obtain the scope of discovery it seeks here.

68.     Petitioner's Section 1782 Application seeks, *inter alia*, the following documents from the Vivo Entities (the "**Requests**"):

a.     documents and communications concerning the fair value of the Company;

b.     documents and communications concerning the negotiations leading to the approval of the Merger;

c.     documents and communications concerning the Merger Consideration;

d.     documents and communications concerning the Consortium Agreement, voting agreements, other agreements, and conflicts of interest or  relating to the Merger;

e.     documents and communications exchanged between the Vivo Entities and members of the Buyer Group relating to the Merger.

69.     In addition, Petitioner seeks deposition testimony concerning these subject matters (collectively the "**Requested Discovery**").

70.     The Requested Discovery is narrowly tailored to obtain highly relevant information regarding the value of Petitioner's shares in the Company for use in the Cayman Islands Appraisal Proceeding.  As noted in above, as a general rule, Cayman Islands courts may consider any relevant evidence and are receptive to evidence obtained in the United States through Section 1782 proceedings. Accordingly, Petitioner will be permitted to submit the Requested Discovery to the Grand Court as evidence in the Appraisal Proceeding.

71.     The Requests, moreover, are narrowly tailored to obtain highly relevant information regarding the Company's valuation for use in the Appraisal Proceeding.

72.     Expedition of this Application will permit sufficient time for (a) this Court's resolution of Petitioner's Section 1782 Application and any objections to the requested discovery; (b) Respondents' collection, review, and production of responsive documents; (c) Petitioner's counsel's review of documents produced by Respondents prior to the requested deposition of

DECLARATION OF ROCCO CECERE

1  Respondents; and (d) Petitioner's timely submission of relevant documents to the court.  I, therefore,

2  urge the Court to expeditiously grant the Petitioner access to the requested discovery as quickly as

3  possible.

4      73.     I declare under penalty of perjury under the laws of the United States of America that

5  the foregoing is true and correct. Executed on May 16, 2022, at George Town, Cayman Islands.

6

7

8  _____

   Rocco Cecere

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

19