# EXHIBIT 1



NEWS RELEASE

# New Frontier Health Corporation Announces Completion of Going Private Transaction

1/26/2022

BEIJING--(BUSINESS WIRE)-- New Frontier Health Corporation ("NFH" or the "Company") (NYSE: NFH), operator of the premium healthcare services provider United Family Healthcare, today announced the completion of its merger (the "Merger") with Unicorn II Merger Sub Limited ("Merger Sub"), pursuant to the previously announced agreement and plan of merger, dated as of August 4, 2021 (the "Merger Agreement"), among the Company, Unicorn II Holdings Limited ("HoldCo"), Unicorn II Parent Limited ("Parent") and Merger Sub. As a result of the Merger, the Company became a wholly owned subsidiary of Parent and will cease to be a publicly traded company.

Pursuant to the terms of the Merger Agreement, which was approved by the Company's shareholders at an extraordinary general meeting held on January 7, 2022, each ordinary share of the Company (each, a "Share") issued and outstanding immediately prior to the effective time of the Merger (the "Effective Time") has been cancelled and ceased to exist in exchange for the right to receive US$12.00 per Share in cash without interest, except for (i) Shares held by HoldCo, Parent, Merger Sub, the Company (as treasury shares) or any of their direct or indirect subsidiaries, which have been cancelled and ceased to exist without payment of any consideration or distribution, (ii) certain Shares held by the Rollover Securityholders (as defined in the Merger Agreement), which have been cancelled and ceased to exist in exchange for the right of each such holder or its designated entities to receive a corresponding amount of equity securities of HoldCo, and (iii) Shares owned by holders who have validly exercised and not effectively withdrawn or lost their rights to dissent from the Merger pursuant to Section 238 of the Companies Act of the Cayman Islands (the "Companies Act"), which have been cancelled and ceased to exist in exchange for the right to receive only the payment of fair value of such dissenting Shares determined in accordance with Section 238 of the Companies Act.

In addition, pursuant to the terms of the Merger Agreement and the warrant agreement dated as of June 27, 2018

1

between the Company and Continental Stock Transfer & Trust Company, as amended by the amendment No. 1 to warrant agreement dated as of January 6, 2022 (the "Warrant Amendment"), each of the Public Warrants, Private Placement Warrants and Forward Purchase Warrants (each as defined in the Merger Agreement and collectively, the "Warrants") that was issued and outstanding immediately prior to the Effective Time (other than the Warrants held by New Frontier Public Holding Ltd. ("NFPH")) has been cancelled and ceased to exist in exchange for the right to receive US$2.70 per Warrant in cash without interest. In addition, in respect of each Warrant (other than the Warrants held by NFPH) for which the holder thereof had timely provided consent to the Warrant Amendment and had not revoked such consent prior to the deadline established by the Company for the warrantholders to submit consents, the holder of such Warrant has the right to receive, for each such Warrant, a consent fee of US$0.30 in cash without interest.

Each record holder of Shares or Warrants as of immediately prior to the Effective Time who is entitled to the merger consideration will receive a letter of transmittal specifying how the delivery of the merger consideration will be effected and instructions for surrendering their Shares or Warrants in exchange for the merger consideration. Record holders of Shares or Warrants should wait to receive the letters of transmittal before surrendering their Shares or Warrants. A holder of Shares or Warrants held in "street name" by a broker, bank or other nominee should receive instructions from its broker, bank or other nominee as to how to receive the applicable merger consideration and should address any questions in relation thereto to its broker, bank or other nominee.

The Company also announced today that it has requested that trading of its Shares and Warrants on the New York Stock Exchange ("NYSE") be suspended as of the close of trading on January 26, 2022 (New York time). The Company has requested that NYSE file a Form 25 with the Securities and Exchange Commission (the "SEC") notifying the SEC of the delisting of the Shares and Warrants on NYSE and the deregistration of the Company's registered securities. The deregistration will become effective 90 days after the filing of the Form 25 or such shorter period as may be determined by the SEC. The Company intends to suspend its reporting obligations under the Securities Exchange Act of 1934, as amended, by filing a Form 15 with the SEC in approximately ten days following the filing of the Form 25. The Company's obligations to file with the SEC certain reports and forms, including Form 20-F and Form 6-K, will be suspended immediately as of the filing date of the Form 15 and will terminate once the deregistration becomes effective.

## About New Frontier Health Corporation

New Frontier Health Corporation (NYSE: NFH) is the operator of United Family Healthcare (UFH), a leading private healthcare provider offering comprehensive premium healthcare services in China through a network of private hospitals and affiliated ambulatory clinics. UFH currently has nine hospitals in operation or under construction in all four tier 1 cities and selected tier 2 cities. Additional information may be found at **www.nfh.com.cn**.

## Forward-Looking Statements

Certain statements made in this release are "forward looking statements" within the meaning of the "safe harbor" provisions of the United States Private Securities Litigation Reform Act of 1995. When used in this press release, the words "estimates," "projected," "expects," "anticipates," "forecasts," "plans," "intends," "believes," "seeks," "may," "will," "should," "future," "propose" and variations of these words or similar expressions (or the negative versions of such words or expressions) are intended to identify forward-looking statements. These forward-looking statements are not guarantees of future results and involve a number of known and unknown risks, uncertainties, assumptions and other important factors, many of which are outside NFH's control, that could cause actual results or outcomes to differ materially from those discussed in the forward-looking statements. NFH undertakes no obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as required by law.

View source version on **businesswire.com**: **https://www.businesswire.com/news/home/20220126005751/en/**

## Investors

Arthur, Yue Chen

Tel: +86-150-0500-3258

Email: **arthur@new-frontier.com**

## ICR, LLC

William Zima

Tel: +1-203-682-8200

Email: **bill.zima@icrinc.com**

## Media

Wenjing Liu

Tel: +86-10-5927-7342

Email: **liu.wenjing@ufh.com.cn**

Source: New Frontier Health Corporation

# EXHIBIT 2

[2016 (1) CILR 192]

IN THE MATTER OF INTEGRA GROUP

GRAND COURT, FINANCIAL SERVICES DIVISION (Jones, J.): August 28th, 2015

Companies—arrangements and reconstructions—dissenting shareholders—to determine "fair value" of dissenting shareholders' shares under Companies Law (2013 Revision), s.238(11), court to determine value of business immediately before approval of merger then calculate proportionate value of shareholders' shares without minority discount, premium for forcible taking or benefits or burdens of merger—company's fair value offer under s.238(8), rejected by dissenting shareholders, not presumed to be minimum

The petitioner sought the determination of the fair value of the respondents' shares pursuant to s.238(11) of the Companies Law (2013 Revision).

The petitioner was an oil field services provider operating in the Russian market. Certain members of its management team, who owned 32.5% of its issued share capital, proposed to purchase the rest of its shares. Although commercially the transaction was a management buy-out, it was structured as a statutory merger under Part XVI of the Companies Law between the petitioner and a newly incorporated special purpose vehicle. The petitioner's board of directors accepted the proposal and details were communicated to shareholders and published to the market. The merger was approved by a special resolution of the petitioner's shareholders at an extraordinary general meeting and was completed in accordance with the relevant statutory requirements two days later. As at the date of the EGM, the petitioner had issued 8,973,473 shares in total, but more shares were issued in the course of executing the merger.

The respondents were three investment funds which, at the date of the EGM, collectively owned 17.3233% of the petitioner's issued share capital. They objected to the merger and exercised their right under s.238 of the Companies Law (2013 Revision) to dissent and demand payment of the fair value of their shares. Pursuant to s.238(8), the petitioner offered to pay US$10 per share for the respondents' shares (which was the same amount as the merger consideration). The respondents rejected the offer and no agreement was reached, prompting the petitioner to seek the court's determination of the fair value of the shares and a fair rate of interest under s.238(11).

The petitioner submitted that the fair value of the respondent's shares should be calculated principally using a market value methodology based

2016 (1) CILR 193

on published stock market prices for the petitioner's shares listed on the London Stock Exchange. It relied on a discounted cash flow valuation as a cross-check.

The respondents disagreed, submitting that the fair value of their shares should be calculated using the income approach and conducting a discounted cash flow valuation. As a secondary method (with a 25% weighting), they also adopted the market approach and carried out a valuation using financial and market information relating to comparable publicly traded companies.

**Held,** ruling as follows:

(1) For the purposes of s.238(11) of the Companies Law, the "fair value" of the shares of a dissenting shareholder was the value to it of its proportionate share of the business if it were sold as a going concern in a hypothetical, arm's length transaction. It was the estimated price for the transfer of an asset between identified knowledgeable and willing parties that reflected the respective interests of those parties (in the present case, the identified parties would be the petitioner on one side and a market participant with an interest in buying the business on the other side). The Companies Law did not specify the date at which the determination of fair value was to be made. The logical date would be immediately before the merger was approved: in the present case, the date of the EGM. Determination of fair value would not include any premium for forcible taking nor apply a minority discount. The effects of the merger, whether positive or negative, would be disregarded. Dissenting shareholders would not therefore benefit from any enhancement to their shares resulting from a merger, nor suffer any diminution in value. There was no presumption that the fair value offer of US$10 per share made by the petitioner pursuant to s.238(8) constituted a minimum price and it was open to the court to determine that the fair value was less (paras. 17–27).

(2) The respondents' valuation approach would be adopted as the most appropriate in the present

circumstances. Section 238 of the Companies Law did not specify a particular valuation method. There were three main approaches to the valuation exercise to be performed by the court: the market approach (comparing the asset with identical or similar assets for which price information was available); the income approach (converting cash flows to a single current capital value—this approach included the discounted cash flow method); and the cost (or asset-based) approach (based on the economic principle that a buyer would pay no more for an asset than the cost of obtaining an asset of equal utility, whether by cost or construction). The mere fact that a company's shares were listed on a major stock exchange (in this case the London Stock Exchange) did not indicate that a valuation methodology based on its publicly traded prices was necessarily the most reliable approach to determining its fair value for the purposes of a s.238 court appraisal. That methodology would be preferred in cases in which there was a well-informed and liquid market

2016 (1) CILR 194

with a large, widely held free float. Its reliability would be diminished if there were any tendency for the market to be uninformed or misinformed. Although the petitioner had always complied with its formal reporting requirements, during the two years preceding the merger the market had been less well informed about the petitioner compared with similar companies. The petitioner's shares appeared to have been very illiquid compared with its peers during the period leading up to the merger. The petitioner's shares would be valued according to the respondent's recommended approach, *i.e.* combining an income approach using a discounted cash flow method (giving it a 75% weighting) with a market approach, using a guideline public company methodology (with a 25% weighting). The fair value of the plaintiff as at the valuation date was US$105m. Given that, at that date, the respondents collectively owned 17.3233% of the petitioner's issued shares, the fair value of the respondent's shares was US$11.70 per share. The fact that more shares had been issued during the implementation of the merger so that, if the respondents were still shareholders, they would now hold a smaller percentage of the petitioner's issued share capital, would be disregarded. The respondents should not bear any diminution in the value of their investment directly attributable to the merger transaction from which they dissented (paras. 28–32; paras. 38–53; paras. 66–70).

(3) The petitioner would be required under s.238(11) to pay interest from the date on which it made its written offer to pay US$10 per share until payment. The fair rate of interest was 4.95%, which was based on the mid-rate between the rate at which the petitioner had earned interest on the money properly belonging to the respondent, which in the absence of affidavit evidence was assumed to be 0.2% per annum, and the petitioner's borrowing rate, which was assumed to be 9.7% per annum (paras. 74–77).

Cases cited:

(1)   *Brant Invs. Ltd.*, *In re* (1987), 42 D.L.R. (4th) 15; 1987 C.L.B. 571; 5 A.C.W.S. (3d) 69; 7 T.L.W.D. 715–001; 60 O.R. (2d) 737; 37 B.L.R. 65; [1987] O.J. No. 574, applied.

(2)   *Cede & Co. Inc.* v. *MedPointe Healthcare Inc.*, Chancery Ct. (Delaware), August 16th, 2004 (revised August 26th and September 10th, 2004), C.A. No. 19354–NC, unreported, referred to.

(3)   *Cyprus Anvil Mining Corp.* v. *Dickson* (1986), 33 D.L.R. (4th) 641; 8 B.C.L.R. (2d) 145, referred to.

(4)   *Deer Creek Energy Ltd.* v. *Paulson & Co. Inc.* (2008), 49 B.L.R. (4th) 1; 170 A.C.W.S. (3d) 66; 2008 ABQB 326, referred to.

(5)   *Weinberger* v. *UOP Inc.* (1983), 457 A.2d 701, referred to.

Legislation construed:

Companies Law (2013 Revision), s.238(1): The relevant terms of this sub-section are set out at para. 6.

2016 (1) CILR 195

s.238(8): ". . . [T]he . . . company shall make a written offer to each dissenting member to purchase his shares at a specified price that the company determines to be their fair value . . ."

s.238(11): The relevant terms of this sub-section are set out at para. 14.

*M. Phillips*, *Q.C.* for the petitioner;

*M. Imrie* and *G. Newell* for the respondents.

1   **JONES, J.:**

**Introduction and general factual background**

### Introduction

This a petition presented by Integra Group (which I shall refer to as "the company" or "Integra") by which the court is required to determine the fair value of its Class A common shares in accordance with the provisions of s.238(11) of the Companies Law (2013 Revision). This is what might be described as a "valuation action" or an "appraisal action."

### The company

2    The company was incorporated in the Cayman Islands on March 15th, 2004 and commenced business in the following year as an oil field services provider operating in the Russian market. On February 22nd, 2007, Integra completed an initial public offering of regulation S class A common shares global depository receipts ("GDRs") listed on the London Stock Exchange ("LSE"). Its market capitalization as at December 31st, 2007 was US$2.3 bn., based upon EBITDA (earnings before interest, taxes, depreciation and amortization) of US$180m. Integra's initial business plan was to grow through strategic acquisitions. By December 2009, it had completed 17 acquisitions, making it one of the leading companies in the oil field services and equipment manufacturing sectors of the Russian market. However, from 2010 onwards, Integra began to dispose of some of its business segments. By the end of 2012, following the spin-off of a joint venture business by means of an *in specie* dividend, the company was operating two reported business segments described as (i) drilling, workover and integrated project management, and (ii) technology services. As at December 31st, 2012, the company had a market capitalization of US$76m. based upon EBITDA of US$33m.

### The dissenting shareholders

3    The respondents to the petition are three investment funds, namely East Capital (Lux) Eastern European Fund, East Capital (Lux) Russian Fund and Salink Ltd. ("the respondents"). They are managed by East Capital International A.B. ("East Capital"), which is an experienced fund

---

2016 (1) CILR 196

manager concentrating on public and private securities in emerging and frontier markets, including Russia. As at October 2014, it had approximately €2.9 bn. under management. The respondents first invested in Integra in the initial public offering in 2007 and held 17.3233% of its issued share capital as at the time of the merger.

### The merger transaction—a management buy-out

4    In December 2013, the company's board of directors was informed of the possibility that certain members of its management team ("the MBO participants") were considering a proposal to purchase all of its shares not already owned by them. The proposal was formally presented to the board of directors at a meeting held in Rome on December 9th and 10th, 2013, when the MBO participants expressed their intention to make an offer to purchase the company's outstanding shares for US$10 per share (equating to US$20 per GDR). The board resolved to establish a committee of independent directors having no financial interest in the transaction who were empowered to accept or reject this offer. The independent committee comprised Mr. Neil Gaskell, who had held senior management roles in Royal Dutch Shell Group, Mr. Iosif Bakaleynik, who was formerly chief financial officer of TNK BP, and Mr. Dimitri Avdeev, who was a former finance director of Integra and had subsequently become vice president of finance at Rosneft. On February 2nd, 2014, the independent committee engaged Deutsche Bank A.G. to produce a "fairness opinion" and Deutsche Bank subsequently opined that the offer price of US$10 per share/US$20 per GDR was fair. On March 26th, 2014, an announcement was made to the LSE that the independent committee had approved the MBO participants' offer. The publicly listed price immediately before the announcement was US$15 per GDR (equivalent to US$7.50 per share). The offer price represented a premium of approximately 45% over the average market price during the previous 30 days.

5    Commercially, this transaction is a management buy-out, but it was structured as a statutory merger under Part XVI of the Companies Law between the company and a newly incorporated special purpose vehicle owned and controlled by the MBO participants. Section 233(1) provides that two or more companies limited by shares and incorporated under the Companies Law may (subject to any express provisions to the contrary in any of their memoranda or articles of association) merge or consolidate in accordance with the statutory procedure. It is not necessary for present purposes to explain the statutory procedure in detail. Suffice it to

say that a plan of merger complying with the statutory requirements was approved by a special resolution of the company's shareholders passed at an extraordinary general meeting ("EGM") held on May 21st, 2014. The merger was duly completed on May 23rd, 2014 and the company's shares were delisted by the LSE on May 28th, 2014.

---

2016 (1) CILR 197

### *The rights of dissenting shareholders—s.238*

6    Dissenting shareholders are not required to accept a merger or consolidation agreement which has been approved by the requisite majority. Instead, they are entitled to dissent and demand payment for the fair value of their shares. Section 238(1) provides that "a member of a constituent company incorporated under this Law shall be entitled to payment of the fair value of his shares upon dissenting from a merger or consolidation." Section 238(2) provides that a shareholder of a constituent company who intends to dissent from a merger or consolidation must give written notice of objection to his company *before* the vote is taken, stating his intention to demand payment for his shares if the merger is authorized. The respondents gave notice on May 20th, 2014, the day before the EGM was held. If the merger or consolidation is authorized, s.238(4) requires that the dissenting shareholder's company must notify him of this fact within the following 20 days. Integra gave the respondents notice on June 6th, 2014. By s.238(5), a dissenting shareholder is then required, within 20 days of receiving that notice, to give his company a written notice of his decision to dissent and a demand for payment of the fair value of his shares. The respondents gave notices of dissent (containing the requisite information) on June 26th, 2014. Section 238(8) then provides that either the shareholder's company or the merged or consolidated company must make a written offer to the shareholder to purchase his shares for a specified price which it has determined to be the fair value (which could be more or less than the merger consideration). On July 2nd, 2014, the company offered to pay US$10 per share (being the same amount as the merger consideration). The legislation contemplates that the parties will then negotiate and attempt to agree upon the price to be paid. If no agreement is reached within a 30-day period, s.238(9) requires that the company must (and the dissenting shareholder may) present a petition to the court for a judicial determination of the fair value of the shares. Whether or not any actual negotiation took place in this case has not been disclosed to the court. Suffice it to say that the company's offer of US$10 per share was not accepted and its petition was duly presented on August 20th, 2014.

7    The effect of having given notices of dissent under s.238(5) on June 26th, 2014 is that the respondents ceased to have any of the rights of shareholders except the right to be paid the fair value of their shares and the corresponding right to participate in the proceedings before the court for the determination of the fair value. They also had the right to commence proceedings to challenge the validity of the transaction. Whilst East Capital has criticized certain of the steps taken by Integra in connection with this transaction, the validity of the merger has never been challenged. The court is therefore required, in accordance with s.238(11), to determine the fair value of the respondents' shares and to determine a

---

2016 (1) CILR 198

fair rate of interest, if any, to be paid by the company upon the amount determined to be payable in respect of the shares.

### The evidence made available to the experts and put before the court

#### *The expert witnesses*

8    The principal evidence before the court is that of the experts retained by the parties. Integra retained Mr. Andrew Robinson, who is a partner of the UK firm of Deloitte LLP and leads its specialist valuation group in London. The respondents retained Mr. John A. Taylor, who is the managing director of the financial advisory services practice of Houlihan Lokey Financial Advisors Inc., based in Los Angeles. Both experts were, of course, supported by a team of professionals whose own credentials were explored in cross-examination of their principals. Mr. Robinson and Mr. Taylor both have some 25 years' experience as commercial appraisers and both have acted as expert witnesses on numerous occasions in various different jurisdictions. They have impressive curricula vitae and their expertise is not in question. Having listened to them giving oral evidence over a period of several days, I formed the view that they are both very capable professionals but it was

apparent that Mr. Taylor had taken a more hands-on approach than Mr. Robinson and was more conversant with the details of the evidence relied upon in support of his conclusions. I ultimately came to the conclusion that the valuation approach and methodologies used by Mr. Taylor are the most appropriate in the circumstances of this case and should be adopted by the court.

9    Mr. Taylor opined that the fair value of the company was US\$125m. as at April 23rd, 2014 and US\$130m. as at May 21st, 2014. Following the exchange of expert reports and discussion between the experts, Mr. Taylor revised his valuations upwards to US\$125m. and US\$135m. Depending upon how the number of shares in issue is calculated, his valuation of US\$135m. translates to US\$15.04 per share or US\$13.36 per share.

10    Mr. Robinson did not put a specific value on the company. He opined that—

"overall, I am of the opinion that the fair value range for [Integra] at April 23rd, 2014 is between US\$70m. and US\$100m. I am of the opinion that the value as at May 21st, 2014 would have been slightly lower than this given the worsening economic outlook for Russia and the emerging Ukrainian situation."

Again, depending on how the number of shares in issue is calculated, the low end of the range translates into a price of US\$7.80 or US\$6.93 and the top end translates to US\$11.14 or US\$9.89 per share. From the court's point of view, it is not particularly helpful to be given a range of value in this way.

---

2016 (1) CILR 199

### Establishment of an electronic data room

11    It goes without saying that the information contained in Integra's own books and records is highly relevant to any appraisal of its fair value as a going concern. The court's intention was that all the relevant material should be uploaded into an electronic data room where it would be available for inspection by the experts (and those instructing them) subject to giving appropriate confidentiality undertakings. The experts are the best judge of what information is or is not relevant for their purposes. It was the court's intention, expressed in para. 7 of an order for directions made on October 27th, 2014, that all documentary information requested by either expert should be uploaded into the data room. This did not happen. A great deal of material was uploaded, but Integra's management took it upon themselves to control what information would be made available to the experts and refused to upload some of the material requested by Mr. Taylor (or did so in a heavily redacted form) on the ground that they considered it to be irrelevant. There is no means of knowing whether material withheld by Integra's management might have affected the experts' judgments in anyway.

### The Moscow meetings

12    The experts and their assistants attended a series of meetings with Integra's senior management for the purpose of gaining a proper understanding of its business and raising questions arising out of their review of the materials uploaded into the electronic data room. These meetings took place at Integra's head office in Moscow on February 18th and 19th, 2015.

### Factual affidavit evidence

13    In addition to the expert reports, each side filed affidavits. Mr. Neil Gaskell swore two affidavits on behalf of Integra. He had ceased to be a director of Integra following completion of the merger, but he was retained as a consultant to assist the MBO participants with this proceeding. Subject to one paragraph in which he commented in a very superficial way upon the directors' earlier attempt to identify potential purchasers for some or all of Integra's business, Mr. Gaskell's affidavits set out the factual and procedural history in a non-controversial way. Mr. Magnus Lekander swore an affidavit on behalf of the respondents. He is East Capital's general counsel and his evidence essentially comprises a complaint, made at an early stage of the proceedings, about the failure of Integra's management to disclose material thought to be relevant to the valuation exercise.

---

2016 (1) CILR 200

### The meaning of "fair value" in s.238 of the Companies Law

14    Section 238(11) of the Companies Law (2013 Revision) provides that "at the hearing of a petition, the Court shall determine the fair value of the shares of such dissenting members as it finds are involved,

together with a fair rate of interest, if any, to be paid by the company upon the amount determined to be the fair value."

15    This is the first time that the court has been called upon to value a company's shares in connection with a merger carried out in accordance with the provisions of Part XVI of the Companies Law. Similar statutory remedies have existed in the state of Delaware and in Canada for many years and both counsel have referred me to decisions of the courts in those jurisdictions as a guide to the way in which s.238 of the Cayman Islands legislation should be interpreted and applied.

16    Mr. Imrie referred me to an article published in the Canadian *Annual Review of Civil Litigation*, 25, at 9–31 (2011) entitled *"Fair Value"—A Common Issue with Surprisingly Sparse Canadian Authority* by Clarke Hunter, Q.C. and Clarissa Pearce which I found to be helpful in a number of respects. On the question of what is meant by "fair value" in the Canadian legislation, which is very similar to s.238 (see the Canada Business Corporations Act 1985, s.190), the authors make the following general propositions as being well established by the authorities:

"1. Valuation of shares pursuant to a legislative appraisal remedy is a fact-based assessment, which requires 'an important element of judgment' by the court.

2. In exercising its judgment, 'a court is advised to be prudent—to proceed not on the basis of the most optimistic approach . . .' Dissenting shareholders are not entitled to a better value than other shareholders simply because they are dissenting. The appraisal remedy is a 'safeguard, not a bonus.'

3. Neither party bears the burden of proving the fair value of the shares. Although each party who asserts a proposition must prove it on the balance of probabilities, by a preponderance of the evidence, it is the court that must ultimately make the assessment of fair value. While expert evidence is commonly put forward to assist in establishing fair value, the court is not obliged to accept it.

4. Complicating the court's task is the frequently expressed admonition that judges should exercise caution in attempting to mix and match portions of competing expert reports and thereby cast themselves in the role of performing their own valuation. As the trial judge put it in the *Brant Investments* case [*In re Brant Invs. Ltd.* (1), a decision of the Ontario High Court of Justice]:

---

2016 (1) CILR 201

'In arriving at my valuation I do not propose to go through the valuation exercise followed by the experts, substituting my own conclusions as to the basic ingredients for theirs. The wide disparity exhibited by them in the application of their technique does not inspire me with any confidence in the result which I would achieve as an amateur in its application.'

5. Market value 'is the highest price expressed in money obtainable in an open and unrestricted market between knowledgeable, prudent, and willing parties dealing at arm's length, who are fully informed and under no compulsion to transact.' However, 'market value' is not equivalent to 'fair value,' although, as will be seen, fair market value can be an important part of the fair value determination depending on the circumstances.

6. Fair value is a value that is 'just and equitable'—one which provides 'adequate compensation (indemnity), consistent with the requirements of justice and equity.' One important implication of the distinction between market and fair value is that, in general, no minority discount can be applied in determining 'fair value,' a point discussed further below.

7. Generally, neither the parties nor the court may rely on hindsight evidence. Events that were not known as of the valuation date are not relevant to determination of fair value on the valuation date. However, while hindsight is generally excluded, there are some limited but potentially significant exceptions to this principle.

8. The characteristics and motivations of the dissenting shareholder are generally irrelevant to a fair value determination, even when the dissenters are engaged in arbitrage.

9. The fair value offer which the corporation is required to make pursuant to legislation does not constitute a 'minimum' price. The court may set a fair value that is lower than the price offered by the corporation, and has done so in several cases." [Footnotes omitted.]

17    The expert witnesses agreed that the definition of "fair value" promulgated in *International Valuation Standards* ("*IVS*"), paras. 38–41 (2013), published by the International Valuation Standards Council, is

relevant and informative for the court's purpose (the International Valuation Standards Council is an independent, not-for-profit private sector organization established in the United Kingdom which has a remit to serve the public interest). The chapter entitled "IVS Framework" states as follows:

2016 (1) CILR 202

"**Fair Value**

38   *Fair value* is the estimated price for the transfer of an asset or liability between identified knowledgeable and willing parties that reflects the respective interests of those parties.

. . .

40   For purposes other than use in financial statements, *fair value* can be distinguished from *market value. Fair value* requires the assessment of the price that is fair between two identified parties, taking into account the respective advantages or disadvantages that each will gain from the transaction. It is commonly applied in judicial contexts. In contrast, *market value* requires any advantages that would not be available to market participants generally to be disregarded.

41   *Fair value* is a broader concept than *market value.* Although in many cases the price that is fair between two parties will equate to that obtainable in the market, there will be cases where the assessment of *fair value* will involve taking into account matters that have to be disregarded in the assessment of *market value*, such as any element of *special value* arising because of the combination of the interests."

The experts are agreed about the way in which this definition of fair value is applied. The "identified parties" are Integra on one side and a market participant with an interest in buying the business on the other side. The reference to "market participants" means the whole body of individuals, companies or other entities that are involved in actual transactions or who are contemplating entering into a transaction

18   Mr. Robinson also referred to the definition of "fair value" for financial reporting purposes, as stated in *International Financial Reporting Standards* ("*IFRS*"). which has been adopted by the International Accounting Standards Board. I have to say that I find this analogy unhelpful. As stated in the *IVS* Framework itself (*op. cit.*, at para. 39), the definition of "fair value" in *IFRS* is different from the *IVS* definition (stated above) and is generally consistent with the *IVS* definition of "market value." I accept Mr. Taylor's evidence that the *IFRS* concept of fair value for financial reporting purposes is not relevant or informative for present purposes, in particular because it would imply a minority discount which I consider to be inappropriate, as do both parties in this case.

19   Given his professional background, Mr. Taylor is of course very familiar with the meaning of "fair value" in the context of statutory remedies under United States laws, in particular §262(h) of the Delaware General Corporation Law. He summarized the comparable United States law in the following way:

2016 (1) CILR 203

"Fair value has a number of various meanings within the variety of U.S. courts, and is often referred to for valuations conducted in family law, corporate dissolution and shareholder-initiated appraisal action disputes. The basic concept of fair value in this context typically provides a minority shareholder the economic benefit it would receive were the business sold as a going concern in a hypothetical, arm's length transaction at the valuation date, with the resulting common shareholders' equity value distributed amongst common shareholders on a pari passu basis. Accordingly, it is customary that these valuations are conducted without incorporating minority, non-controlling or marketability and illiquidity discounts into the analysis. Further, for illustrative purposes, in the context of U.S. Delaware appraisal cases, it is my understanding that §262(h) of the Delaware General Corporation Law requires the court to '. . . determine the fair value of the shares, exclusive of any element of value arising from the accomplishment or expectation of the merger . . .' In other words, the fair value analyses should reflect the 'operative reality' of the enterprise being examined without the expected impact or structure of the merger."

I accept this statement as a useful summary of the Delaware jurisprudence, which I think can be relied upon as a helpful guide to the meaning of "fair value" in s.238 of the Cayman Islands Companies Law.

20   Mr. Imrie referred me to an article, Heaver-Wren & Jackson, *Dissenting Shareholders' Appraisal Rights in Cayman Islands Mergers and Consolidations*, 18 *The M&A Lawyer* 11 (2014). It makes the point that the

drafting of what is now Part XVI of the Companies Law (2013 Revision) was heavily influenced by the Delaware and Canadian law and suggests that, having regard to the principles established in those jurisdictions, this court should have little difficulty in accepting the following proposition:

"1. Fair value is the value to the shareholder of his proportionate share of the business as a going concern, save where it is worth less on a net assets (i.e., liquidated) basis, as at the merger date: ex hypothesi the shareholder has bought into the company as a going concern, not in anticipation of participating in a liquidation, and it follows that, when he elects to dissent from a merger or consolidation brought about at the behest of the majority, he is thereafter deprived of his proportionate share of an active enterprise and is entitled to be compensated for it. In determining the measure of such compensation, the Court should be guided by the following considerations:

(a) Fair value does not include any premium for forcible taking (i.e., expropriation of shares).

2016 (1) CILR 204

(b) It is neither appropriate nor permissible to apply a minority discount when making the determination."

I agree with this proposition.

21    The Canadian courts have emphasized that every appraisal case turns on its own facts and that there is the need to consider all the evidence that might be helpful to the court. Lambert, J.A., writing for the majority of the Court of Appeal of British Columbia in *Cyprus Anvil Mining Corp.* v. *Dickson* (3) (33 D.L.R. (4th) 641, at paras. 50–51), said:

"It is not necessary for me to analyze those cases or to quote from them. The point that they emphasize is that the problem of finding fair value of stock is a special problem in every particular instance. It defies being reduced to a set of rules for selecting a method of valuation, or to a formula or equation which will produce an answer with the illusion of mathematical certainty. Each case must be examined on its own facts, and each presents its own difficulties. Factors which may be critically important in one case may be meaningless in another. Calculations which may be accurate guides for one stock may be entirely flawed when applied to another stock.

    The one true rule is to consider all the evidence that might be helpful, and to consider the particular factors in the particular case, and to exercise the best judgment that can be brought to bear on all the evidence and all the factors. I emphasize: it is a question of judgment. No apology need be offered for that. Parliament has decreed that fair value be determined by the courts and not by a formula that can be stated in the legislation."

22    The Companies Law does not specify the date at which the determination of fair value is to be made. The order for directions made on October 27th, 2015 identified two potential valuation dates, namely April 23rd, 2014 (which was the date upon which the circular containing the merger proposal was sent to shareholders and published to the market) and May 21st, 2014 (which was the date upon which the EGM was held). Counsel ultimately agreed that the latter date should be adopted and this is consistent with both Delaware and Canadian law.

23    Under §262(h) of the Delaware General Corporation Law, dissenting shareholders are entitled to receive their pro rata share of the common stock of the company as it existed as of the merger date, exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation. This equates to the date of the EGM, namely May 21st, 2014.

24    Under §190(3) of the Alberta Companies Act, dissenting shareholders are entitled to be paid the fair value for their shares on the last business day before the day on which the resolution from which the

2016 (1) CILR 205

shareholder dissents was adopted. This equates to the last date upon which the respondents could have served their notices of dissent, namely May 20th, 2014.

25    The principle underlying the legislative approach in both these jurisdictions is reflected in what was said by Anderson, J. in *Brant Invs. Ltd.* (1) (42 D.L.R. (4th) at 50):

"The basic ground upon which the dissenting shareholders took their position of dissent was objection to the impugned transaction. Because the manner of carrying that transaction forward involves a fundamental change within the meaning of the Act, they were accorded by the Act a right of dissent and a right to be paid

'fair value' of their shares. In my view they should have no enhancement in the value of their investment attributable to the transaction which gave rise to their dissent."

I agree with this proposition and its converse, namely that the dissenting shareholders should not bear any dilution or diminution in the value of their investment resulting from the merger.

26    I agree with counsel that the date upon which a merger decision is made, in this case May 21st, 2014, is the logical date at which to determine the fair value payable to dissenting shareholders. This means that the fair value should be determined at the point immediately before the merger is agreed, disregarding the effects of the merger, whether it would have had a positive or negative effect upon the respondents had they continued to be shareholders of Integra. I use the expression "the valuation date" to mean May 21st, 2014.

27    In conclusion, the court is therefore required to determine the fair value of Integra's business as a going concern as at the valuation date, meaning at the point immediately before the merger was approved. The fair value of the respondents' shares is their proportionate share of this amount without any minority discount or any premium for the forcible taking of their shares. There is no presumption that the fair value offer made by Integra on July 2nd, 2014 in accordance with s.238(8) constitutes a minimum price and it is open to the court to determine that the fair value is less than US$10 per share.

**The possible approaches to valuation and valuation methodologies**

***Section 238***

28    Section 238 of the Companies Law (2013 Revision) does not dictate any particular valuation methodology. It is well established in both the Canadian and Delaware jurisprudence that fair value should be proved by

2016 (1) CILR 206

any techniques or methods which are generally considered acceptable in the financial community and are otherwise admissible in court (see the decision of the Delaware Supreme Court in *Weinberger* v. *UOP Inc.* (5) (457 A.2d at 713)). It is generally accepted and agreed by the expert witnesses in this case that there are three main approaches to an appraisal exercise of the kind required to be performed by the court, each of which contains a number of specific valuation methods.

***The market approach***

29    The IVS Framework (*op cit.*, at para. 56) describes the *market approach* as providing an indication of value by comparing the subject asset with identical or similar assets for which price information is available. This approach encompasses a number of possible methodologies, including a valuation based upon the trading prices of a company's own shares and a valuation based upon the trading prices of comparable companies operating in the same market sector.

30    Mr. Taylor explains this approach in his report in the following way:

"The market approach provides value indications for a company through a comparison of the company with guideline public companies or guideline transactions. The market approach entails selecting relevant financial information of the subject company and capitalizing those amounts using valuation multiples that are based on empirical market observations.

A valuation multiple is an expression of what investors, in the aggregate, believe to be a reasonable valuation for a particular security relative to a measure of financial information, such as revenues, earnings or cash flows. It incorporates expectations of growth and rests on the implicit assumption that some level of economic earnings will be generated by the enterprise into perpetuity. The most common means of obtaining valuation multiples is through the guideline public company method, in which market-derived measures of value for a set of guideline public companies are compared with selected financial information for each of such companies. This method yields valuation 'multiples,' which are generally expressed as ratios of the various financial metrics. The multiples are then used as data points for selecting multiples to be used for valuing the subject company. Another common method of obtaining valuation multiples, the guideline transaction method, involves comparing the transaction values for a set of acquired companies to selected financial metrics for each of such companies. The resulting transaction multiples are then used as data points for selecting multiples to be used for valuing the subject company. In

2016 (1) CILR 207

both methods, one should choose guideline companies that are similar to the subject company in economic and operational areas that are of major importance to investors."

*The income approach*

31    The IVS Framework (*op cit.*, at para. 58) describes the income approach as providing an indication of value by converting cash flows to a single current capital value. Each of these approaches to valuation encompasses different methodologies. The income approach includes the *discounted cash flow method* (DCF) which Mr. Taylor describes as follows:

"The discounted cash flow method (DCF) estimates the present value of the projected free cash flows to be generated by the subject company, and theoretically available (though not necessarily paid) to its various capital providers. The discount rate used in the DCF method is intended to reflect all risks associated with realizing the stream of projected free cash flows. It can also be interpreted as the rate of return that would be required by providers of capital to a company to compensate them for the risk-adjusted time value of their money. Unlike a valuation multiple, however, the discount rate contains no implicit expectations of growth for the free cash flows. Instead, such growth expectations are contained within the projected free cash flows."

*The cost (or asset-based) approach*

32    For the sake of completeness, I should mention that the third possible valuation approach would be the *cost approach* (or *asset-based approach*) which provides an indication of value using the economic principle that a buyer will pay no more for an asset than the cost to obtain an asset of equal utility, whether by cost or construction. As Mr. Taylor explains in his report, this approach differs from the market and income approaches in two important ways. It focuses on the value of the entity's underlying assets and liabilities rather than the economic earnings generated by the entity as a whole. It may also be applied in situations where liquidation is a reasonable possibility. The experts agree that a cost approach to valuation would not be appropriate in this case.

*The experts' respective valuation approaches*

33    The experts do not agree upon the valuation methodologies which are most appropriate for determining the fair value of Integra having regard to the factual circumstances existing at the material time. Mr. Robinson favours a market value methodology based upon published stock market prices for Integra's GDRs (which were listed on the LSE) as the prime

---

2016 (1) CILR 208

indicator of fair value, to which a control premium is then added. He relies upon a DCF valuation merely as a means of cross-checking the reasonableness of his range of values derived from his consideration of the listed GDR prices, control premium and the merger consideration. Mr. Taylor adopted the income approach and conducted a DCF valuation. He also adopted the market approach and carried out a valuation using the guideline public company methodology, which relies upon financial and market information relating to publicly traded securities of comparable companies engaged in the same industry. Mr. Taylor considered the DCF methodology to be three times more reliable than the guideline public company methodology and so his concluded equity valuation is reached by applying a 75:25 weighting to the results of the two methodologies.

34    In section 7 of his report, Mr. Robinson sought to place some reliance on the proposition that "the Board had unsuccessfully attempted to sell the business." This conclusion was based entirely upon the following statement contained in Mr. Gaskell's affidavit:

"In this regard it should also be noted that prior to the merger transaction, starting in mid 2011, the Board had attempted to identify potential purchasers for some or all of the Petitioner and had instructed MS in connection with this process. However, other than an agreement with Geotech in November 2011 to merge the Petitioner's seismic business with theirs, and notwithstanding continuing efforts assisted by MS, no such party was found, and indeed no formal or informal expression of interest was made other than that which was eventually put forward by the Participants. In light of the failure of this exercise and the absence of any alternative offer following the announcement of the merger proposal, I believe that the MBO Participants were the only prospective purchaser of the Petitioner or any of its material subsidiaries that existed in the marketplace."

Mr. Robinson said in evidence that he produced section 7 of his report without looking for any evidence to support Mr. Gaskell's statement. As it turned out, a review of the material put in the data room did not reveal any evidence that would justify placing reliance upon the notion that an unsuccessful marketing exercise had ever been undertaken. Mr. Taylor found no evidence that Integra had instituted a "go-shop," undertaken any auction process or hired any investment bank to identify potential purchasers or contact potential alternative buyers as part of the MBO transaction.

35    Integra did engage Morgan Stanley in 2011. The engagement letter, dated September 9th, 2011, was eventually uploaded into the data room

---

2016 (1) CILR 209

after the experts had completed their joint report. It is perfectly clear from the terms of this letter that Morgan Stanley was instructed in connection with the potential sale, or some other kind of strategic transaction, in respect of identified parts of Integra's business. It was not instructed to find a buyer for the company. In the event, Integra decided not to upload into the data room any of the material which would have enabled the experts to gain a proper understanding of the work actually undertaken by Morgan Stanley and the results of that work.

36    I conclude that the points made by Mr. Robinson in section 7 of his report are not justified by the available evidence.

**The court's approach to the valuation of Integra**

37    For the reasons which I shall now explain, I have come to the conclusion that Mr. Taylor's valuation approach is the most appropriate in the circumstances of Integra and that it should be adopted by the court.

38    The mere fact that a company's shares are listed on a major stock exchange, in this case the LSE, does not lead to the conclusion that a valuation methodology based upon its publicly traded prices is necessarily the most reliable approach towards determining its fair value for the purposes of a s.238 court appraisal. The case law and academic commentary to which I have been referred suggests that this methodology is to be preferred in cases where there is a well-informed and liquid market with a large, widely held free float.

39    The Hunter & Pearce article (*op. cit.*, at 37) makes the following observation:

"The extent to which the criticisms of the [efficient market hypothesis] and stock market valuation have merit is dependent upon the factual circumstances in which the stock market valuation approach is applied. However, as the trial judge in *Deer Creek* [*Deer Creek Energy Ltd.* v. *Paulson & Co. Inc.* (4), a decision of the Court of Queen's Bench of Alberta] observed, the fact that markets are not perfect is no reason to ignore them altogether. What can be said is that stock market prices become more persuasive of fair value the more the following things can be said:

1. the market is well informed about the company's assets, earnings and future prospects;
2. the market for the company's stock is liquid, by which is meant that at any time, someone wishing to buy or sell can readily find a counterpart with the opposite objective;
3. the shares are widely held rather than dominated by a large majority shareholder."

---

2016 (1) CILR 210

40    Any tendency for the market to be uninformed or misinformed will diminish the reliability of publicly traded share prices as an indicator of a company's (intrinsic) fair value. It is agreed that Integra always complied with its formal reporting requirements. The experts are also agreed that the manner and extent to which a listed company communicates with the market can affect its share price. Mr. Robinson concluded that Integra's management communicated regularly with the market, that it was under sufficient scrutiny from market analysts and that lack of information was not a factor affecting liquidity. Mr. Taylor considered this issue in a more detailed and nuanced way and I accept his conclusion that, during the most relevant period from mid-2012 onwards, the market was less well informed about Integra compared with CAT Oil A.G. ("CAT") and Eurasia Drilling Co. ("EDC"), two companies which both experts have identified and used as comparable for various aspects of their valuation work.

41    The relative liquidity of Integra's GDRs has been measured by reference to four commonly used criteria, namely (a) the annual trading volume as a percentage of the "free float," meaning the number or percentage

of a company's shares not held by its management and insiders which are freely tradable on the public market; (b) the number of days on which the GDRs were not traded in each year; (c) the median "bid-ask spread," meaning the difference between the bid and offered prices in trading on the LSE, over each year; and (d) the dollar volume of daily trading.

42   The following table reflects that the number of Integra's GDRs traded as a percentage of the free float had declined steadily relative to its peers and was significantly lower in the year before the MBO. There is some doubt about the amount of Integra's free float because it failed to disclose its share register and other relevant information. The MBO participants held 32.5% of Integra's issued share capital as at the date of the announcement. This does not necessarily mean that the free float is 67.5% because registered shares or GDRs may have been held by members of management and/or other insiders who are not MBO participants. There is some evidence tending to suggest that this may have been the case,[1] but the

---

1   Integra's CFO sent Deutsche Bank an analysis of Integra's shareholding structure as an attachment to an email transmitted on February 3rd, 2014. This states that the "JF Group" (a reference to John Fitzgibbons, one of the MBO participants) held 19.14% and the "Management Group" held 48.51% of an assumed number of 5,054,000 GDRs (which takes account of additional shares intended to issued or cash paid to directors and employees who held unvested units in a restricted stock unit remuneration plan). In the absence of any explanation from Integra about the composition of these groups, the respondents inevitably suspect that the free float may have been substantially lower than 67.5% during the most relevant period from 2012 onwards.

---

2016 (1) CILR 211

following table is based upon the assumption that the free float is 67.5% of the issued share capital.

**Trading volume by year, as a percentage of free float**

| Year | Integra | CAT | EDC |
|---|---|---|---|
| 2007 | 180% | 39% | 37% |
| 2008 | 162% | 230% | 148% |
| 2009 | 178% | 232% | 93% |
| 2010 | 98% | 135% | 193% |
| 2011 | 106% | 78% | 264% |
| 2012 | 64% | 56% | 95% |
| 2013 | 16% | 212% | 106% |
| 2014 | 9% | 156% | 100% |

Source: Mr. Robinson's Table 8.1

43   The following table reflects that the number of days on which Integra's GDRs were not traded increased very significantly from 2012 onwards. In that year, it was not traded on 42 out of about 250 trading days (about 17%). In 2013, it rose to 112 (about 45%). During 2014, there was no trading on 52 out of about 100 trading days up to May 26th when its GDRs were delisted. By this measure, Integra's GDRs were very illiquid compared with its peers in the period of about two years leading up to the merger.

**Days of no trading**

| Year | Integra | | CAT | EDC | |
|---|---|---|---|---|---|
| 2007 | 00 | 1 | 0 | 0 | 0 |
| 2008 | 00 | 1 | 0 | 0 | 1 |
| 2009 | 00 | 7 | 0 | 37 | |
| 2010 | 00 | 2 | 0 | 0 | 6 |
| 2011 | 00 | 2 | 0 | 0 | 0 |
| 2012 | 00 | 42 | 0 | 0 | 0 |
| 2013 | 112 | | 0 | 0 | 0 |

| 2014 (Jan–May) | 0 | 52 | | 0 | | 0 | | 0 |
| TOTAL | | 219 | | | 0 | | | 44 |

Source: Mr. Robinson's Table 8.2

2016 (1) CILR 212

44   The following table reflects median bid-ask spreads calculated by Mr. Taylor from data sourced from Bloomberg. (There is an unexplained discrepancy between Mr. Robinson's analysis based upon data sourced from Capital IQ and Mr. Taylor's analysis based on data sourced from Bloomberg. Since Capital IQ obtains its data from Bloomberg, I concluded that the court should rely upon the Bloomberg sourced data.) I accept his conclusion that, until 2011, Integra's median bid-ask spread was in line with the other two companies, but it widened significantly and became volatile starting in mid-2012 and then declined notably after the MBO announcement was made on March 26th, 2014.

**Median bid-ask spread**

| Company | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014(1) |
|---|---|---|---|---|---|---|---|---|
| Integra | 1.5% | 1.1% | 2.4% | 1.3% | 0.8% | 3.2% | 6.5% | 7.3% |
| EDC | 1.5% | 2.0% | 3.1% | 0.7% | 0.5% | 0.3% | 0.2% | 0.4% |
| CAT Oil AG | 1.5% | 1.9% | 2.0% | 2.0% | 1.9% | 1.5% | 1.3% | 0.8% |

Source: Mr. Taylor's Appendix 10.2.3

45   This table reflects the median bid-ask spread expressed as a percentage of the price. Mr. Robinson made the point that one should also consider the absolute amount of the spread as well as the percentage amount. In the 90 days prior to the MBO announcement, Integra's average market price was US$15.74 per GDR. During this period, the median dollar amount of the bid-ask spread was around US$1.15. The relatively high bid-ask spread is indicative of illiquidity.

46   The following table reflects the daily volume of trading of Integra's GDRs during the periods of 180 days, 90 days and 60 days prior to the MBO announcement. Even if the days on which Integra's GDRs were not traded at all are excluded from the analysis, the daily volume is significantly lower than that of its peers—US$59,000 compared with US$9.563m. for EDC and US$4.192m. for CAT over the 180-day period. If the days on which Integra's GDRs were not traded are included and counted as nil, the average trading volume for the 180-day period falls to just US$29,000.

47   By each of these four criteria, Integra's GDRs were an illiquid stock from 2012 onwards and the trend was towards increasing illiquidity during this period. Mr. Taylor regards this relative illiquidity as an important factor pointing to the conclusion that a market approach towards the determination of fair value may not be appropriate. In contrast, Mr. Robinson's view is that, in spite of the relative illiquidity, a market approach to the determination of fair value is still appropriate because the market was not affected by what he calls "structural illiquidity" as the GDRs were listed on the LSE.

2016 (1) CILR 213

**Daily volume of trading**

| | Price | | | Average amount of daily trading volume (including no trade days as $nil) | | | Average amount of daily trading volume (excluding no trading days) | | |
|---|---|---|---|---|---|---|---|---|---|
| | Integra US$/GDR | EDC US$/GDR | CAT AG (€/share) | Integra (US$m.) | EDC (US$m.) | CAT (€m.) | Integra (US$m.) | EDC (US$m.) | CAT (€m.) |
| Closing price before announcement date: | | | | | | | | | |
| March 25th, 2014 | 15.00 | 23.50 | 13.55 | 0.007 | 7.733 | 4.385 | 0.007 | 7.733 | 4.385 |
| 180-day average | 13.10 | 38.71 | 17.01 | 0.029 | 9.563 | 4.192 | 0.059 | 9.563 | 4.192 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 90-day average | 15.74 | 36.68 | 19.15 | 0.019 | 9.304 | 6.590 | 0.050 | 9.304 | 6.590 |
| 60-day average | 14.95 | 33.25 | 18.10 | 0.021 | 11.413 | 5.755 | 0.068 | 11.413 | 5.5755 |

Source: Mr. Taylor's Appendix 10.1 (as corrected)

---

2016 (1) CILR 214

48   Mr. Robinson uses the expression "structural illiquidity" to mean illiquidity caused by factors which affect the stock exchange or the particular market as a whole, rather than factors affecting individual securities listed on the exchange. He says that the reason for Integra's relative illiquidity in 2013 and 2014 was that the market had lost patience with its inability to meet its earnings forecasts. He said that "the key point here is that it had become less liquid because nobody wanted to buy the shares and it was related to the performance rather than a structural defect in the market." For this reason, he concludes that a market approach to valuation is still appropriate. This does appear to be a novel concept in that it is not supported by, or even referred to, in any of the jurisprudence and academic literature to which I have been referred.

49   In answer to a question from the court, Mr. Robinson said this:

"THE COURT: And for present purposes, what is the significance of the fact that it was more liquid in the years prior to 2012?

THE WITNESS: That it is not structural reason why it became less liquid, it was all to do with the market's perception of the company and its performance and what its future expectations were. So the value of the company had, I think, effectively declined. And that's what I'm trying to point out, that nothing been changed that would say from a structural perspective to say that this company should no longer be illiquid if it was an attractive asset.

THE COURT: So are you saying that the shares of any company which meets the criteria necessary to be listed on the London Stock Exchange would not suffer from structural liquidity as you define it?

THE WITNESS: Yes, because you have to deal with—the London Stock Exchange does not want structural problems when its market, it wants to have its market and you end up delisting from London if you can't perform."

50   I am not able to accept Mr. Robinson's analysis. He recognizes that the market price of a security listed on a major stock exchange such as the LSE may reflect a minority discount, resulting in the need to apply a control premium in order to arrive at a fair value, but he does not appear to recognize that it may also reflect an illiquidity discount. He says: "Ceteris paribus therefore, investors will rationally pay more for an otherwise identical liquid asset than for an illiquid asset." This must be right and I think that it leads to the conclusion that the public traded price of a stock may reflect a liquidity discount even though it is listed on a major exchange such as the LSE.

---

2016 (1) CILR 215

51   In this regard, I found the observations of Deutsche Bank's research analyst published on the day after the MBO announcement to be instructive. Its company alert document stated:

"The price offered does not look particularly great to us. The offer price is a 33% premium to the market price as of the yesterday's closing. It is also visibly higher than our estimated target price of USD16/GDR. Note that we derive our fair value of Integra assuming a punitive ROE of 17% to reflect the stock's poor liquidity. Should we assume no special liquidity discount (a 'regular' liquidity risk premium of 2pp rather than 4pp that we currently use in Integra), our target price would be USD24/GDR. Hence, the proposed price does not look great to us."

52   Deutsche Bank's approach recognizes the need to compensate for the illiquidity discount reflected in the traded price of Integra's GDRs in order to arrive at a fair value. Mr. Robinson does not recognize that the traded price might reflect any illiquidity discount because Integra's GDRs are listed on the LSE and therefore do not suffer from any "structural illiquidity." Deutsche Bank's approach was put to Mr. Robinson in cross-examination. His response was unconvincing and certainly did not lead me to conclude that, in the absence of "structural illiquidity" (as defined by him), a market approach to the valuation of Integra's GDRs based upon its own traded prices should be preferred to a methodology based upon traded prices of comparable stocks or

an income approach based upon a DCF calculation or a combination of both. I prefer the more conventional approach, which is that illiquidity of the kind identified in this case is an important factor which may lead to the conclusion that the publicly traded price is not a reliable indicator of fair value or not sufficiently reliable to exclude some alternative valuation approach or methodology.

53   For these reasons, I have come to the overall conclusion that the court's valuation of Integra should be done in the way recommended by Mr. Taylor. He combined an income approach using a DCF methodology with a market approach, using a guideline public company methodology. He places greater weight on the DCF methodology (giving it a 75% weighting) than the guideline public company methodology (giving it a 25% weighting). I turn next to consider various specific criticisms about the way in which he applied these methodologies.

**Criticisms made of Mr. Taylor's valuation methodologies**

54   Mr. Robinson rightly makes the point that the level of confidence that can be placed in any DCF valuation depends upon the reliability of

---

2016 (1) CILR 216

underlying cash flow models. His review of the forecasts published to the market in the years 2011–2013 by the company itself and by various independent analysts (Integra was covered by Deutsche Bank, Morgan Stanley, Renaissance Capital, URALSIB and VTB Capital in the period from 2012 onwards) suggests that both Integra's management and the analysts have been repeatedly over-optimistic about the company's anticipated performance, although Mr. Taylor makes the point that the estimated revenue growth forecast by Integra's management is low relative to the oil field service sector generally. Mr. Robinson also cautions that a majority of the value derives from cash flows in the later years of the projection period (through to 2018) and that the earnings forecasts are dependent upon Integra having made a substantial capital investment in new drilling rigs (budgeted at US$328m. over the period). The fact that a high proportion of the value reflected in the experts' DCF calculations is derived from the terminal value calculation means that the resulting value is very sensitive to small assumption changes. For these reasons, it is particularly important that the cash flow projections/models are subjected to an in-depth review and analysis.

55   In the period from December 6th, 2013 to February 21st, 2014, Integra's management prepared and revised multiple cash flow models for the purposes of the merger transaction. Mr. Robinson's report identifies nine separate models produced in this period.[2] Mr. Taylor's report explains how the model relied upon by Deutsche Bank for the purposes of its fairness opinion (which I shall refer to as "the MBO projection model") went through at least 11 revisions by management during the period of about 10 weeks before finally being approved by the independent committee on February 21st, 2014 (see Mr. Taylor's report, para. 75 and Figure 4). Mr. Taylor conducted an in-depth analysis of these models which were found to have been generated in various different ways, with significantly different levels of detail. In particular, he noted that many of the Excel spread sheets contained "hard coded" numbers inserted by management rather than values generated from the use of clearly identified working formulae. In spite of these difficulties and a certain reluctance on the part of Integra's CPO to explain the methodologies used by her staff, Mr. Taylor concluded he had been able to gain a sufficient understanding of the way in which the MBO projection model had been generated such that

---

2   Mr. Robinson's report (paras. 9.1–9.9) identifies nine separate models produced in this period. The first is the long term model dated December 6th, 2013 approved by the board of directors at a meeting on December 9th, 2013. The last is the model approved by the independent committee and sent to Deutsche Bank on February 21st, 2014 and is referred to as "the Business Plan" in its fairness opinion. I have referred to it as "the MBO projection model."

---

2016 (1) CILR 217

it could be relied upon for the purposes of a DCF valuation, subject to certain adjustments. Mr. Robinson did not devote a similar effort to analysing the models, which is understandable bearing in mind that he decided to use his DCF calculation merely for the purpose of cross-checking the valuation produced by a market

methodology. Nevertheless, he concluded that the MBO projection model presents a "reasonable starting point for a DCF valuation."

56    Integra's share capital is denominated in US dollars, but its functional currency is the Russian rouble. For this reason, management's various cash flow projections have been generated in roubles and then converted into dollars, for which purpose a flat exchange rate has been used. In preparing its DCF valuation, Deutsche Bank used a forward curve exchange rate which forecast that the rouble would fall against the dollar over the applicable period, thus resulting in a lower valuation. Mr. Taylor used the flat exchange rate reflected in the MBO projection model. Mr. Robinson carried out DCF calculations using both the flat exchange rate and the forward curve forecast, without expressing any preference. I have adopted Mr. Taylor's DCF calculations using the flat exchange rate.

57    Mr. Robinson does not agree with the way in which Mr. Taylor dealt with the working capital requirement in his DCF calculation. They agree that Integra had a working capital deficit of about US$1m. as at December 31st, 2013. The working capital requirement over the period ending 2018 was determined to be about US$47.7m. by Deutsche Bank based upon the MBO projection model. Mr. Robinson and Mr. Taylor projected about US$41m. and US$40m. respectively based upon different methodologies. The relevant issue debated by the experts is whether Mr. Taylor ought to have made a deduction from his concluded equity value to reflect the working capital deficit. Mr. Taylor's methodology relies upon market-based working capital assumptions and so his selected multiples already reflect the relative risk of Integra's working capital position as at the valuation date. I accept Mr. Taylor's judgment that, for this reason, no adjustment should be made because it would result in a form of "double counting."

58    The second issue relates to the amount of the deferred tax asset which ought properly to be included in the model used for any DCF calculation. The Integra Group's audited consolidated financial statements for the year ending December 31st, 2013 reflect a net deferred income tax asset of US$22.447m. (2012: US$20.412m.). Note 16 states as follows: "Deferred income tax assets associated with tax losses available for carry-forward are recognized when management believes it is probable that the Group will be able to apply the losses to offset future tax profits." The note explains how the deferred tax assets (liabilities) of individual

2016 (1) CILR 218

group companies have been consolidated and identifies the extent to which Integra's management decided to impair certain tax assets on the basis that it did not believe that such tax losses can be used to reduce taxes on income in the foreseeable future. In other words, Integra's management made a judgment about the extent to which the gross deferred tax assets should be impaired. These audited financial statements were issued on April 16th, 2014. It follows that Integra's management must have been providing financial information simultaneously to Ernst & Young (for purposes of the audit) and to Deutsche Bank (for purposes of the fairness opinion). (The auditor is the Russian firm of Ernst & Young (CIS) B.V., based in Moscow.) However, the gross deferred tax asset reflected in the MBO projection model prepared for Deutsche Bank is significantly lower than the corresponding amount in the audited financial statements. Mr. Taylor sought an explanation for this discrepancy at the Moscow meetings. He was told that a dispute had arisen with the Russian tax authority which was challenging the utilization of approximately US$36.7m. of the losses but Integra did not explain to Mr. Taylor, and has not explained to the court, how its management felt able to make materially different representations to Ernst & Young and to Deutsche Bank about the extent to which it believed that the gross deferred tax assets should be impaired. It seems to me that Mr. Taylor was right to place reliance upon the published statement of management's belief reflected in the audited financial statements.

59    The third adjustment to the MBO projection model made by Mr. Taylor also concerns tax. Integra's audited consolidated financial statements reflect that it has incurred non-tax-deductible expenses in 2013 and in the prior year. Integra does not qualify as a "consolidated group taxpayer" under the applicable Russian law with the result that expenses incurred in one group company (whether it be the parent company or a subsidiary) cannot be set off against income generated in another group company for income tax purposes. The effect of this rule is reflected in Note 16 of Integra's audited consolidated financial statements. At the Moscow meetings, Mr. Taylor was told that the non-tax-deductible expenses in fact comprise overhead

expenses incurred at the parent company level. I assume this answer must relate to both historic expenses reflected in the financial statements and projected expenses reflected in the MBO projection model. Mr. Taylor's research led him to the conclusion that it would be possible for such expenses to be charged to operating subsidiaries in a way which would enable it to be treated as a deductible expense, provided that a *bona fide* framework of service agreements is established pursuant to which services are actually provided on the basis of arm's length pricing.

---

2016 (1) CILR 219

60    Even if Mr. Taylor's understanding of the applicable Russian tax law is right, it seems to me that he had insufficient evidence (and the court still has insufficient evidence) to justify adjusting the MBO projection model to assume that these expenses will be tax deductible going forward. Integra did in fact incur non-tax-deductible expenses in 2012 and 2013. Why this occurred is unclear. There was no in-depth discussion of the issue at the Moscow meetings. If Integra's management had considered the issue with its auditors and tax advisers at any stage in the past, the relevant material has not been disclosed. All that can be said is that Integra's management and the independent committee believe that the company will continue to incur non-tax-deductible expenses. There is no sufficient evidential basis for concluding that their judgment is likely to be wrong and that tax relief is likely to be available going forward. For these reasons, I have adjusted Mr. Taylor's valuation to reflect that Integra will continue to incur non-tax-deductible expenses.

61    After having produced his report, Mr. Taylor gave further consideration to the question of the cost savings resulting from "going private." In a case such as the present, where a company is taken private by means of a management buy-out, there is an argument for saying that the anticipated cost saving inherent in delisting its shares should be reflected in the fair value attributable to the minority who are squeezed out by operation of the statutory provisions. This is an exception to the general principle reflected in the Canadian jurisprudence that synergies resulting from mergers (in the economic sense of combining two existing businesses) should be excluded from the fair value of the dissenters' interest (*Brant Invs.* (1) (42 D.L.R. (4th) at 50–51, *per* Anderson, J.)). The MBO projection model includes the cost savings of going private but it has then been eliminated by adding back unidentified expenses of equal amount for which there is no explanation in the model itself. During the Moscow meetings, the experts were told by the Chief Financial Officer ("CFO") that the cost saving of going private was expected to be between US$0.5m. and US$1m. However, the experts were also told that Integra was expecting to incur extra expense for some additional services but these have not been identified. In the absence of any explanation about how this extra expense would arise, Mr. Taylor decided to adjust the MBO projection model to reflect US$0.75m. per annum as the cost saving of going private. This adjustment would result in an increase of US$4.058m. in his concluded equity value.

62    However, I have come to the conclusion that this adjustment should not be made. The cost saving of going private is an inherent result of the transaction from which the respondents have dissented. In my view, dissenting shareholders should not benefit from any enhancement in the value of their shareholding attributable directly to the transaction from which they have dissented.

---

2016 (1) CILR 220

63    As I have already said, Mr. Taylor also adopted a market approach using a guideline public company methodology, the details of which are fully explained in his report. He identified three categories of comparable companies engaged in the oil field services industry for the purpose of developing appropriate multiples, namely Russian companies, large international diversified companies, and a group of smaller companies. The process by which he formulated his final list of guideline public companies is set out in his report and was carefully explained in re-examination. All the large international diversified companies and three of the Russian companies were eliminated, including Integra itself.[3] The guideline public companies used in the multiples analysis therefore comprised CAT and EDC and five "other international diversified oil field services companies."

64    Counsel for Integra criticized the selection of guideline companies; the way in which Mr. Taylor distilled multiples from the market data; and the way in which he determined the control premium which is necessary to convert the publicly traded price (which reflects the value of a minority interest) to a fair value (which

reflects the intrinsic value without any minority discount). It seems to me that counsel's broad brush criticism of Mr. Taylor's guideline public company methodology was superficial and not actually supported by any evidence given by Mr. Robinson. Mr. Taylor explained his methodology in re-examination at length in a way which I found persuasive and I am satisfied that his conclusions can be relied upon by the court.

65   Mr. Robinson identified certain adjustments required to EBITDA for the years 2012 and 2013 which are relevant to Mr. Taylor's judgment about the multiples to be used. This was one of the points discussed by the experts following exchange of their reports. The result of making this adjustment is to increase Mr. Taylor's concluded equity value of Integra by US$3.045m. There appears to be no good reason for rejecting this adjustment.

66   I have come to the conclusion that I should adopt Mr. Taylor's valuation approach and methodologies and that his judgment can be relied upon by the court. However, for the reasons which I have explained, I shall adopt his concluded equity value subject to two adjustments in respect of tax and the cost savings of going private. I conclude that the fair value of Integra as at the valuation date was US$105m. The following

---

3   The five Russian publicly traded oil field service companies identified by Mr. Taylor are C.A.T. Oil A.G., Eurasia Drilling Co., HMS Hydraulic Machines & Systems plc, IG Seismic Services plc and Integra itself.

---

2016 (1) CILR 221

table reflects Mr. Taylor's work and explains how I have adjusted his conclusions to arrive at the court's valuation (rounded up to the nearest million).

| US$000s | 5% TGR 15.625% DR | 7.5% TGR 15.625% DR | Concluded DCF valuation | Guideline public company valuation | Concluded equity value |
|---|---|---|---|---|---|
| Enterprise value non-tax-deductible expenses | 227.5 | 235.1 | | | |
| | (34.8) | ' (40.1) | | | |
| Adjusted enterprise value | 192.7 | 195.1 | | | |
| DCF weighting | 0   67% | 0   33% | | | |
| Weighting | 129.109 | 0   64.383 | 193.492 | 267.6 | |
| | | | 0   75% | 0   25% | |
| Weighted enterprise value | | | 145.119 | 0   66.9 | 212.019 |
| Add cash | | | | | 0   59.468 |
| Add tax asset | | | | | 0   12.4 |
| LMT EBITDA adjustment | | | | | 00   3.045 |
| Deduct debt | | | | | (182.345) |
| **Concluded equity value** | | | | | **104.587** |

Definitions: terminal growth rate ("TGR") and discount rate ("DR").

**Calculation of the fair value of the respondents' shares**

67   The fair value of the respondents' shares as at the valuation date is their proportionate share of US$105m. without any minority discount or premium for forcible taking. There is a dispute between the parties about the way in which their proportionate share should be calculated.

68   Integra failed to disclose its share register, but the offering circular states that "the Company expects that, on the Voting Record Date, 8,973,473 Shares would be issued and outstanding." At the 2:1 ratio, this equates to 4,486,736.5 GDRs. (This is more than the 8,946,531 shares (equivalent to 4,473,265.5 GDRs) issued and outstanding as at December 31st, 2013, as reflected in the company's audited consolidated

financial statements.) It is not in dispute that the respondents collectively owned 1,554,520 shares on the valuation date as stated in para. 12 of the petition. It follows that the respondents owned 17.3233% of Integra's issued share

2016 (1) CILR 222

capital as at the valuation date. The respondents argue that I should calculate the fair value of their shares as follows:

Value per share:

| | | | | |
|---|---|---|---|---|
| | US$105,000,000 | ÷ | 8,973,473 shares | = | US$11.70 per share (rounded to the nearest cent) |

Amount due to respondents:

| | | | |
|---|---|---|---|
| | 1,554,520 shares | × | US$11.70 | = | US$18,187,884 |

Alternatively:

| | | | |
|---|---|---|---|
| | US$105,000,000 | × | 17.3233% | = | US$18,189,465 |

69    This analysis does not take account of the fact that unvested units awarded by way of deferred remuneration to certain of Integra's directors and employees under its restricted stock unit ("RSU") plan vested pursuant to cl. 5.4 of the merger implementation agreement, which provides as follows:

"(a) Prior to the Implementation Date [May 23rd, 2014], the Integra Board will resolve that, subject only to the Merger being consummated on the Implementation Date, the RSUs under the RSU Plan shall vest immediately on the Implementation Date.

(b) Within 10 Business Days of the Implementation Date:

(i) Integra Shares shall be issued by Integra to RSU Participants who are MBO Participants in accordance with the terms of the RSU Plan held;

(ii) USD $10 shall be paid by Integra to each RSU Participant who is not an MBO Participant instead of each Integra Share to which that RSU Participant would otherwise be entitled in accordance with the terms of the RSU Plan."

The number of unvested RSUs is not stated in Part 11 of the circular and there is no affidavit evidence before the court addressing this issue. The resolution passed by the Integra board is not in evidence. Therefore, the court has no direct evidence about the number of new shares issued to MBO participants and the amount of money paid to other RSU participants. However, counsel for Integra submits that I can infer from the material given to Deutsche Bank for the purposes of preparing its fairness opinion that the effect of vesting all the outstanding RSUs is to dilute the respondents' proportionate interest from 17.3233% as at the valuation date

2016 (1) CILR 223

to 15.3801% as at the implementation date.[4] Counsel for Integra argues (in effect) that I should calculate the fair value of the respondents' shares as follows:

Value per share:

| | | | |
|---|---|---|---|
| US$105,000,000 | ÷ | 10,107,344 shares | = | US$10.39 per share (rounded to the nearest cent) |

Amount due to respondents:

| | | | |
|---|---|---|---|
| 1,554,520 shares | × | US$10.39 | = | US$16,151,462 |

Alternatively:

| | | | |
|---|---|---|---|
| US$105,000,000 | × | 15.3801% | = | US$16,149,105 |

70    For the reason which I have explained in para. 61 above, my view is that counsel's submission leads to a result which is wrong in principle and should be rejected. The respondents have a statutory right to dissent

from the merger transaction, as a result of which they cease to have the rights of shareholders and are instead entitled to receive the fair value of their shareholdings. They should not be afforded the benefits of the transaction from which they have dissented. Nor should the burdens of the transaction be imposed upon them. In *Brant Invs.* (1), Anderson, J. said (42 D.L.R. (4th) at 50):

"The basic ground upon which the dissenting shareholders took their position of dissent was objection to the impugned transaction. Because the act of carrying that transaction forward involves a fundamental change within the meaning of the Act, they were accorded by the Act a right of dissent and a right to be paid 'fair value' of their shares. In my view they should have no enhancement in the value of their investment attributable to the transaction which gave rise to their dissent."

I agree with this statement of principle. Its converse is that the dissenting shareholders should not bear any diminution in the value of their investment directly attributable to the transaction from which they were entitled

---

4   Counsel's submission referred me to the information given to Deutsche Bank described above, from which I think that it is possible to infer that Integra's CFO anticipated that the RSU participants' total entitlement under cl. 5.4 would be 1,113,871 shares. On this basis, the total number of shares (hypothetically) in issue on the implementation date would be 10,107,344 shares (disregarding the fact that the respondents' shares would have been cancelled and the fact that some RSU participants are entitled to receive cash, not shares). It follows that the respondents' (hypothetical) proportionate interest would have been 15.3801%.

---

2016 (1) CILR 224

to dissent. As at the valuation date, they owned 17.3233% of the issued share capital. As a result of the merger transaction being approved and implemented, new shares were issued on the implementation date with the result that, if the respondents had still been shareholders, they would have owned only 15.3801% of the company. In my view, they are entitled to their proportionate share as it existed on the valuation date. They should not suffer any diminution of value attributable directly to the transaction from which they dissented. If my approach were held to be wrong, I would include the cost savings of going private into the DCF calculation, thus increasing the equity value by US\$4.058m.

71   For these reasons, I adopt the respondents' method of calculating the amounts due to them.

**The fair rate of interest**

72   By s.238(11) of the Companies Law, the court is required to determine the fair value "together with a fair rate of interest, if any, to be paid by the company upon the amount determined to be the fair value." This formulation appears to have been reproduced from an earlier version of §262(h) of the Delaware General Corporation Law which provided that "the Court shall appraise the shares . . . together with a fair rate of interest, if any, to be paid upon the amount determined to be the fair value." The Delaware courts interpreted this provision in a way which involves balancing the rate which the surviving corporation would have had to pay to borrow funds and the rate which a prudent investor could have earned on cash or cash equivalents during the relevant period. The "legal rate" payable on judgment debts was treated as a useful default rate in cases where the parties failed to adduce any relevant evidence (*Cede & Co. Inc.* v. *MedPointe Healthcare Inc.* (1)).

73   The "legal rate" under Delaware law is the equivalent of the "prescribed rates" payable on judgment debts under the Judgment Debts (Rates of Interest) Rules in the sense that it is the statutory rate payable on judgment debts, but I have no evidence about the way in which the Delaware rate is fixed. The prescribed rates applicable in this jurisdiction are fixed from time to time by the Rules Committee for a basket of different currencies using the following formula: three-month LIBOR (or equivalent) rounded to the nearest one-eighth percent plus two percentage points or increased by 125%, whichever is the greater. The prescribed rate for US dollars has been fixed at 2.375% since February 1st, 2013.

74   It can be said that the respondents have been kept out of their money since July 2nd, 2014, the date on which Integra made its written offer to pay fair value of US\$10 per share pursuant to s.238(8). For whatever reason, it did not offer to pay this amount (or any lesser amount) on

2016 (1) CILR 225

account pending the outcome of the proceedings. It follows that Integra has had the use of the respondents' money for more than a year.

75   Integra's audited consolidated financial statements reflect that it has Russian rouble-denominated loan liabilities and US dollar-denominated cash reserves. Note 17 reflects that its cost of borrowing was 10.7% in 2013 and 11% in 2012 (being the weighted average fixed and floating rates in respect of Russian rouble-denominated borrowings due after more than one year). The circular stated that the merger consideration would be financed by approximately US$34m. of cash held by Integra and the balance from a US$30m. facility agreement dated April 22nd, 2014 and made between OAO "Alfa-Bank" and Foreston Holdings Ltd., which is a party to the merger implementation agreement. The rate of interest payable under this facility is 9.7% per annum.

76   The respondents have not adduced any evidence about the effective rate of interest which they actually earned or which a prudent investor could reasonably have expected to earn on cash or cash equivalents during the relevant period. Integra's audited consolidated financial statements reflect that it had the equivalent of US$59,468,000 in cash and cash equivalents as at December 31st, 2013 but the notes do not disclose the results of its cash management operations. Integra's counsel's written closing submission says that "the appropriate rate is 0.163% per annum being that which has actually been earned by Integra on the monies during the course of the proceedings" but there is no affidavit evidence explaining this assertion. The written submission contains a footnote which refers to a document reflecting that Integra had an average cash balance of US$20,004,906.02 during a 316-day period from June 23rd, 2014 to May 5th, 2015 on which it earned US$36,547.32, which implies an effective annual rate of interest marginally in excess of 0.2%. The document also states the "effective interest rate—0.158%" but I cannot reconcile this rate with the stated interest income. In the absence of any affidavit evidence about the way in which Integra has actually been managing its treasury operation during the period since the merger, I think that it is reasonable to assume that it was generating around 0.2% per annum.

77   Counsel for the respondents submits that the court should adopt a mid-rate between the prescribed rate for US dollars (2.375%) and Integra's assumed US dollar borrowing rate (9.7%), which would be 6.0375% per annum. There is no obvious logic to this submission. The prescribed rate does not reflect the rate which a judgment creditor can expect to earn on cash deposits. The mid-rate between Integra's assumed return on cash (0.2%) and Integra's assumed US dollar borrowing rate (9.7%) is 4.95% per annum. I conclude that this is a "fair rate of interest" which should be awarded to the respondents from July 2nd, 2014 until payment.

---

2016 (1) CILR 226

**Conclusion**

78   In conclusion, I declare that the fair value of the respondents' shares and the fair rate of interest payable on the fair value is as follows:

East Capital (Lux) Russia Fund

| | |
|---|---|
| 730,238 shares at US$11.70 per share | = US$8,543,784.60 |
| Interest for 422 days at US$1,158.67 per day | = US$ 0'488,961.98 |
| **Total** | **= US$9,032,746.58** |

East Capital (Lux) Eastern European Fund

| | |
|---|---|
| 193,414 shares at US$11.70 per share | = US$2,262,943.80 |
| Interest for 422 days at US$306.89 per day | = US$ 0'129,508.59 |
| **Total** | **= US$2,392,452.39** |

Salink Ltd.

| | |
|---|---|
| 630,868 shares at US$11.70 per share | = US$7,381,155.60 |

Interest for 422 days at US$1,001.06 per day  = US$ 0'422,424.57

**Total**                                      **= US$7,803,580.17**

**Costs of the proceeding**

79    Section 238(14) provides that "the costs of the proceeding may be determined by the Court and taxed upon the parties as the Court deems equitable in the circumstances . . ." It was agreed between counsel that costs should be reserved pending the exchange of written submissions.

*Orders accordingly.*

Attorneys: *Walkers* for the petitioner; *Maples & Calder* for the respondents.

# EXHIBIT 3

IN THE COURT OF APPEAL OF THE CAYMAN ISLANDS
ON APPEAL FROM THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

CICA NO 24 OF 2017
FSD CAUSE NO 76 OF 2017 (RPJ)

IN THE MATTER OF THE COMPANIES LAW (2016) REVISION
AND IN THE MATTER OF QUNAR CAYMAN ISLANDS LIMITED

BETWEEN

QUNAR CAYMAN ISLANDS LIMITED

*Appellant*

and



1. **ATHOS ASIA EVENT DRIVEN MASTER FUND**
2. **FMAP ACL LIMITED**
3. **BLACKWELL PARTNERS LLC – SERIES A**
4. **MASO CAPITAL INVESTMENTS LIMITED**
5. **SENRIGAN MASTER FUND**
6. **PAG ASIA ALPHA LP**
7. **PAG QUANTITATIVE STRATEGIES TRADING LIMITED**
8. **PAG-P ASIA FUND LP**

*Respondents*

| | |
|---|---|
| **Appearances:** | Petitioner/Appellant: represented by Thomas Lowe QC, Paul Madden and Lachlan Greig instructed by Harney Westwood & Riegels<br>1st, 2nd and 5th Respondents: represented by Paul Girolami QC and Andrew Jackson, instructed by Appleby<br>3rd and 4th Respondents: represented by Robert Levy QC and Rocco Cecere and Jessica Bush, instructed by Mourant Ozannes<br>6th, 7th and 8th Respondents: represented by Nigel Meeson QC and Erik Bodden, instructed by Conyers Dill & Pearman |
| **Before:** | **THE RT HON SIR JOHN GOLDRING** *President*<br>**THE RT HON SIR BERNARD RIX, JA**<br>**THE HON SIR RICHARD FIELD, JA** |
| **Date of Hearing:** | **13 November 2017** |
| **Date of Delivery:** | **10 April 2018** |

### DISCLOSURE JUDGMENT

**Sir Bernard Rix, JA**

1.     This appeal concerns three aspects of disclosure which formed part of a Judgment dated 20 July 2017 and an Order dated 31 August 2017, both of the Hon Mr Justice Parker.

2.     The appeal arises in the context of proceedings pursuant to section 238 of the Companies Law (2016 Revision) by which dissenting shareholders (the Respondents) challenge the price offered for their shares in a merger by which Qunar Cayman Islands Limited, the Appellant, a NASDAQ quoted company, was taken private by Ocean Management Merger Sub Limited, a wholly owned subsidiary of Ocean Management Holdings Limited. The Appellant (the "**Company**") continues as the surviving company.

3.     The Respondents (the "**Dissenting Shareholders**") between them owned 5.2% of the issued share capital of the Company. The Dissenting Shareholders fall into three groups (the judge below said there were four) each of which has been separately represented. As a result there was a certain unevenness in the quantity of the submissions made on behalf of the Company and the Dissenting Shareholders respectively.

4.     The merger was proposed on 23 June 2016, a finalised merger agreement was executed on 19 October 2016, and the merger was approved on 24 February 2017 by a special resolution of the Company's shareholders at an AGM called for that purpose. The Dissenting Shareholders had already given notice in writing of their objection prior to the AGM (pursuant to section 238(2)). As of 28 February 2017 the merger was certified as effective by the Assistant Registrar of Companies.

5.     The value of the Company according to the merger price was some US$4.6 billion. This reflected a price per share of US$10.13 (or US$30.39 for American Depository Shares, each representing three ordinary shares). Despite their dissent, the Dissenting Shareholders' shares were cancelled, pursuant to section 238, in exchange for the right to receive the "*fair value*" of their shares.

6.      On 24 April 2017 two petitions were filed pursuant to section 238(9) seeking a determination of the fair value of the Company's shares. It was agreed that the proceedings should be consolidated.

7.      Directions Summonses were heard on 23 June 2017 before Mr Justice Parker. The Company's appeals concern three aspects of the outcome of those summonses, two of which relate to the disclosure to be given by the Company and the third of which relates to the disclosure to be given by the Dissenting Shareholders. In brief, the Company complains that the Company is being required to give too much disclosure, and that the Dissenting Shareholders are being required to give no disclosure at all.

*Section 238*

8.      For present purposes the critical parts of section 238 are as follows:

> *"(7)    Upon the giving of a notice of dissent under subsection (5), the member to whom the notice relates shall cease to have any of the rights of a member except the right to be paid the fair value of his shares and the rights referred to in subsections (12) and (16)...*
>
> *(11)    At the hearing of a petition, the Court shall determine the fair value of the shares of such dissenting members as it finds are involved, together with a fair rate of interest, if any, to be paid by the company upon the amount determined to be fair value."*

*The experts*

9.      For the purposes of assisting the parties in relation to disclosure, the Company and the Dissenting Shareholders each appointed experts. My understanding is that these will not be the experts who will ultimately give respective opinions on fair value.

10.    The Company appointed Mr Timothy James Reid, of Singapore, and the Dissenting Shareholders appointed Mr Bruno Arboit, of Hong Kong. For the purposes of the Directions Summons, each expert produced two affidavits.

11.    In his first affidavit sworn 23 May 2017, Mr Reid spoke to a schedule of documents to be disclosed by the Company. This schedule came to be called Schedule A (because it was so-called as attached to the Company's Summons for Directions). Mr Reid said of this Schedule:

> "*The Schedule is intended to be equally relevant and applicable to both the company and the dissenting shareholders in any given section 238 action. That is, the categories of documents listed are sufficient for either side's expert to produce a robust valuation analysis. In preparing this, I have been careful to acknowledge and take into account the inherent imbalance between the information available to the company and that available to the dissenting shareholders.*"

12.    Mr Reid went on to say this about the process of valuation:

> "...*there are five widely recognised and accepted valuation methodologies used to value the total assets of a company or the equity in that company. A decision of which methodology or methodologies to use will be influenced by the purpose of the valuation, the nature of the assets being valued and the relevant available information. In theory all valuations are based on cash flows that are then discounted to reflect the time value of money. Valuations methodologies which do not use the discounted cash flow methodology are, in theory, surrogates for cash flow based valuations. The other four basis recognised methodologies are:*
> *(a) Capitalisation of future maintainable profits;*
> *(b) Notional realisation of assets;*
> *(c) Value of net tangible assets;*

> *(d) Capitalisation of future maintainable dividends."*

13.   In his first affidavit sworn 9 June 2017, Mr Arboit acknowledged Appendix A as broadly following the categories of documents ordered in other section 238 cases in the Cayman Islands, but he emphasised that such categories should not be regarded as closed. It was "*a good starting point*". He also said this:

> "*28.    In my opinion, it is an essential and critical requirement that the Experts be allowed the opportunity to request further documents/information and to have reasonable access to Company management, particularly those involved in the production and finalisation of any management projections or heavily involved in the strategic planning of the business...*
>
> *29.    Additionally, companies in different sectors may require different documents in order to produce a report. It is only after an expert has done extensive research on the company, its business model, and competitors within the sector, that the relevance of certain documents might become clear to him/her...*
>
> *36.    Additionally, it is unclear why Appendix A limits information to those from within the last three years prior to the date of valuation. I consider that information from a longer time period (usually five years) will be required to clearly demonstrate historical patterns of growth...*
>
> *45.    ...The experts may also reference fair value by way of comparison with peers (where appropriate) but often directly comparable companies do not exist.*
>
> *46.    In my professional opinion, a review of documents is required in order to determine the appropriate methodology/ies..."*

14.    Mr Arboit also referred extensively to Cayman Island jurisprudence on section 238 valuations, inter alia to Mangatal J in *Homeinns Hotel Group*, from whose judgment he quoted this:

> "*I am of the view that the additional requirements should relate not only to documents, but also to information...experts are the best judge of what is relevant when it comes to disclosure...*"

15.    Mr Arboit next turned to a so-called Schedule B, also attached to the Company's Summons for Directions, in which documents sought from *the Dissenting Shareholders* were set out. As to Schedule B he said this:

> "*53.    I do not consider that the documents listed in Qunar's Request for Information – Appendix B, that is documents and information relating to the Dissenters' investment in the Company and internal analysis, are relevant to the determination of fair value of a publicly listed company's shares. The rationale and motivations of each dissenting shareholder in making investment in the Company are not factors that I would take into account in forming my own independent determination of fair value and would have no bearing on my opinion thereof.*
>
> *54.    To this end I would not consider any analysis produced by dissenting shareholders to be relevant to a valuation and would not factor their analysis into my valuation (in order to ensure that my valuation was wholly my own). Analyses produced by dissenting are no doubt produced for a variety of purposes, and are likely to be informed by their own methodologies.*"

16.    In sum, Mr Arboit, as the expert appointed by the Dissenting Shareholders, was anxious to get the widest possible disclosure from the Company, but repeatedly asserted the irrelevance of the Dissenting Shareholders' documents relating to their investment in

the Company. For this he gave no reason other than his personal anxiety to distance his own opinion from anything revealed from such documentation. He said, no doubt plausibly, that dissenters' analyses are likely to be informed by their own methodologies – but given his own evidence that at this stage methodology remains open and that "*a review of documents is required in order to determine the appropriate methodology/ies*", the fact that dissenters may adopt methodologies of their own can hardly be a factor negative to the relevance of their analyses. It may be noted moreover that among the categories of documents Mr Arboit sought from the *Company* were third-party market and industry reports relevant to the markets in which the Company operates which were included in the order made by the judge in Appendix 2 to his Order as item (l). It is not immediately clear why such third party and industry reports in the possession of the Company are relevant for disclosure by the Company, and not if in the possession of Dissenting Shareholders, even though they may be incorporated in and/or relevant to their own analyses of the Company and its operations.

17.    Mr Arboit's first affidavit elicited a response from Mr Reid in his second affidavit, sworn 16 June 2017. He there stated as follows:

> "*14.    As an expert valuer it is helpful to consider all forms of valuations of the Company and especially those conducted at or around the time of merger and particularly those that were participating in the market at that time as willing buyers and sellers.*
>
> *15.    I understand that all of the Dissenters are hedge funds or private equity firms who specialise in investing in companies prior to a merger or management buy-out. The strategy of these firms is to identify companies where the merger or buy-out has been 'mis-priced', allowing them to make a profit for their investors and clients. Such firms will usually employ experienced securities analysts to identify suitable companies for this type of event-driven investment.*

16.     *Securities analysts are finance professionals who gather and interpret data about companies, industries and financial markets in order to express opinions on the investment potential of stocks and securities. They employ a wide range of techniques, from conducting comparisons of similar companies to modifying the figures in a company's annual statements where the analyst spots items in those statements that can be questioned. A securities analyst will typically produce detailed research and valuation reports to justify his or her recommendations in relation to a particular investment opportunity.*

17.     *In my opinion, the views of securities analysts employed by the Dissenters are potentially highly relevant to the issue of the fair value of the Company. While the analysts do not have access to all of a company's internal information, they are able to rely on the large quantity of information that is available generally…It is highly likely that the Dissenters have produced their own sophisticated and informed valuations and analyses of the Company, and in my opinion these are potentially highly relevant due to the experience and expertise of the securities analysts."*

18.  Appendix A also includes "*External projections and reports relating to the Company's long-term plans*" and "*Third-party market and industry reports relevant to the markets in which the Company operates*". While such documents would not have been prepared internally by the Company, they can still be relevant for many reasons, including as a cross-check and to compare any inputs and/or assumptions employed. I note again that Arboit 1 does not dispute the relevance of these documents. In my opinion any valuations relied on by the Dissenters would be just as relevant for an expert valuer's purposes as third-party valuations or reports in the Company's possession. As with third-party reports used by the Company, the fact that the reports or valuations originate

outside the Company itself does not prevent them from being useful or relevant for valuation purposes.

19.     Mr Arboit also made a second affidavit, sworn 20 June 2017. On the subject of disclosure by the Dissenting Shareholders, he had this further to say:

> "5.     I re-iterate that "the valuers should be valuing as if they are 'inside the company', rather than outsiders" (Arboit 1, paragraph 30). Relevant information for these purposes entails the universe of both public information and private information available to the Company...
>
> 6.     ...to the extent that third-party market reports have been relied upon by the Company (and may have informed the views of the Company's management on the question of valuation), I would consider these reports relevant because in valuing from "inside the company", the Experts will necessarily require full access to the information that may have influenced Company management in its business planning or may underpin the assumptions in any projections.
>
> 7.     That is not to say that in a determination of fair value I would not seek access to publicly available information beyond that which is known to be (or have been) in the possession of the Company, however this information is available, as it is in the public domain, and can (and should) be sourced independently. Whilst the public documents themselves may be relevant, the opinions of specific investors derived from these public sources are of no relevance and would not inform my valuation. The Experts should develop their own deeper understanding of the true drivers of the intrinsic value of the Company...

8.  *...They* [the Dissenters] *will have necessarily performed their analysis disclosure on the basis of publicly available information. That is, they have no more information than the experts would already have access to in the public domain. I consider the request for disclosure in Appendix B to be irrelevant for the purposes of determining fair value because the valuation opinion of the Dissenting Shareholders is precisely that – simply an opinion. That is, an opinion based on less relevant and complete information than the Experts would already have access to by way of the information supplied by the Company...*"

20.  I add to these extracts the observation that both Mr Arboit and Mr Reid, beginning with Mr Arboit, cited some jurisprudence, both in the Cayman Islands and elsewhere. However, I will consider that jurisprudence below. The experts may be experts in valuation, but they are not lawyers.

*Schedules A and B*

21.  Reference has been made above to Schedules A and B. Schedule A became a document agreed between the experts listing disclosure to be made by the Company: it was annexed to the judge's Order as Appendix 2 thereto. Schedule B, however, was not annexed because the judge determined that anything in the possession of the Dissenting Shareholders was irrelevant. I will refer to the judge's judgment below. It is relevant, however, to set out Schedule B, as proposed by the Company and supported by Mr Reid's evidence:

1.  All documents reflecting or relating to any valuations or similar analyses of the Company that the Respondents prepared, reviewed, or considered, including but not limited to:

      1.1   all written documents, including Excel files, that set forth, summarise, or otherwise reflect valuation analyses of the Company or Company shares;

      1.2   any internal valuations of the Company or the Company's shares; and

      1.3   any valuations of the Company or Company stock reviewed or considered by the Respondents in connection with this action.

2.   A list of any communications that the Respondents had, whether in writing, electronically or verbally, with any representative of the Company prior to the date of the merger;

3.   Confirmation of the date the Respondents purchased any or all of their shares in the Company, including the method of purchase;

4.   A history of the Respondent's trades in the shares of the Company;

5.   Confirmation as to whether the Respondents have ever taken a short position in the Company's shares; and

6.   All documents, information and material issued or shared between the Respondents' investment manager and/or investment advisor and the Respondents' Investment Committee for their consideration of the Company's go-private action including file notes of meetings, meeting agendas and all forms of written communications.

22.    In effect Mr Arboit was saying that because, in his opinion, Company documents would be *more* relevant or more persuasive than Dissenting Shareholders' documents, therefore the latter had no relevance at all. That is not, to my mind, a sound argument.

*The three issues on appeal*

23.    There are three issues raised on this appeal by the Company concerning the judge's Judgment and Order. The first two relate to the extent of the Company's disclosure.

The second relates to the complete absence of any disclosure required from the Dissenting Shareholders.

24.   Thus the Company complains about the terms of paragraphs 6 and 11 of the judge's Order. Under paragraph 6, the Company is required to give general disclosure of all relevant documents, beyond that required by Schedule A or Appendix 2 which is the separate subject-matter of paragraph 5. The Company complains that there is no case for such general disclosure. And under paragraph 11, the Company is required to provide such further disclosure and/or information as the experts might require after they have assimilated the first rounds of disclosure. The Company complains that there is no call for such further disclosure, nor, separately, for the right to obtain further information from the Company. The Company submits that this is, inappropriately, to delegate powers to the experts, and to do so on a flimsy basis.

25.   I shall set out the terms of paragraphs 6 and 11 below. These are the basis of the Company's first two issues on appeal, which it is convenient to call the "*paragraph 6 issue*" and the "*paragraph 11*" issue respectively.

26.   As for disclosure from the Dissenting Shareholders, the Company submits that the judge was wrong to rule that any such disclosure was irrelevant and on that ground to decline to order it.

*The Order and the judgment*

27.   The relevant paragraphs of the Order made by the judge are as follows:

> "5.   *By 4.00 pm on 4 September 2017 (Cayman Islands time), the Company shall upload to the Data Room all documents (of whatsoever description, whether electronic, hard copy or in any other format) and communications (whether by email or otherwise) and other materials which are in its possession, custody or power comprising the categories of documents*

prepared or created in the five year period ending with 24 February 2017 (the **"Valuation date"**) set out in **Appendix 2** together with an index of the same.

6.      In addition to paragraph 5 above, by 4pm (Cayman Islands time) on 18 September 2017, the Company shall upload any additional documents (of whatsoever description, whether electronic, hard copy or in any other format) and communications (whether by email or otherwise) and other materials which are in its possession, custody or power which are relevant to the determination of the fair value of the shares in the Company as at the Valuation Date and shall include any such documents in the index.

...

11.     The Company shall upload to the Data Room any additional documents, materials, communications (whether by email or otherwise) or information requested by any Expert for the purpose of preparing his/her own opinion within 14 days of receipt of such a request, unless otherwise agreed or directed by order of the Court, and such requests for information of any Expert shall be made prior to the date 21 days before the exchange of expert reports, or any such other date as mutually agreed by the parties. For the avoidance of doubt, if the Experts so request, this may include documents, materials or information produced after the Valuation Date, and such requests may be made from the date of the upload of documents to the Data Room pursuant to paragraph 5 above. Any such request from or response to an Expert shall be copied by email to the Expert for the other party or parties to the email addresses notified in paragraph 10.

> 12.   *The Company by consent agrees to procure that appropriate members of its management team shall be available to meet both Experts, in person or by telephone or by way of video link, such meetings to be scheduled to take place at a mutually convenient place and time for the purpose of providing information and answering queries which are relevant to the preparation of the Experts' respective opinions...*"

28.   Thus it will be seen that the judge provided for disclosure by the Company (i) pursuant to Appendix 2 (by para 5), (ii) 2 weeks later in respect to "*any additional documents...relevant to the determination of the fair value*" (by para 6), and (iii) by subsequent request "*by any Expert for the purpose of preparing his/her own opinion*", albeit "*unless otherwise agreed or directed by order of the Court*" (by para 11). Any expert could also (by para 11) request "*information*", and para 12 "*by consent*" of the Company provides for the manner in which such information might be provided, in addition to the documentary form in which it was to be given or copied to an opposing party's expert under para 11.

29.   The judgment explained these orders for production of documents and information as follows.

30.   The judge referred to prior cases under section 238, such as *In the matter of Homeinns Hotel Group* (FSD 75 of 2016, unreported 12 August 2016: "*I accept that the experts are to have regard to all relevant documents and information, not just publicly available information*" *per* Mangatal J at para 20); and *In the matter of Integra Group* (FSD 92 of 2014, unreported 28 August 2015, Jones J), from which the judge derived a number of propositions including that "*The experts are the best judges of what information is or is not relevant for their purposes and so a Company should not control what information should be made available to the experts, based upon its own assessment of relevance*" (*per* Parker J at para 17); and *In the matter of Shanda Games Limited* (FSD 14 of 2016, unreported 25 April 2017: where, albeit by consent, the disclosure order "*also provided that all additional documents or information needed*

*and requested by the parties' experts would be made available within fourteen days of receipt of a request"* at para 55 *per* Segal J).

31.     The judge also spoke (at para 20 of his judgment) of a submission made by Mr Terence Mowschenson QC on behalf of the Company that there was no power to order general discovery (under Order 24 rule 1) in actions begun by petition (as distinct from actions begun by writ) and that disclosure should therefore be confined to disclosure by request for specific categories of documents under rules 3 and 8 – such as the requests made in Schedule A, which were agreed, and which were all that was necessary, and that *"Further documents would only be provided on request by an expert"* (at para 21).

32.     The judge decided otherwise, however (at paras 22ff). He said that disclosure of *"all documents that are relevant to fair value"*, on a *"catch-all basis"*, after production of specific classes of document agreed, *"is the usual order"* (as indeed the authorities he had cited demonstrate). He rejected the submission that there was no power under the GCR to order general discovery in actions begun by petition. That was in respect of the paragraph 6 issue.

33.     The judge then turned (at para 32 of his judgment) to the paragraph 11 issue, which he described as the issue *"whether in response to a request for documents and/or information the requesting expert should be required, if so asked by the Company, to state (and if necessary verify) why the information and documents were relevant."* Mr Mowschenson had submitted that this requirement was necessary, in the interests of proportionality and to prevent abusive requests.

34.     The judge answered this issue, however, in the negative. He said:

> *"36.     I approach this case on the basis that all parties will comply with the orders of the Court. They will in their conduct ultimately be regulated by the Court, in the sense that the Court will rule, as it must when asked to do so, on all matters relating to the law and procedure leading up to the trial...*

> *37.   I do not believe that any additional check or balance needs to be specifically built into the discovery order as Mr Mowschenson QC has suggested, in order to give the Company some added protection. Since the question of fair value is a matter for the Court's judgment to be reached in the light of all the factual evidence put before it and on the basis of expert assistance from valuation experts from both sides, it is not for the Company or its expert to seek to limit in advance the expert's line of enquiry. Of course, if the requests are oppressive or disproportionate or calculated to harass the Company, the Court will step in if asked to do so..."*

35.   Thirdly, the judge addressed the disputed question of whether the Dissenting Shareholders should give disclosure of their documents (at paras 55ff). Mr Mowschenson submitted that they should, and pointed to the fact that, in a similar situation of the assessment of fair value in Delaware, dissenters were required to give disclosure: *In re Appraisal of Dole Foods Company, Inc*, CA No 9079 (December 9, 2014). On the other side, however, Mr Robert Levy QC said that the decision of Mangatal J in *Homeinns*, to the effect that "*it is not in keeping with the purposes of section 238 for the dissenting shareholders to be ordered to provide discovery*" (*Homeinns* at para 20), was an end to the matter, and that judges of one division should speak with the same voice.

36.   On this issue too, the judge decided in favour of the Dissenting Shareholders. He said that he preferred the evidence on this subject of Mr Arboit over that of Mr Reid. It will be recalled that Mr Arboit said that the Dissenting Shareholders' documents were "*not...relevant*". The judge agreed. He said (at para 69) that "*I am not persuaded by Mr Reid's second affidavit that valuations of third parties based on public information are relevant to a determination of fair value*". He said (at para 70) that he preferred the evidence of Mr Arboit that the Dissenting Shareholders' internal analyses "*are not relevant*". He said (at para 73) that "*Section 238 cases should not be treated like ordinary civil litigation as it pertains to discovery*". As for the Delaware case of *Dole*,

he said (at para 75) that he would pay close attention to the decisions of the Courts in Delaware on matters of substantive law *"given the similarity of the jurisprudence and the actual words used in section 238"*. But not on matters of procedure, where care had to be taken that Delaware law was consistent with Cayman law and practice. He concluded (at para 76):

> *"Whilst I take the view that the possibility of discovery from dissenters should not be ruled out, in an exceptional case, I take some comfort from the fact that I do not consider it to be very likely that discovery would be ordered to be given by dissenters in a section 238 case. This is in keeping with the approach both in **Integra** and **Homeinns**. It follows that in my respectful opinion that Mangatal J was clearly right in her decision that it was not appropriate for dissenting shareholders to be ordered to provide discovery in the usual way…"*

*The first issue, concerning paragraph 6 of the Order: submissions*

37.    On this appeal, Mr Mowschenson QC, although present in court to present a different appeal on behalf of the Company, was replaced by Mr Thomas Lowe QC. It was suggested that this was because Mr Mowschenson had conceded the paragraph 6 and paragraph 11 issues below, before the judge.

38.    Be that as it may, Mr Lowe submitted on behalf of the Company that there should not be automatic or *"blanket"* disclosure of all relevant documents in an action begun by petition; that discovery should be by requested categories under Order 24 rules 3, 8 and 14, not rule 1, and that such requests had to be justified as necessary and proportionate; and that in any event production should not be ordered unless so justified.

39.    On behalf of the Dissenting Shareholders, Messrs Girolami QC, Mr Levy QC and Mr Meeson QC all submitted that the judge was right, inter alia because paragraph 6 had been agreed below between the parties. It was true that in para 20 of his judgment, Parker J had mistakenly suggested that paragraph 6 was in issue: but that reflected an earlier stage of skeleton argument, whereas by the time of the court hearing the parties

had agreed on the terms of a "*catch-all*" provision in paragraph 6 of the draft order, in addition to the Schedule A categories for disclosure which had been agreed pursuant to paragraph 5 of the draft order. In any event counsel submitted that the judge had been right, for the reason he proposed, to conclude that a catch-all provision was necessary, as had previous judges before him in section 238 cases.

*The first issue: discussion and decision*

40.   To some extent, in their oral submissions the three counsel appearing for one or another of the Dissenting Shareholders, sought to divide up their fire-power so as not to overlap on the three issues. But there was no complete success in this endeavour. In any event, all three had filed full written skeleton arguments. This had the effect of somewhat overwhelming the advocacy.

41.   Be that as it may, this first ground of the Company's appeal was wholly undermined by clear evidence that the Company had conceded the catch-all provision of paragraph 6 below. Such agreement was not altogether surprising in the light of previous orders possibly agreed but in any event sanctioned in earlier section 238 cases.

42.   Thus, a travelling draft of what was ultimately agreed as paragraph 6 demonstrated that the Company had accepted paragraph 6 and had made some (albeit relatively small) changes to it.

43.   In any event, it is clear that rule 3 applies in any proceedings ("*whether begun by writ, originating summons or otherwise*") and allows the court to make an order for general discovery. It is unlike rule 7 which is concerned with discovery of particular documents. Whereas rule 7 requires an affidavit from the requesting party, rule 3 does not. And although it is true that production goes beyond discovery and inspection, and that production will only be ordered where necessary, it is likely to be an unusual case where the documents discovered as being relevant go beyond what is necessary for production – even if that can of course happen where disclosure is vast and goes well beyond what is necessary for a fair trial of the proceedings, especially on matters of only tangential interest. Because of discovery by list, it will be open to the parties to anticipate how

much actual production will be necessary. Where there is a dispute, rule 14 makes it clear that the burden is on the party seeking production.

44.     In the present case, however, it was agreed that the relevant documents, whether under paragraph 5 (Appendix 2 documents) or under paragraph 6 (the catch-all provision) were not merely to be discovered by list but "*uploaded*" ie produced.

45.     In a section 238 fair value proceeding, moreover, such an attitude to the Company's disclosure obligations is entirely understandable. It is the Company itself which has put forward a price for the merger buy-out of its shares, and it has done that on the basis of its own internal assessment of its business and its prospects. For these purposes it knows better than anyone else the documentary material which is relevant to its assessment. Although independent experts may make a good start at categorising likely documents for disclosure, as has been done in Schedule A/Appendix 2, and, subject to the second issue concerning paragraph 11 of the Order discussed below, those experts may usefully be able to follow through with further requests for documentation, it makes good sense for the standard obligation on a party, to make disclosure of its relevant documents, to stand behind such initiatives. The judge said (at para 25 of his judgment):

> "*This seems to me to be in keeping with the Court's approach in these types of cases. I do not think the Company should be made to do so only if an expert requires further documents and asks for them, rather it should be a general obligation of the Company to search for and produce all documents relevant to fair value.*"

46.     In these circumstances, the appeal with respect to paragraph 6 of the Order is dismissed.

*The second issue, concerning paragraph 11 of the Order: submissions*

47.     Mr Lowe submitted on behalf of the Company that the process contemplated in paragraph 11 of the judge's Order was "*wholly outside Order 24*". The judge had no power to delegate his powers under Order 24. Rule 7 was the regular process for seeking further specific documents, and that process required support in the form of an affidavit

and was subject to well recognised limitations. In the present case, the Dissenting Shareholders' (new) expert had produced two long lists of additional materials which had every appearance of being an unrestrained catch-all. Moreover, the reference to "*information*" in paragraph 11 was an additional error: it effectively allowed an expert to administer interrogatories, which usually required the specific permission of the court. By delegating its functions to the experts, the court had put it out of its power to control the process of disclosure and interrogatories in a way that circumvented recognised safeguards.

48.     On behalf of the Dissenting Shareholders, however, it was again submitted that the Company had agreed to the essential terms of paragraph 11 in the run-up to the hearing before the judge below. This was demonstrated by the travelling drafts of the draft order prior to the hearing, from which it was clear that the Company had agreed both to the concept of further experts' requests for documents and to their requests for information, and had only disagreed on how such requests might be policed. Thus the Company sought protection in the form below (with emphasis added by me):

> "*11.     Each expert personally and not through parties' attorneys, can make a request for such additional documents or information as he/she reasonably believes to be relevant to the determination of the fair value of the shares in the Company at the Valuation date and for the purposes of preparing his/her own opinion...*
>
> *12.     The Company or Respondent shall respond to the expert request...within 21 days of receipt of such a request unless otherwise agreed. In responding to such request the Company or Respondent may, if they consider appropriate, request further clarification of the request from the expert if the Company or the Respondent is concerned that the request is too broad, disproportionate or not relevant to the determination of fair value...and for the purposes of the expert preparing their own report...*

> 13.    *The expert shall respond to any request for clarification...within*
>        *7 days of such request providing the clarification requested...*

> 15.    *The Company may, on 5 days' notice, apply to the Court for an*
>        *order that the Dissenters' Expert certify by affidavit that the*
>        *documents sought are both relevant and necessary for him/her*
>        *to prepare his/her report.*"

49.    Ultimately, however, the judge decided in effect, with the aid of prior cases, that the experts were less likely to abuse their position than the Company was. He also inserted into his Order at para 11 the words "*unless...directed by order of the Court*" and made specific reference in his judgment (at para 41) to a liberty to apply, in these terms: "*All parties have liberty to apply to the Court at any stage if the process is not being followed or is being circumvented in some way.*"

50.    During submissions, Mr Lowe accepted that the words inserted into paragraph 11, understood as the Court made clear it understood them, namely as a further protection on the part of the Court against any abuse on the part of the experts and maintaining the ultimate control of the Court over the paragraph 11 process, went far and perhaps the whole way to meet the Company's objection to that process.

*The second issue: discussion and decision*

51.    In the circumstances, there is little that needs to be said under this heading. Mr Lowe effectively withdrew the Company's appeal against paragraph 11 during the course of submissions. In my judgment, the Company cannot in any event successfully appeal against the concept of expert engagement in the process of disclosure which had been sanctioned by the Parties and the Court not only in paragraph 11 of the Order, but also in paragraph 6 (dealt with above) and in paragraph 12 (against which there has been no appeal).

52.    In sum, I would dismiss the Company's appeal on the paragraph 11 issue.

*The third issue, concerning disclosure by the Dissenting Shareholders: submissions*

53.     In the event, this was the issue which most divided the Parties on this appeal.

54.     On behalf of the Company, Mr Lowe submitted that the Dissenting Shareholders' own documents concerning the valuation of the Company were relevant and it was for the Dissenting Shareholders to show why they should not be disclosed. The Company's expert had asked for these documents, as set out in Appendix B, on the basis they were relevant for the purposes of a report on fair value. There was no logic in the judge's rejection of the Company's expert's views in favour of relevance. The judge was wrong to say that the requested documents were irrelevant.

55.     On behalf of the Dissenting Shareholders, Counsel supported the judge's decision refusing any disclosure from the Dissenting Shareholders for the reasons he had given. In essence: it was a matter of precedent in the Cayman Islands where in all previous section 238 cases *"disclosure has been a one-way process"*; a conflicting view from Delaware in the *Dole* case could be explained on the basis of a different and broader view about disclosure there, inter alia because disclosure was allowed simply on the basis that it was relevant to credit in cross-examination, which was not the case in the Cayman Islands, and reference was also made to what Segal J had to say about Delaware authorities in *Shanda* at paras 73-80, and in any event it was the law of the forum which prevailed; the question of fair value was a matter for independent experts examining objective data; the views of the Dissenting Shareholders were subjective, based on merely public and incomplete information, and in any event irrelevant as mere opinion, and what was worse opinion from non-experts and non-independent sources; there was no need for any *"reality check"* since experts could be trusted; any documents were likely to be privileged; the judge's decision was a case management decision within his discretion and could not be faulted on any of the limited grounds on which an exercise of discretion could be attacked.

*The third issue: discussion and decision*

56.     It was somewhat anomalous that the Dissenting Shareholders devoted much more
        energy to responding to this branch of the Company's appeal than the Company itself
        devoted to advancing it. That was not only due to the fact that the Dissenting
        Shareholders had three separate skeleton arguments and three separate leading counsel
        duplicating their submissions. However, the point is of substantial importance in
        section 238 proceedings generally, and arises in the Court of Appeal substantially for
        the first time.

57.     I approach this issue from the point of view that one sided disclosure on the central
        issue of a case (a fortiori where that issue is one of fair value and the Dissenting
        Shareholders are only shareholders in the first place because, as professional and
        sophisticated investors, they have taken a decision to invest in the Company whose
        value is in issue), is anomalous, unprecedented outside section 238 cases in the Cayman
        Islands, and prima facie counter-intuitive, and therefore the argument in favour of such
        one-sided disclosure has to be considered with the greatest of care.

58.     I ask myself first what can be learned from previous cases in the Cayman Islands. It
        appears that, whatever may have been done in practice, the *issue* has only risen in two
        cases, one of which is cited by the judge and the other of which emerges from one of
        the skeleton arguments before the Court. The case cited by the judge is *Homeinns*, a
        decision of Mangatal J which he cited at para 12 of his judgment and referred to again
        at paras 61 and 75. I repeat the relevant part of her judgment (at para 20 thereof):

> *"Further in my judgment it is not appropriate to make a standard order
> under order 24 of the GCR for disclosure by both parties. In my
> judgment, it is not in keeping with the purposes of section 238 for the
> dissenting shareholders to be ordered to provide discovery."*

59.     The case relied on in Mr Levy's skeleton is *Trina*. The court does not have a judgment
        in that case, but Mr Levy has annexed to his skeleton an email dated 25 July 2017 (5
        days after the judgment of Parker J in the present case) sent by Segal J to the parities in
        that case, in which the following appears:

> "*As regards the Petitioner's application for a direction that the Dissenting Shareholders upload to the Data Room and provide discovery of the documents listed in paragraph 7 of the draft directions order dated 4 July, I am not persuaded by the evidence relied on by the Petitioner that valuations of third parties based on public information are relevant to a determination of fair value. It seems to me that once an expert has the Petitioner's full records he does not need to see and nothing helpful could be gained by reviewing such third-party valuations. Nor do I consider that the other documents referred to in paragraph 7 (being information relating to the Dissenting Shareholders' investment in the Petitioner and the Dissenting Shareholders' internal analyses) are relevant to the determination of fair value of a publicly listed company's shares."*

60.    The trouble with these views, as it seems to me, are as follows. Mangatal J's only reason for her conclusion is that discovery from dissenters "*is not in keeping with the purposes of section 238*". However, she does not explain, and I can find nothing within section 238 to explain, why any discovery from dissenters is inappropriate or not in keeping with the purposes of section 238. As for Segal J's views, he is equally against disclosure of "*valuations by third parties*" and dissenters' "*internal analyses*". As for the former, he says that the experts do not need them; as for the latter he says simply that they are "*not relevant*". Nevertheless, both experts in this case are agreed that third party valuations are relevant and helpful, and, where in the possession of the Company, should be disclosed; and at any rate Mr Reid is of the opinion that Schedule B documents, which include the Dissenting Shareholders' analyses, are also relevant and will assist him for the purposes of a report. Segal J gives no reason for his statement that such documents are irrelevant. In my judgment, if third party valuations in the possession of the Company are relevant, so are third party valuations not in the possession of the Company, but, for instance in the possession of the Dissenting Shareholders. After all, the question of fair value is closely related to the question of what a willing buyer and a willing seller would exchange for the shares of the Company (or for the Company as a whole): and that question is closely related to valuations

conducted within the market generally. And if that is the case, then analyses and valuations conducted by the Dissenting Shareholders, which may well in any event be based in part on "*third party*" valuations, assessments and analyses, are as relevant as any such valuations, assessments and analyses, or even more so for the very reason that the Dissenting Shareholders are not merely potential investors, but actual investors in the Company. They are active members of the market who are willing to put their money where their analysis is.

61.     I conclude therefore that prior decisions in the Cayman Islands are of very little assistance to this Court.

62.     I also remind myself that the Dissenting Shareholders' counsel, when asked, could cite no other jurisprudence, in the Cayman Islands or in the United Kingdom, in which wholly one-sided discovery has been tolerated or practised, outside section 238 in the Cayman Islands.

63.     Next I go to the jurisprudence of Delaware, which has had long familiarity with the concept of fair value in the context of dissenting shareholders and a statute with similar wording to section 238. Reference was made to the case of *Dole* before the judge, and in the Dissenting Shareholders' skeleton arguments before this Court. A significant part of the judge's judgment below consisted in setting *Dole* aside as throwing any light on the issue before this Court. Mr Lowe did not refer to it in his submissions, but that as it seems to me does not relieve this Court of the need to consider whether the judge was justified in what amounts to his disparagement of that case for present purposes. I do not, however, take any account of *Dole* as constituting any authority or precedent. In any event it comes from a separate jurisdiction. However, I cannot ignore considerations which are addressed in *Dole* as though such matters did not exist in the world. That would be to shut my eyes to the realities of life.

64.     What I find in *Dole* is a sophisticated, well-informed, modern, judgment (delivered in 2014), with extensive citation of jurisprudence. The current issue, of disclosure by dissenting shareholders, is considered in real depth, unlike the brief assertions made in the Cayman Islands jurisprudence cited above. I assume that the Delaware law of

discovery is broader than the law in the Cayman Islands, and that it also allows discovery going to credit, which is not the law in the Cayman Islands or in English law. I therefore fully understand that in these respects Delaware jurisprudence will be an unsafe guide. I will also assume, for the sake of argument, that experts in Delaware may be less conscious of the need to assist the Court as distinct from promoting the interests of the party appointing them, than will be the case in the Cayman Islands (or from wherever the experts in Cayman Islands cases may be brought). Nevertheless, a reading of *Dole* demonstrates that its reasons for requiring normal cross-party disclosure go much deeper than could be explained by those factors. I cite passages in Vice Chancellor Laster's Opinion to exemplify the power of its reasoning (but omitting the extensive footnotes):

> "*Several Court of Chancery decisions have ordered production of pre-suit valuation material prepared by appraisal petitioners. These decisions recognize that the pre-litigation valuations are relevant to the central issue in the proceeding, which is the value of the subject company. They are also relevant to issues of such as the appropriate inputs and considerations for valuation methodologies…*
>
> *The petitioners argue that their valuations are opinions, not facts, and that the question of valuation in an appraisal is purely a matter for the experts…In my view, the valuation-related information that Dole seeks easily satisfies the potential admissibility requirement. A statutory appraisal proceeding is not a fault-based case in which one side has the burden of proof and loses if it fails to meet its burden…*
>
> *…In making its determination, this court can consider a wide range of factual evidence, including, but not limited to, the market price, the merger price, other offers for the company or its assets, prices at which knowledgeable insiders sold their shares, internal corporate documents from the respondent, and valuation work prepared for non-litigation purposes. Even when the parties have retained valuation experts and the court relies on their opinions when determining fair value, the court*

*has considered factual evidence relating to valuation as a cross-check, or reality-check, on the litigation-driven figures generated by the experts. The fact that a party has retained an expert does not enable the party to shield factual material relating to valuation that otherwise would be discoverable and admissible...*

*...Nor, in this case, are the petitioners' witnesses unqualified to express views on value. In my view, their testimony and their pre-litigation valuations will be "helpful to...the determination of a fact in issue," namely the determination of the fair value of Dole..."*

*Experts on valuation in this court often consider other valuation work when rendering their opinions. For example, when developing a weighted average cost of capital for the subject company, an expert may prepare her own calculation and then demonstrate the reasonableness of the selected inputs by showing that other valuations have used the identical or similar inputs, or that the inputs that the expert selected were more conservative than the inputs used by others. The expert may employ similar reasoning to attack the opposing expert's work by showing that other valuations have not used comparable inputs or that the approach selected by the other side's expert was particularly aggressive. Comparisons are made frequently to reports from securities analysts, presentations by the investment bankers who worked on the deal, or internal materials prepared by corporate personnel...*

*The petitioners' internal, contemporaneous valuations are real-world assessments by "astute investors" who must "back their beliefs with their purses". Their views may prove to be as or even more credible than the litigation-crafted opinions of valuation experts...*

*Experts can act strategically when selecting comparable companies or precedent transactions, when picking multiples, or when choosing inputs for their cost-of-capital calculations. Perhaps more importantly,*

> *academic studies have shown that experts unconsciously reach higher*
> *or lower results depending on whether they represent the plaintiff or the*
> *defendant due to cognitive phenomena like attachment bias. It is helpful*
> *to check an expert's litigation-driven work or a party's litigation-*
> *inspired arguments against other valuations, particularly pre-litigation*
> *analyses...*
>
> *Discovery into the petitioners' analyses also should help promote*
> *settlement...Access to both sides' pre-litigation valuations should help*
> *de-bias the litigation positions, constrain the range, and promote*
> *settlement..."*

65.   Irrespective of the foreign source of these remarks, I consider there is wisdom in them. It has been my experience in cases in which experts, and share valuation experts, play a significant or dominant role, that such experts, however professional and loyal to Court or tribunal rather than party, always tend to diverge from each other in favour of their appointing party. It has also been my experience in share valuation cases that there can be much room for issues on the facts of a company's history, its financial performance, the validity of its predictions, projections as to the state of an industry, or markets, or products, or technological developments, and so on. However important a company's own documents may be on such matters, the company and its personnel and advisors have no monopoly on understanding of or insight into the world in which the company operates. The company's own documents, however important to the issue of fair value (and no one would doubt that) must be exposed to the arguments which can flow from the findings, analyses, evaluations and factual selections which other sophisticated entrepreneurs, investors and analysts in the market have made or performed. Moreover, it must be remembered that the documents of investors prior to litigation are not driven by the litigation itself but by their willingness to put their own cash to work in support of those findings and evaluations. There is a reality to that which must not go unrecognised.

66.     I turn next to the evidence of the experts involved in the current stage of these
        proceedings, Mr Reid and Mr Arboit. In a nutshell, Mr Arboit says that the Dissenting
        Shareholders' documents cannot be relevant, Mr Reid says that they are likely to be
        highly relevant. Mr Arboit says that he would prefer to distance himself from them
        (because as I understand it, they are the documents of his appointing party), whereas
        Mr Reid says that he would use them as being relevant for the purposes of his report.
        The judge accepted the evidence of Mr Arboit and rejected the evidence of Mr Reid.
        Why? In my respectful opinion, there is something unbecoming about an expert
        appointed by one party opining that its appointing party's documents *cannot* be
        relevant; and there is something unfortunate in a judge at a merely interlocutory stage
        choosing between the differing views of the experts, when it will only ultimately be at
        trial, and in the light of adequate disclosure and of experts' reports that an objective
        position is capable of satisfactory evaluation.

67.     It is often the case that at the *procedural and interlocutory* stage of disclosure, one or
        other party to a dispute seeks to take up an extreme position about the irrelevance of
        some category of documents, when what it is really doing is making an unwarranted
        assumption about the final outcome of the *substantive* arguments raised in the parties'
        dispute. Courts have to be wary of that approach, for otherwise they may find
        themselves taking up a final position about some aspect of the argument before they are
        in a position to do so. Something of that kind seems to me to be going on in this case.
        The Dissenting Shareholders, who want to focus on the Company's own internal
        documents, almost to the exclusion of any other documents (I will revert to that
        "*almost*"), does so because that approach best suits their case that the Company is the
        most knowledgeable judge of its own affairs. No one else can be privy to as much of
        its own information as itself. Public information is all very well, but that is only half
        the story. Because only the Company is privy to all the information, both public and
        internal, the Dissenting Shareholders point to the Company's own submission (even if
        that is not accepted) that its view of its own value has a precedence which cannot be
        challenged by anyone with only a partial view. Therefore the views of others are
        irrelevant. And saying that the views of others are irrelevant, involves also saying, albeit
        implicitly, that their views of everything which goes to make up a business's value is
        irrelevant: not only their ultimate view of value, but every ingredient which goes to

make up that ultimate view, such as the state of the industry, the state of the market, the position of competitors, the state of the Company's products and competing products, the ability to predict the future, the discount which has to be made for that uncertainty, the cost of capital, both loan and equity, and so on and so on. But the implicit theory of the Company's submissions, supported by Mr Arboit, is that everyone's views on all these matters are irrelevant.

68.    Except, (and I now come to that "*almost*"), that Mr Arboit, although he seeks to make that case of total irrelevance, inter alia by talking about valuers valuing "*as if they are 'inside the company'*" (see above at para 18) – in itself an arguably controversial concept, unless all it means is that the Company's internal documents have to be considered as of significant importance, but I doubt that that is all it means – nevertheless still has to accept that he would take into consideration as potentially relevant both (a) "*third-party market reports…relied upon by the Company*", and (b) "*publicly available information beyond that which is known to be (or have been) in the possession of the Company*": but even so *not*, he says, (c) the reports of specific investors, which "*are of no relevance*" (*ibid)*. This does not make sense to me: if the reports of third parties should be taken into account, I do not understand why the reports of specific investors should not also be taken into account. They are part of the market, they are third parties so far as the Company is concerned and were in every sense third parties immediately before their investment, and their reports are likely to be all the more pertinent in that they are likely to be highly contemporaneous and professional reports of sophisticated members of the market who are not only observers but ready to act on their own research and scholarship (see Mr Reid's second affidavit cited at para 17 above). In these circumstances, I do not understand Mr Arboit's view that only these reports are irrelevant, or, with respect, why the judge was willing to act on that view. I respectfully consider that the judge was wrong to do so, and wrong in principle to find any support in Mr Arboit's view for a totally exceptional exclusion of any obligation of disclosure from one party.

69.    Mr Arboit, of course, had to accept that third party reports were relevant, because he had put his agreement to asking the Company to produce inter alia "*third party and*

*industry reports relevant to the markets in which the Company operates*" (ex Schedule A/Appendix 2).

70.   Moreover, I find it inconsistent that the judge was willing to accept, under the regime provided for in paragraph 11 of his Order, that the view of *either* expert as to further documents or information to be provided by the Company was sufficient, subject to the order of the Court, for the Company to have an obligation to provide such material, whereas he was not willing to accept Mr Reid's well-reasoned evidence that *he* would require the documents of the Dissenting Shareholders on value to assist him in the preparation of a report on fair value, even if Mr Arboit would choose to ignore them. It is a strong thing indeed, in the face of a general regime for mutual disclosure, or even in the absence of such a regime, to rule at an interlocutory hearing that documents that an expert says that he would find useful in the preparation of his report would not be permitted to him.

71.   I would next refer to the oddity of the contrast between the Dissenting Shareholders', Mr Arboit's and the judge's views that *all* factors are relevant to the Court's finding of fair value, and the selection of the Dissenting Shareholders' documents as alone being excluded from that totality. The judge's judgment is replete with references to the width of the investigation leading to the Court's determination of fair value (section 238(11): "*the Court shall determine the value of the shares*"). Thus the judge cites (i) Mangatal J in *Homeinns* that "*In particular I accept that the experts and the Court are to have regard to all relevant documents and information, not just publicly available information*" (at para 12 of his judgment); (ii) Mr Levy's submission that the section 238 cases of *Perfect World; Shanda; Mindray; Bona;* and *Qihoo* demonstrated that "*the Court should not limit in advance the types of documents which the expert should be entitled to see and to call for*" (at para 13); (iii) the proposition which (inter alia) the judge derived from the judgment of Jones J in *Integra* to the effect that "*Section 238 does not dictate any particular valuation methodology…fair value should be proved by any techniques or methods which are generally considered acceptable in the financial community*" (at para 17); (iv) his own view that "*it should be a general obligation of the Company to search for and produce all documents relevant to fair value*" (at para 25); (v) Jones J in *Integra* that "*The one true rule is to consider all the evidence that*

*might be helpful, and to consider the particular factors in the particular case, and to exercise the best judgement that can be brought to bear on <u>all the evidence and all the factors</u>. I emphasise: it is a question of judgment. No apology need be offered for that. Parliament has decreed that fair value be determined by the Courts not by a formula that can be stated in the legislation"* (at para 30); (vi) his own view that *"Since the question of fair value is a matter for the Court's judgement to be reached in the light of <u>all the factual evidence</u> put before it and on the basis of expert assistance from valuation experts from both sides, <u>it is not for the Company or its expert to limit in advance the expert's line of enquiry</u>"* (at para 37: and I would add that what applies to the Company or its expert applies equally to the Dissenting Shareholders or their expert); and (vii) his own view that *"<u>I accept that there may be different approaches and what one expert considers necessary and relevant another expert may not</u>"* (at para 39) (emphasis added).

72.   What is then striking is the contrasting approach that the judge takes to (a much smaller number of) documents identified by an expert as relevant documents in the hands of Dissenting Shareholders, a contrasting approach which the judge asserts on the a priori conception that *all* the relevant documents will be held by the *Company* (a proposition which not even Mr Arboit accepts), and that dissenters' documents relating to fair value are irrelevant. Thus the judge repeatedly assumes the conclusion at which he arrives, for he states: (i) *"Since the Company will likely hold all the relevant information which will go to a determination of fair value..."* (at para 31); (ii) *"The Court would require very clear grounds upon which to make such an order [discovery from dissenters]"* (at paras 64/65); *"material which might give an indication of value which the dissenters themselves may have thought the company or their shares to have had prior to or for the purposes of the merger, is irrelevant..."* (at para 67); (iii) *"although I do not rule out the possibility of dissenters being ordered to give specific discovery in an exceptional case, such a case would be very rare indeed and would require clear grounds"* (at para 68); (iv) *"I am not persuaded by Mr Reid's second affidavit that valuations of third parties based on public information are relevant"* (at para 69: but he ordered the disclosure by the Company of such third party valuations on the basis that they were relevant, as they were agreed to be by both experts); (v) *"I prefer the evidence of Mr Arboit that [the requested documents] are not relevant..."* (at para 70).

(vi) "*Section 238 cases should not be treated like ordinary civil litigation as it pertains to discovery…*" (at para 73); (vii) "*Mangatal J was clearly right in her decision that it was not appropriate for dissenting shareholders to be ordered to provide discovery in the usual way…"(*at para 76).

73.    It seems to me that all these statements are at root the same simple assertion of irrelevance. Rather inconsistently, the judge allowed that in exceptional cases some (unidentified) documents might have a special case made for their disclosure from dissenters. But that perhaps merely reflects the judicial caution of "*Never say never*". On the judge's assertion of irrelevance, however, no case could be made, and even if in theory it could be, no one could ever know of what documents to ask for.

74.    I have stated my reasons above for respectfully disagreeing with the judge's a priori assertion of irrelevance. In sum, dissenters live in the same world as companies whose fair value has to be assessed. Such companies may have internal information and projections which are not in the public domain, albeit in the case of a listed company like Qunar the room for such private information may be more limited than in the case of unlisted companies. In any event, no one disputes the relevance and potential importance of such companies' documents. It remains true, nevertheless, that value, and the market, is for the world, not only the companies concerned, and that often such companies may not understand the world in which they operate as well as outsiders understand it. But whether that is true or not, value depends on a multiplicity of factors, and methodologies, about which sophisticated analysts have different insights, and no one is more relevantly concerned with getting the research and analysis and those insights right than those who are thinking of investing in or have invested in a company. However, "*getting it right*" is not the point at this stage of the proceedings. What is needed is for the Court, at the end of the day, to get it right, having been exposed to all the material and all the arguments.

75.    In my judgment, it is unhealthy in such a context, and in litigation especially, to form a priori assumptions about relevance. The normal rule is that disclosure is a mutual obligation. Mutuality in this respect is equity and fairness. Of course some litigants may have more of what needs to be disclosed than other litigants. And it is always possible

that the documents of one party will turn out to be of greater influence than those of the other side. But I would need to be clearly persuaded that section 238 litigation is the unique field in which one-sided disclosure ought to be practised, and I would in principle regard that as a heavy task. Counsel have not suggested that there is one-sided disclosure in any other field. I am not persuaded of that extreme and unique position by repeated assertions that only the companies concerned, and not its sophisticated investors, have disclosure relevant to fair value. It seems to me that if dissenters have in their possession, as they are likely to do, documents, reports, analyses, projections and so on about companies in which they invest, their products, their industries, their markets, their competitors, in other words documentary material which relates to the value of such companies, then this material is as much a matter for disclosure as any such documents in the hands of the companies: and it matters not whether such material is possessed by the one side or the other, or is simply available as a matter of efficient research. In this context I find the evidence contained in Mr Reid's second affidavit, which merits repeated re-reading (see at para 18 above) highly persuasive. At any rate it is arguably highly persuasive, and that is all that is needed at this stage of the proceedings.

76.   It is submitted for the Dissenting Shareholders that the judge's decision is an exercise of discretion and not readily amenable to appeal, subject to the usual limited grounds on which the exercise of discretion can be attacked. There are three answers. First, the ruling is not so much an exercise of discretion (for instance in relation to particular documents) as a decision of law (as to relevance) and/or principle. The fact that the judge allowed the remote possibility that in some (unexplained) case a dissenter could be made to disclose a document in exceptional circumstances does not change the reality of the judge's rationale. Secondly, however, even if his decision were a matter of discretion, the judge has erred fundamentally and in principle, by creating a unique field for one-sided disclosure. Thirdly, the judge wrongly considered himself to be following in the line of established precedent, in the form of Mangatal J in *Homeinns*, and even if not strictly binding on him: but it is clear to me that her assumption, that section 238 somehow makes disclosure by dissenters inappropriate, cannot carry weight.

77.   Finally, I refer briefly to two judgments of this Court of Appeal on the subject of disclosure in section 238 proceedings, albeit judgments only at the permission to appeal stage. The first is *Qihoo 360 Technology Co Ltd v. Maso Capital Investments Limited & Ors* (CICA no 20 of 2017, 9 October 2017), where permission to appeal against disclosure by the company concerned was refused, but this Court (Martin JA, Newman JA and Morrison JA) ended by warning of the possibility of abuse by dissenters conducting "*a 'drains up' inspection of the entire business regardless of the relevance to fair value*" (at para 27). The second is to the permission to appeal judgment of Martin JA in this very case, where he repeated his concern about possible abuse by dissenters in their disclosure demands of companies, and was also clearly concerned in general that, in the light of a series of section 238 petitions coming before the Grand Court, the Court of Appeal should have an opportunity to consider the proper parameters of the interlocutory stages of a section 238 petition. It seems to me that in the present case there is as yet no sign of danger of abuse in respect of potential further requests of the experts from the Company, provided that they are properly held subject to the control of the Court, which will wish to prevent anything abusive or disproportionate. However, there would to my mind be a danger of abuse in a situation where one sided disclosure is demanded of a company, on matters of relevance to fair value, but dissenters are given carte blanche to address any arguments on fair value they wish or can, free of any discipline that would be imposed by having, where necessary, to present to the experts and ultimately to the Court their own documents on matters of relevance to fair value, which must inevitably exist.

78.   Thus Dissenting Shareholders in this case have not submitted that they do not possess the documents which they have been requested to disclose pursuant to Schedule B. The list of documents within Schedule B is a short list, and certainly not a difficult list to answer, and there is nothing disproportionate about that list. It has not been suggested that there is. The list has been sanctioned by the Company's expert.

79.   Even so, item 5 is not so much a request for documentation as a request for information, and I would not allow that. Item 4 could be reflected in documentation, but it is much simpler if the position is simply scheduled, as requested. If the schedule is challenged, the Dissenting Shareholders should stand ready to confirm it by documents.

(Incidentally, the idea that Dissenting Shareholders should not be required to disclose their dealings in the shares of a section 238 company seems to me to be inexplicable.) Item 4 may incidentally answer the question in item 5. Item 2 should be confined to communications regarding the value of the Company or its shares. Item 1.3 should be amended to read "*in connection with the above*" rather than "*in connection with this action*".

80.     Subject to the above paragraph, I would therefore allow the Company's appeal under this third issue.

*Conclusion*

81.     In sum, I would dismiss the Company's appeal on the first two issues, against paragraphs 6 and 11 of the Order, but allow the Company's appeal on the third issue, concerning discovery from the Dissenting Shareholders, so as to grant discovery as set out in Schedule B to the draft order, subject to the detailed comments at para 79 above.

**Sir Richard Field JA**

82.     I agree.

**Sir John Goldring P**

83.     I also agree



*CICA 24 of 2017 - In the matter of Qunar Cayman Islands Ltd – Disclosure Appeal Judgment*

# EXHIBIT 4

**IN THE COURT OF APPEAL OF THE CAYMAN ISLANDS**

**ON APPEAL FROM THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CICA NO. 20 OF 2017**

**(ON APPEAL FROM CAUSE NO FSD 129 OF 2016 (IMJ))**

**IN THE MATTER OF THE COMPANIES LAW (2016 REVISION)**

**AND IN THE MATTER OF QIHOO 360 TECHNOLOGY CO. LTD.**

**BETWEEN:-**

**QIHOO 360 TECHNOLOGY CO. LTD.**

**Petitioner/Proposed Appellant**

**-and-**

**(1) MASO CAPITAL INVESTMENTS LIMITED**
**(2) BLACKWELL PARTNERS LLC- SERIES A**
**(3) CROWN MANAGED ACCOUNTS SPC ACTING FOR AND ON BEHALF OF CROWN/MASO SEGREGATED PORTFOLIO**

**Respondents/Proposed Respondents**

BEFORE:

**The Honourable John Martin QC, Justice of Appeal**
**The Honourable Sir George Newman, Justice of Appeal**
**The Honourable Dennis Morrison, Justice of Appeal**

Appearances:

Madeleine Heal, James Elliott and Dhanshuklal Vekaria of Harneys for the Proposed Appellant. Robert Levy QC instructed by Nicholas Dunne and Rupert Bell of Walkers for the Respondents.

Hearing and Judgment: 31 August 2017
Reasons released: 9 October 2017

MARTIN JA:

1. On 31 August 2017 we refused the applicant Company leave to appeal against an order ("the Order") dated 27 July 2017 of Mangatal J. These are our reasons for that decision.

2. The Order was made in the context of a petition brought by the Company under section 238 of the Companies Law (2016 Revision). That section entitles members of certain Cayman companies who dissent from a merger or consolidation to be paid the fair value of their shares. In default of agreement, the fair value is to be determined by the Court.  The respondents are members of the Company who have dissented from a merger of the Company. They are referred to in these reasons as "the Dissenting Shareholders".

3. Proceedings under section 238 present two particular difficulties to the courts. First, all or nearly all of the financial information necessary to enable the Court to determine the value of a company's business, and hence of its shares, will inevitably be held by the company itself. The proper conduct of the valuation exercise will accordingly require

that the company make adequate disclosure of that information. Secondly, although the task of determining the value is one for the Court alone, the Court will not usually be equipped to derive a value from the financial information without expert assistance. The consequent importance of the expert evidence means that the Court must have confidence that the valuations proposed are based on sufficient information; and that in turn means that the experts will often have to be given a substantial degree of autonomy in determining what information is needed for their valuations. Although care must be taken to ensure that this autonomy is not abused (a point to which we return at the end of these reasons), in general we agree with the statement of Jones J in *In the matter of Integra Group* [2016] (1) CILR 192 at [11] that "the experts are the best judge of what information is or is not relevant for their purposes".

4.   In the present case, these two difficulties were initially addressed by the making of a consent order (dated 25 October 2016), which in relevant part was in the following terms:

"IT IS ORDERED that:

1.   The Petitioner shall, by 4.00 pm on 1 November 2016 (Cayman Islands time), open an electronic data room (the "Data Room").

2.   The Data Room shall be accessible to each of the parties and the parties' respective advisors, consultants and experts for inspection of the documents contained therein each upon the entry into [a confidentiality agreement].

3.   ...

4.   By 4.00 pm on 18 November 2016 (Cayman Islands time), the Petitioner shall upload to the Data Room all documents (of whatsoever description, whether electronic, hardcopy or any other format) and communications (whether by email or otherwise) and other materials which are or have been in their respective possession, custody or power and which are

relevant to the determination of the fair value of the shares in the Petitioner as at 30 March 2016 (the "Valuation Date").

5. Provided that such documents are within the possession, custody or power of the Petitioner, paragraph 4 shall include for the avoidance of doubt the following categories, namely all documents and communications (including, without limitation, emails):

(a) previously provided to or obtained from J. P. Morgan Securities (Asia Pacific) Limited or its affiliates (the "Financial Adviser") in relation to the fair value opinion, including those passing between the Financial Adviser and:

   (i)    the independent directors or Special Committee of the Petitioner; and

   (ii)   the Petitioner's other directors, management, employees, counsel and/or advisers; and

   (iii)  the bidding consortium,

   for the purposes of compiling the fair value opinions; and/or

(b) previously provided to or obtained from the Petitioner's financiers (whether to or from any of the persons mentioned in 5(a) above) for the purposes of securing finance for the merger transaction (including but not limited to all management forecasts provided to the same); and/or

(c) previously provided to or obtained from the bidding consortium or former members thereof (whether provided to or from any of the persons mentioned in 5(a) or (b) above) or passing between such persons for the purposes of undertaking due diligence on the Petitioner (including but not limited to all management forecasts provided to the same).

6. ...

7. The (a) Petitioner and (b) Dissenting Shareholders shall each have leave to separately instruct an expert witness in the field of valuation in order to opine upon the fair value of the shares in the Petitioner as a going concern at the Valuation Date (both such experts together, the "Experts"). The Experts shall be appointed by no later than 1 November 2016, and on that date each of the Petitioner and the Dissenting Shareholders should advise the other in writing of the identities and email addresses of the respective Experts so appointed.

8. The Petitioner shall upload to the Data Room any additional documents, materials, communications (whether by email or otherwise) or information requested by either expert for the purpose of preparing their own opinion within 14 days of receipt of such a request, unless otherwise agreed or directed by order of the Court, and such request for information of either Expert shall be made prior to the date 21 days before the exchange of expert reports, or any such other date as mutually agreed by the parties. For the avoidance of doubt, if the Experts so request, this may include documents, materials or information produced after the Valuation Date, and such requests may be made from the date of the upload of documents to the Data Room pursuant to paragraph 4 above. Any such request from or response to an Expert shall be copied by email to the Expert for the other party to the email addresses notified in paragraph 7.

9. The Petitioner shall procure that appropriate members of its management team be available to meet with both Experts together, in person or by telephone or by way of video link, such meetings to be scheduled to take place at a mutually convenient place and time for the purpose of providing information and answering queries which are relevant to the preparation of the Experts' respective opinions ...".

The consent order then went on to provide for the exchange of experts' reports, for a meeting between the experts, for the provision of a joint memorandum of the experts identifying areas of agreement and disagreement, for the provision of supplemental reports and for the holding of a case management conference after exchange of supplemental reports.

5.     The consent order was subsequently amended by further order dated 21 December 2016.  The amendments are not relevant to the issues on this application.

6.     On 3 March 2017 the Dissenting Shareholders issued a summons for relief in terms of a draft order attached to it.  In essence, the draft order provided for preservation of electronic devices and data; for specific discovery "pursuant to Order 24, rule 7 of the Grand Court Rules [and to] paragraphs 4, 5 and 8 of the [consent order]" of documents listed in a schedule containing 44 categories of document, and the appointment of a forensic expert to conduct a search in the Company's IT systems and on its electronic devices for documents containing certain keywords. The 44 categories of document were summarised by the judge at paragraph [28] of her judgment as being documents and communications related to the 2025 Projections; documents and communications to and from, or in the possession of, JP Morgan; documents and communications to or from the Company's financiers; meeting file notes; documents and communications to and from the Buyer Group; internal employee communications, documentation and analysis; Skadden emails; and tax analysis.

7.     It was this summons that led to the making of the Order, which is in the following terms:
       "IT IS ORDERED that
       1. The Company shall forthwith take all steps necessary to preserve all computers, servers, network systems, cloud storage,

laptops, back-up tapes, archives, handheld electronic devices or other means of transmitting or receiving or storing data ("Electronic Devices") and all or any data in the Company's possession, custody or power which may be relevant to these proceedings which is held or stored on or by Electronic Devices or similar means in any jurisdiction whatsoever until the conclusion of the cause or further Order of the Court.

2. The Company shall, in the manner hereinafter appearing, give specific discovery pursuant to Order 24, rule 7 of the Grand Court Rules, of (a) all correspondence between the Company and J.P. Morgan Securities (Asia Pacific) Limited ("JP Morgan") regarding JP Morgan's refusal to provide documentation; and (b) all emails from Skadden, Arps, Meagher & Flom LLP in their native format (the actual electronic email with any attachments).

3.      The Company shall prepare and serve a list of documents by 21 August 2017, such list to identify all relevant documents including of any electronic file type (and for the avoidance of doubt such documents must include inter alia (whether in hard copy or electronic form on any Electronic Device wherever they may be) memoranda, graphic files, office based documents, drafts, notes of meetings and discussions, including telephone conversations and e-mails (including attachments) or other data sent to or from any e-mail address used by any of the directors, officers or employees or anyone else on its behalf, which relate in any way to the determination of the fair value of the shares in the Company as at the Valuation Date (as defined in the Order for Directions dated 25 October 2016 (the "First Directions Order")) ("Documents") which are or have been in the possession, custody or power of the Company (the "List").

4.      The List shall be verified by an affidavit sworn by a director of the Company and such director shall attend in person at the trial of the cause to be cross-examined unless the director's  attendance

is not required by the written agreement  of the Dissenters or further Order of the Court.

5.      Within 7 days following the provision of the List, the Dissenters and the Company shall designate specific key words to be used to search all Electronic Devices used by or available to the Company and its directors, officers or employees or anyone else on the Company's behalf for the Documents (the "Keywords").

6.      Subject to the provision of appropriate confidentiality undertakings (which, in the event that there is no agreement, the Court shall determine such terms), the Company and the Dissenters shall jointly appoint an independent forensic technology expert (the "Forensic Expert") to conduct an audit of the Company's information technology systems and all Electronic Devices used by or available to the Company and its directors, officers or employees  or  anyone  else on the Company's behalf for documents (including but not limited to any documents and/or information in Schedule A to the Summons, save for paragraph 40 of Schedule A to the Summons) containing the Keywords (the "Forensic Audit").

7.      The Forensic Expert shall be a person with considerable experience of conducting forensic examination of electronic sources and the appointment shall be approved in advance by agreement of the parties, failing which the Court shall determine the identity of the Forensic Expert on the application of any of the parties.

8.      The Company shall provide all such assistance and access as requested by the Forensic Expert, including but not limited to providing access to the Company's information technology systems and all Electronic Devices referred to in paragraph 6 above and to allow the Forensic Expert to take forensic copies and/or image any emails (including attachments) and/or other electronic Documents.

9.      The Forensic Expert shall report to the Court and the Dissenters' Cayman Islands attorneys ("Walkers") on a weekly basis, such report to contain details of the progress of the Forensic Audit, including but not limited to what has been searched, the Keywords used, the results of the Forensic Audit, the assistance and access provided by the Company pursuant to paragraph 8 above and any impediments to the Forensic Audit.

10.      The Forensic Expert shall provide all results of the Forensic Audit to the Company's Cayman Islands attorneys ("Harneys") on a rolling basis.

11.      Harneys shall review the documents obtained from the Search for privilege and shall cause all non-privileged documents to be uploaded to the Data Room (as defined in the First Directions Order) within 3 days of receipt from the Forensic Expert.

12.      The Forensic Expert shall give notice to the Court, Walkers and Harneys when the Search has been completed.

13.      The time for exchange of experts' reports in accordance with paragraph 11 of the First Directions Order be extended to the date falling four weeks after either the final document has been uploaded to the Data Room pursuant to paragraph 11 above or the Forensic Expert has given notice pursuant to paragraph 12 above, whichever is later.

8.    It can be seen that this order has four elements: (a) an order for preservation of electronic devices and data (paragraph 1); (b) an order for specific discovery of two categories of documents, including emails from Skadden, Arps in native format (paragraph 2); (c) an order for service of a verified list of documents (paragraphs 3 and 4); and (d) the appointment of an expert to conduct a search of the Company's IT systems and electronic devices for documents containing certain key words (the rest of the order).

9.     The Company challenges each of these elements, although elements
       (a) and (d) are dealt with together. It does so on three grounds: that
       the judge erred in law by failing properly to apply the test for specific
       discovery set out in Order 24, rule 8; that she was wrong in law to
       treat the Company's verifying affidavit as not conclusive; and that she
       was wrong in law to regard the appointment of an independent
       forensic technology expert as a remedy available under Order 24, rule
       7.  We deal with these grounds in turn.

*Ground 1: specific discovery*

10.    Specific discovery is dealt with by Order 24, rule 7, of the Grand Court
       Rules.  Order 24, rule 8 provides so far as relevant that on the hearing
       of an application under rule 7 the Court "shall in any case refuse to
       make such an order if and so far as it is of the opinion that discovery is
       not necessary either for disposing fairly of the cause or matter or for
       saving costs".

11.    The judge largely rejected the Dissenting Shareholders' application for
       specific discovery. At paragraph [107] of the judgment, she said that
       "save for the correspondence regarding JP Morgan's refusal to provide
       documentation, and the Skadden documents, in my judgment the
       Dissenters have not satisfied the standard required for the Court to
       order the specific discovery sought in paragraph 2 of the Summons
       and as set out in Schedule A.  This is because they have not
       demonstrated objectively the existence of these specific documents or
       categories of documents".

12.    In relation to the two categories of documents in respect of which she
       did order specific discovery, her reasoning was as follows. As to the JP
       Morgan correspondence, she said at paragraph [103] of the judgment
       that "in order to properly understand the context of JB Morgan's letter
       of 7 April 2017, which has been disclosed, it does seem to me that the
       correspondence between the Company and JP Morgan's refusal to

provide documentation should be discovered. This is in my view relevant, necessary and proportionate". As to the Skadden emails, she referred at paragraph [104] to the reason given by the Dissenting Shareholders for asking for the documents in native format, namely that the versions disclosed were in PDF format and only if the emails were uploaded in their native format would the experts be able to see the attachments. At paragraph [105] she rejected the Company's assertion that the Skadden emails were not in its power, possession or custody on the grounds that, since Skadden were the Company's former attorneys, the Company was entitled to seek the documents from its attorneys.  She then set out as follows two reasons quoted as to Skadden's stance:

> *"It is not protocol to provide "native" files, especially not to an adversarial party in litigation, due to various reasons:*
>
> *(1)      If the documents are provided in their native format, there is no way to place identifying markers on them (e.g. dates stamping is not possible), so there is no way to maintain appropriate control over the documents and what is being claimed or discarded as part of the production set.*
>
> *(2)      Additionally, when documents are provided in their native format, all of the information related to the documents, (i.e. the forensics) are inevitably provided, including but not limited to each time it was edited, saved, opened, what edits were made, and the author of the edits. Such information could potentially be privileged and cannot be removed from the documents. We do not provide the forensics unless ordered to do so by a court."*

Finally, at paragraph [106], the judge said this:

> "However, in my judgment, any question of privilege attaching would be the privilege of the client, the Company, to waive, and I therefore accept Mr. Levy QC's submission that the Company ought to be able to compel Skadden to hand over the documents for uploading to the Data Room in their native form. In my judgment

discovery of these documents is relevant, reasonable, necessary and proportionate."

13.     The Company complained that, having regard to the evidence filed on behalf of the Company, there was no proper foundation for the judge's conclusion that an order for specific discovery was reasonable, proportionate or necessary. The only possible basis for that view was a statement by the expert engaged by the Dissenting Shareholders, James Nicholson, in a letter dated 10 March 2017, that the information and documents set out in the schedule to the Dissenting Shareholders' summons (which included the JP Morgan and Skadden documents) was "relevant to my assessment of fair value as at the Valuation Date". But, in the words of paragraph [15] of the Company's written submissions, "the learned Judge also failed to take account or any proper account of the fact that the [Dissenting Shareholders] had not said why specific discovery of such documents was necessary for the fair disposal of the proceedings or how their perceived deficiencies in [the Company's] discovery are preventing their expert from preparing his report. Nor did they say how they are relevant to the question of fair value."

14.     The judge dealt with this issue extensively between paragraphs [77] and [89] of her judgment. She stated that although in ordinary cases of discovery relevance was not a matter of opinion but was determined by the pleaded issues, in a section 238 petition the sole issue was fair value. The discovery exercise was absolutely central to the proper determination of the value, and experts had a special role to play. She accepted that an expert must express his views as to relevance with independence, and must not allow the instructing party or its attorneys to dictate relevance; but she held at [85] that it would be highly speculative for her to come to the view on this interlocutory application, without cross-examination, that the view expressed in Mr Nicholson's letter was not his own opinion and considered view of

what was relevant for his assessment, and what was needed to complete his work. She considered the Company's submission that it was not enough for Mr Nicholson simply to state that the documents were relevant, but held that the matter had to be viewed against the backdrop of the repeated requests made by Mr Nicholson's firm. She considered also the relevance of the fact that the Company's expert had indicated that he was able to complete his report without the additional documents, but said that that did not have the effect of convincing her that Mr Nicholson was being unreasonable in requesting to see the documents and to obtain the information. She pointed out that experts may differ in approach and also as to the degree of detail or information required in order to give a valuation. Ultimately, she concluded at paragraph [89] that the court was "not in a position to second-guess or to sift through Mr Nicholson's assertion of relevance".

15.   In our view, the judge's reasoning on this aspect of the matter is clear, cogent and persuasive, and her conclusion eminently within the range of conclusions open to her. We do not consider that this ground raises any realistic possibility of challenge to her decision.

*Ground 2: verifying affidavits conclusive*

16.   The foundation of this ground of appeal is the assertion that affidavits verifying discovery are ordinarily conclusive. The Company relied in particular upon *Lonrho v Fayed (No 3)*, The Times, 24 June 1993, a decision of the Court of Appeal of England and Wales, in which Stuart-Smith LJ gave the leading judgment. The relevant part of the report is as follows:

> "His Lordship concluded that on whatever grounds the order for a further affidavit was made, whether because of some admission by the deponent or the belief of the opposite party that other documents existed, the deponent's oath was conclusive; it could not be contravened by a further contentious affidavit and could not

be the subject of cross-examination. ... The reasons for the rule were not far to seek. In the great majority of cases where it was alleged that one party or the other had suppressed documents, that issue would be crucially relevant to the issues in the trial and could only be properly determined after the judge at trial had heard all the evidence. To try the issue at an interlocutory stage could involve injustice to both sides."

17.   The judge dealt with this aspect of the case between paragraphs [92] and [102] of her judgment. She started by accepting the Company's submission that the verifying affidavits sworn on the Company's behalf would normally be conclusive as to whether or not the Company had in its custody, possession of power any relevant documents other than those disclosed. She said, however, that they would not be conclusive if there had been an insufficiency of discovery which could be established from (a) the pleadings, the list, the affidavit, or documents referred to in them; (b) any other source that constituted an admission of the existence of discoverable documents not previously disclosed; and (c) an apparent exclusion of documents from discovery under a misconception. She said that what had caused her concern was the Company's approach to the discovery process, which had been in instances somewhat careless and cavalier, resulting in incomplete and ineffective discovery. There were areas where the Company had given inconsistent responses to requests, examples of which she identified; and she remarked that some of the variations in the responses were hard to reconcile without full or complete discovery. She referred to instances where the Company had claimed not to have certain categories of documents, but had subsequently disclosed them. One of those instances related to 431 documents concerning the Company's quarterly budgets, which the Company uploaded after the issue of the summons, having previously asserted that it did not create quarterly budgets. In paragraph [102], she said this:

"in my judgment, the Company has not misunderstood the case or mis-conceptualised it. What it is saying is that a lot of categories of information do not exist and never have existed in document form, which the Dissenters say is incredulous and incapable of relief. The position taken by the Company may well be strange. By itself, that is not sufficient for the Dissenters to discharge the burden of demonstrating objectively that the documents exist. However, in light of the Company's inconsistent positions, coupled with its cavalier approach to previous aspects of the discovery process, in my judgment there has been an insufficiency of discovery. If anything, the Company may have mis-conceptualised the discovery process. This insufficiency has been established, based on the specific facts, as well as the surrounding circumstances. It is such that I cannot say that I find the Company's statements that it has given complete and full disclosure reliable. I make a distinction between credibility and reliability, because I am not saying that there has been deliberate concealment or deletion, but rather that the discovery process has not been handled with the care required in order for the Court to ensure that its Orders are carried out and that the discovery process is carried out fairly".

18. Again, we do not think that the judge's approach to this aspect of the matter can be validly criticised. There clearly were grounds on which she was entitled to conclude that, despite the Company's assertions to the contrary, complete disclosure had not been given. She was right also to recognise that there were exceptions to the general rule that an affidavit verifying discovery is conclusive. This has been clear in England and Wales since at least 1912: see *British Association of Glass Bottle Manufacturers Ltd v Nettlefold* [1912] AC 709, 714, where Viscount Haldane said this:

"But while it is true that as a general rule you cannot go behind the affidavit in the absence of admissions in that or some other document, the rule is qualified where the basis on which the

affidavit of documents has been made turns out to have been wrong. If the party making the affidavit has misconceived his case, so that the Court is practically certain that if he had conceived it properly, and had acted upon a proper view of the law, he would have disclosed further documents, then the Court can refuse to recognise an affidavit as conclusive, and order a further affidavit".

19.     It is, in our view, also important to recognise that the rationale of the conclusivity presumption does not apply in the special circumstances of a section 238 petition. As identified in *Lonrho v Fayed (No 3)*, the rationale is that allegations of suppression of documents are capable of being relevant not only to discovery but to the substantive issues in the litigation. That was obviously the case in *Lonrho v Fayed* itself, where the issue was what was the ultimate source of funds for the purchase of House of Fraser and the object of the specific discovery application was to establish that the asserted source of funds was a fabrication. In such circumstances, it is obviously unsatisfactory that a substantive issue should be decided at an interlocutory stage. It is also the case that, in ordinary litigation, an absence of discovery can be dealt with by the drawing of adverse inferences: if the court is satisfied that a document that must exist has not been disclosed, the court may if appropriate conclude that its contents are harmful to the interests of the party failing to disclose it. In the case of a section 238 petition, however, neither of these considerations applies. The sole task of the Court is to determine the fair value of the dissenters' shares. To do that, it needs full information. If that information is lacking in some material respect, the court is not prejudging any substantive issue by ordering its disclosure. Nor can the absence of information be dealt with by drawing adverse inferences: the court needs to know what the information is, and concluding that it has been deliberately withheld does not help the court identify its contents.

20.    In the present case, having identified inconsistencies and problems with the Company's discovery, the judge was fully entitled to order further disclosure. There is no real prospect of this ground of appeal succeeding.

*Ground 3: no jurisdiction to order an IT audit*

21.    This ground is based partly on the assertion that appointing an expert to conduct or supervise discovery undermines the principle of conclusivity, and we have already stated our views on that topic. However, the Company goes further, and contends that the order for a forensic audit, requiring the Company to preserve all its electronic data and devices and submit them to examination by an external expert, is outside the powers of the court under its discovery jurisdiction and its inherent jurisdiction.  The Company submits that the order "is a highly intrusive form of injunctive relief akin to an *Anton Piller* order but without the safeguard of a supervising solicitor. Relief of that kind was unjustified and wholly inappropriate in this case and would not be granted in reliance solely on specific discovery rules in any Commonwealth jurisdiction".

22.    The judge dealt with this issue at paragraphs [108] to [115] of her judgment. She quoted from Hollander, *Documentary Evidence* (12th ed, 2015), paragraph 8.18, including the following passage:

> "It is obvious that an order requiring a party to give access to his opponent to enable disclosure to be effected is an exceptional remedy and gives rise to serious issues which need addressing. Thus in *Nucleus Information Systems v Palmer[1]* Lewison J was told that the applicant did not accept that the other party had given proper disclosure of the relevant contents of his home computer, and sought an order that he should have access to the computer in order to search through his lawyers. The judge refused direct

---

[1] [2003] EWHC 2013 (Ch)

access to the computer, pointing out that it raised ECHR and privilege issues.

In *Mueller Europe Ltd. v Central Roofing (South Wales) Ltd*.[2] the issue was lack of the relevant expertise rather than deliberate failure. It had become apparent that the relevant individual from the defendant did not have the expertise to perform a meaningful search for back-up tapes, which had been previously ordered. Coulson J held that he had power to order that the search be carried out by a suitably qualified IT consultant on behalf of that party in order to ensure that the orders of the Court were effectively complied with...

From this line of cases, it is apparent that the court has power to order inspection of a computer by an expert, or that disclosure be given in whole or part by an expert rather than the party, but that this is an exceptional order which will only be given when the particular circumstances justify it, and normally after there has been a failure to comply with disclosure orders."

23. The judge then said that the court had inherent jurisdiction to order discovery by means of a forensic audit. That would be in keeping with the overriding objective of dealing with cases justly and in a way that was proportionate to the amount of money involved, the importance of the case, and the complexity of the issues.  The case was exceptional, not only because of the central importance of discovery in section 238 proceedings and the role of the company in that process, but also because of the Company's inconsistent and cavalier approach to discovery. The case was analogous to the *Mueller* case where there was a lack of expertise in carrying out the discovery process. An order for a forensic audit was necessary to avoid a denial of justice to the Dissenting Shareholders and to permit the court to appraise the fair value of the Dissenting Shareholders' shares. Although the order was undoubtedly intrusive, it was justified in this case.

---

[2] [2012] EWHC 3417 (TCC); [2013] TCLR 2

24.    As we have indicated, part of the Company's challenge to this part of the Order was based on the assertion that it went far beyond specific discovery as contemplated by Order 24, rule 7 – which, so the Company said, was the jurisdiction invoked by the Dissenting Shareholders' summons.  We agree that rule 7 would not, on its own, justify an order for the disclosure exercise to be conducted by a third-party expert.  However, the Dissenting Shareholders' summons was also expressly intended to procure compliance with defined paragraphs of the Consent Order, which they contended – and the judge plainly accepted – had not been complied with by the Company.  The court has an inherent jurisdiction to ensure that its orders are observed, and it was that jurisdiction that the judge exercised, as her references to the inherent jurisdiction (paragraph [110]) and the insufficiency of discovery under previous orders (paragraph [112]) demonstrate.  The Company relied on cases concerned with the court's inherent jurisdiction to order security for costs, such as *Dyxnet Holdings Limited v Current Ventures II Limited* [2015 (1) CILR 174] and *In re Bancredit Cayman Limited* [2009 CILR 578], to demonstrate that the exercise of the inherent jurisdiction, in the words of Lord Scott of Foscote in the latter case at [9], "is subject to what has become the settled practice of the court"; and from that base it was contended that the court "cannot simply invent orders that are otherwise unknown to the laws of these Islands and which are highly and unjustifiably intrusive. ...The discretion must be exercised not merely in a generally judicial manner, but in a manner which accords with the settled practice of the Court, as circumscribed or extended by primary or secondary legislation".

25.    Although the judge did not rely on it, there was in fact an available basis in the Grand Court Rules for the order she made.  Order 24, rule 20(1) provides as follows:

> "Where the Court has made an order for discovery (either of documents or by way of oral examination) against any party and such party fails to comply, the Court may make such order as it thinks just, including, in particular, an order that the action be dismissed or, as the case may be, order that the defence be struck out and final judgment entered accordingly".

This power not only in terms gives a wide discretion as to the orders that may be made, but extends to striking out the case of the defaulting party.  The inherent jurisdiction of the court to deal with deficiencies in discovery, to the extent that it is necessary to invoke it, cannot be less wide.  On either basis, there was a clear jurisdictional basis for the order the judge made.  She had ample grounds for concluding that a forensic audit was the only practical way of ensuring that the Company complied with its disclosure obligations.  She recognized that the order was intrusive and exceptional, and put in place protections for the Company – in particular the provision in paragraph 11 preserving privilege.  There are in our judgment no realistic grounds for believing that a challenge to this part of the order could succeed on appeal; and we do not regard the exceptional nature of the order as giving rise to a point of general importance sufficient to justify an appeal.

26.   According to a note made by the Company of the judge's reasons for refusing leave to appeal, she said that she doubted whether an appeal would have a real prospect of success because it involved a pure question of discretion and also involved an exercise of her discretion in relation to case management issues.  In this, as in her decision generally, we consider that the judge was plainly correct.  She had a sound jurisdictional basis for the order she made, identified the correct considerations, and reached a decision that is clearly within the bounds of her discretion.  An appeal against the decision would have no reasonable prospect of success.

27.     As presaged in paragraph 3 of these reasons, we come back to the possibility of abuse of the autonomy that is of necessity to be given to experts in section 238 proceedings.  In paragraph 63 of her judgment, the judge recorded a submission by leading counsel for the Company "that section 238 fair value claims must not be allowed to become a carte blanche for dissenters to conduct a "drains up" inspection of the entire business, regardless of relevance to fair value".  We think there is a danger that the liberty given to the experts to define what is relevant to value could be abused, and even used to put pressure on a company to agree an inflated value for dissenters' shares rather than accept the wholesale disruption of an external inspection of its physical and electronic records.  At paragraph 114 of her judgment, the judge said that she wished to make it clear that she was not at all holding that an order for appointment of a forensic expert would be appropriate in every section 238 proceeding; and again she was right to do so.  It is, however, observable that such orders have been made in at least two cases – this one, and *In the matter of Shanda Games Limited*[3] (although in the latter case the order was made by consent) - and we are concerned that they may become accepted practice.  We stress that they are to be regarded as exceptional remedies, not common currency in section 238 petitions.

Martin JA

Newman JA

Morrison JA

---

[3] Unreported, Segal J, 25 April 2017

# EXHIBIT 5

# IN THE COURT OF APPEAL OF THE CAYMAN ISLANDS

**CICA 12 of 2017**
**(Cause FSD 14 of 2016 (NSJ)**

**IN THE MATTER OF SHANDA GAMES LIMITED**

**BETWEEN**

### SHANDA GAMES LIMITED

**Appellant**

**AND**

**(1) MASO CAPITAL INVESTMENTS LIMITED**
**(2) BLACKWELL PARTNERS LLC – SERIES A**
**(3) CROWN MANAGED ACCOUNTS SPC ACTING FOR**
**AND ON BEHALF OF CROWN/MASO SEGREGATED**
**PORTFOLIO**

**Respondents**

Before:

The Right Honourable Sir John Goldring, President
The Honourable John Martin QC, Justice of Appeal
The Honourable Dennis Morrison, Justice of Appeal

Appearances:



For the Company's Re-Open Appeal
Ms. Madeline Heal, Mr. Paul Madden and Mr. James Elliott of
Harneys on behalf of the Appellant
Mr. Robert Levy QC instructed by Mr. Mac Imrie and Ms.
Gemma Freeman of Maples and Calder

For the Company's Substantive Appeal
Mr. Philip Jones QC instructed by Mr. Paul Madden and Mr.
James Elliott of Harneys for the Appellant
Mr. Robert Levy QC instructed by Mr. Mac Imrie and Ms
Gemma Freeman

CICA 13 of 2017
(Cause FSD 14 of 2016 (NSJ)

IN THE MATTER OF SHANDA GAMES LIMITED

(1) MASO CAPITAL INVESTMENTS LIMITED
(2) BLACKWELL PARTNERS LLC – SERIES A
(3) CROWN MANAGED ACCOUNTS SPC ACTING FOR
AND ON BEHALF OF CROWN/MASO SEGREGATED
PORTFOLIO

**Appellants**

AND

SHANDA GAMES LIMITED

**Respondent**

Appearances:          Mr. Robert Levy QC instructed by Mr. Mac Imrie and Ms.
                      Gemma Freeman of Maples and Calder for the Appellants
                      Mr Philip Jones QC instructed by Mr. Paul Madden and Mr.
                      James Elliott of Harneys for the Respondent


Date of Hearing:      4 and 5 September 2017

Date of Delivery:     6 March 2018

Judgment Finalised:   9 March 2018
and approved

**JUDGMENT**

MARTIN JA:

*Introduction*

1.    A shareholder in a Cayman-registered company who dissents from a merger or
      consolidation of the company under ***Part XVI of the Companies Law*** is entitled under
      section 238 of that Law to be paid "*the fair value of his shares*" as determined by the
      court, together with a fair rate of interest.  These appeals raise important questions about
      the methodology to be applied in determining the fair value and fixing a fair rate of

interest, and about the extent to which principles developed in other jurisdictions with similar regimes may legitimately be applied to a section 238 determination.

2.  On 18 November 2015 Shanda Games Limited ("**Shanda**"), a Cayman-incorporated company, merged with Capitalcorp Limited in the culmination of a take-private transaction led by Shanda's principal shareholders and management. At the EGM held on that date to authorise the merger, 99.3% of Shanda's shareholders that voted did so in favour of the merger. Under the terms of the merger, they received US$3.55 per share (or US$7.10 for each American depository share ("**ADS**"), those shares equating to two ordinary shares). Certain shareholders ("**the Dissenting Shareholders**") dissented from the merger: they are the respondents to the petition by Shanda seeking determination of the fair value of their shares that gives rise to these appeals.

3.  On 17 May 2017 Segal J made an order on Shanda's petition, determining the fair value of the Dissenting Shareholders' shares to be US$8.34 per share (US$16.68 per ADS) – more than double the merger price - and the fair rate of interest to be 4.295%. This resulted in an order for payment to the Dissenting Shareholders of US$73,575,995 plus interest of US$2,788,801. Shanda appeals with leave of the judge against the judge's refusal to discount the value of the Dissenting Shareholders' shares to reflect their minority holdings, and against his decision on the rate of interest. The Dissenting Shareholders appeal, again with the leave of the judge, against aspects of the methodology adopted by the judge to determine the fair value of the shares.

4.  Shanda also took issue with the refusal of the judge to admit further expert evidence and defer his decision on value until after the evidence had been heard, and filed a notice of appeal without leave. On 4 September 2017 we determined that leave was necessary and refused it, alternately dismissing the appeal if we were wrong about the necessity for leave. My reasons for this are incorporated in this judgment.

*Background*

5.  In his commendably careful and comprehensive judgment, the judge set out in detail the history of the companies, the merger and the proceedings. For the purpose of these appeals, it is unnecessary to say more than the following.

6.    Shanda was incorporated in the Cayman Islands on 12 June 2008. It is an online game developer, operator and publisher. It is one of China's largest video game companies, offering a diverse portfolio of popular online and mobile games primarily in China, as well as in overseas markets.

7.    As at 31 December 2014, Shanda had an aggregate of 537,832,318 ordinary shares outstanding, comprising Class A and Class B shares including Class A ordinary shares represented by the ADSs. The ADSs were publicly listed on the US NASDAQ Global Select Market from September 2009 until Shanda was taken private in November 2015. Each Class B ordinary share was convertible into one Class A ordinary share but carried ten times as many votes. At the conclusion of the merger the Dissenting Shareholders were between them the registered owners of 8,822,062 Class A ordinary shares, representing some 1.64% of the issued share capital.

8.    The merger was effected under the provisions of *Part XVI of the Companies Law*. Those provisions, which were introduced in 2009, in their current form have the effect that a merger or consolidation ordinarily requires authorisation only by special resolution of the shareholders of each constituent company – that is to say, by a two-thirds majority. As will be seen, this provides a simpler method of effecting a merger, consolidation or take-over than other regimes contained in the *Companies Law*, which require majorities of 90% or 75% and contemplate intervention by the court.

9.    Section 238 (which forms part of Part XVI) contains a procedure for dissenting from a merger. It was complied with in the present case. One consequence of dissent is, by subsection (7), that from a period no longer than 40 days after the meeting approving the merger the dissenting shareholder ceases to have any of the rights of a member except the rights to be paid the fair value of his shares as determined by the court, to participate in the petition and to institute proceedings disputing the validity of the merger.   A first step towards arriving at the fair value of the dissenter's shares is the making by the company of an offer for the dissenter's shares at a specified price that the company determines to be their fair value (subsection (8)); but that cannot occur before the dissenting shareholder has lost his rights as member by virtue of subsection (7). Such an offer was made in the present case by Shanda but was rejected by the Dissenting Shareholders.

10.     Shanda's petition was issued on 4 February 2016.

11.     Each side engaged an expert.  Shanda's expert was Professor Gregg A. Jarrell ("Professor Jarrell"), a tenured Professor of Economics and Finance at the University of Rochester's Simon Business School, where he has been a member of the faculty since 1988. He holds a Ph.D. in Business Economics from the University of Chicago (1978), with major concentrations in Industrial Organization and Finance, as well as an MBA (1976) from the University of Chicago.  The Dissenting Shareholders engaged William Inglis ("Mr. Inglis"), a Senior Managing Director in the Singapore office of FTI Consulting, a global expert services firm specialising, amongst other matters, in expert witness services and litigation support. Mr. Inglis is a Chartered Accountant and since 1989 has specialised in valuation and the quantification of loss in the context of legal disputes.

12.     The hearing of the petition took place in November 2016 over eight days, of which five were taken up by the expert evidence.   At all stages of the petition, up to and including the hearing, the attorneys acting for Shanda were Conyers Dill & Pearman ("Conyers"). On 20 January 2017, however, Shanda gave the Court and the Dissenting Shareholders notice that it had changed its attorneys and was now represented by Harneys.

13.     On 20 March 2017 the judge circulated a draft judgment. He had signalled his intention to do so at various stages over the preceding weeks, but because of an administrative error by the court, Harneys were unaware of this.  On the same day, but before the draft was circulated, Shanda, acting by Harneys, issued a summons seeking liberty to reopen its case and to introduce additional expert evidence. The judge dismissed this summons on 25 April 2017.  He gave reasons for his decision on 27 July 2017. As already stated, Shanda appealed against the judge's dismissal of the summons ("the reopen application"), contending that leave was unnecessary – although it applied for leave if in fact it was necessary. Also on 25 April 2017, the judge formally released his substantive judgment. On 6 May 2017 he produced a note on the fair value calculation; on 16 May 2017 he issued a further judgment dealing with the fair rate of interest; and on 17 May 2017 he made the order referred to in paragraph 3 above embodying his various decisions.

14. As I have said, both Shanda and the Dissenting Shareholders appealed against that order. I deal in turn with the reopen application, Shanda's substantive appeal and the Dissenting Shareholders' appeal.

*The reopen application*

15. Following their replacement of Conyers as Shanda's attorneys, Harneys commissioned Jaime d'Almeida ("Mr. d'Almeida") to review the trial transcripts and the reports and evidence of Professor Jarrell and Mr. Inglis. Mr. d'Almeida subsequently provided a fresh expert opinion, which concluded that the evidence from Professor Jarrell was so inadequate, both in its own methodology and approach and in its failure adequately to challenge Mr. Inglis's work and conclusions, that the court had been misled at trial. The basis of Shanda's summons was that Mr. d'Almeida's evidence was necessary if the court was to make a proper and just decision as to fair value.

16. The reasons given by the judge for refusing to allow Shanda to reopen its case and adduce the evidence of Mr. d'Almeida, which were again expressed in a clear and comprehensive judgment that extended to 69 pages, may be summarised as follows.

   (1) The court had jurisdiction to admit new evidence and reopen the trial after judgment had been handed down in draft. The principle to be applied when deciding to exercise the jurisdiction was the overriding objective to deal with cases justly and at proportionate cost. Although the application was made to the trial judge, the court should take into account the ***Ladd v Marshall*** factors restricting reliance on new evidence on appeal - which, even applied more leniently than on an appeal, meant that powerful factors or strong reasons would be needed to justify the application. When applying the overriding objective after a judgment had been handed down, the court needed to take into account the question of reconsideration and the prejudice caused by depriving a successful party of a judgment; and in the context of applications to admit new evidence after trial, whether or not a judgment had been handed down, there was a balance to be struck between on the one hand the court's desire (and the parties' entitlement) to have a decision based on the true factual position and on the other the need for finality in litigation.

(2)   The court had to "*consider and weigh in the balance in particular the reasons for the application, the conduct of the parties, the delay between the conclusion of the trial and the making of the application, the prejudice to the applicant as a result of not allowing the new evidence to be admitted and the trial re-opened, the prejudice to the other party of being deprived of the judgment or the further costs and delays of having to deal with new evidence and a new hearing and the need to secure the "just, most expeditious and least expensive determination of every cause or matter on its merits (see paragraph 2.2 of the Preamble to the Grand Court Rules). The need for justice to other litigants and a fair allocation of the court's resources must be taken into account*".

(3)   A number of factors weighed strongly in favour of dismissing the summons. They were as follows:

a.   The issues dealt with in Mr. d'Almeida's report had been the subject of detailed submissions and cross-examination during the course of a long trial conducted by leading counsel. Many if not most of the difficulties faced by Professor Jarrell during his cross-examination were crystal clear during the trial because he was candid and straightforward about the limited nature of his evidence and preparation and his failures fully to understand parts of Mr Inglis's evidence. It had been Professor Jarrell's poor performance in the witness box on some issues that had presumably caused Shanda and its counsel to make a series of concessions and not to contest a significant number of issues at trial.

b.   The trial had concluded on 17 November 2016, but Shanda had waited until 20 March 2017 to make its application. The fact that the court had not by then delivered its judgment was no excuse for the delay in a case where the problems with the expert witness and evidence were apparent at trial. The court's concern and criticism arose from Shanda's failure to act with sufficient expedition during or shortly after the trial, when the performance of the expert was visible and clear during the trial. Some delay was bound to be involved in instructing a new expert and awaiting the outcome of his work; but, even taking that into account, Shanda could have acted much more rapidly in bringing on an application to deal with the perceived deficiencies in, and problems with the expert evidence.

c.  The judge accepted that Harneys had not been aware of his updates regarding the timing of the handing down of the judgment, and consequently did not take the view that the application was an abuse of process. He did, however, comment that it was a remarkable coincidence that the filing of the summons almost precisely coincided with the handing down of the draft judgment, and he said that he felt himself entitled at least to note that the filing of the summons could be viewed as a litigation tactic to delay the conclusion of the litigation.

d.  If the summons were acceded to, the whole process of preparation of revised experts' reports – including the provision of further information, further meetings with management, and a further joint meeting of the experts – would have to be gone through again, and there would have to be another trial at which they could both be cross-examined. In many respects the proceedings would need to revert to the stage reached when the original directions order had been made. This would involve significant further cost to the parties, delays and significant further amounts of limited court time and resources.

e.  The real thrust of Shanda's complaint was that Professor Jarrell had been negligent in the performance of his duties. The negligent performance of his duties by an expert would not generally be, and in the present case was not, sufficient to allow the party that selected him to re-open the trial and instruct a second expert (and in effect have a second bite at the cherry). The prejudice suffered by the party concerned could be remedied by making a claim against the expert. It would be disproportionate and unjust to make the other party suffer the consequences when both had been able to select whichever expert they chose.

f.  Shanda had rightly accepted that it needed to demonstrate that the problems with the experts meant that the court's decision was unsafe. In this respect a section 238 petition was no different from other cases. Although the court had to determine the fair value for itself and form its own independent view, it was (both generally and in the present case) particularly dependent on the expert evidence to assist it. If it could be shown that the expert opinion evidence was fundamentally flawed the

court's decision-making would of necessity be unsafe because there would be no other evidence on which the court could have relied for the purpose of forming its view.

g. Shanda had asserted that both Professor Jarrell and Mr. Inglis had failed properly to deal with a number of critical issues, with the result that their valuations were fundamentally flawed and their evidence was so seriously deficient that the court had been materially misled by the entire corpus of opinion evidence going to value and its determination of fair value was as a result unreliable. However, Mr. d'Almeida's report did not establish that Mr. Inglis's evidence on the material matters he identified was so deficient and incompetently prepared as to be outside the range of reasonable professional opinions on the valuation issues. The court had been properly able to rely on Mr. Inglis's evidence, as well as on parts of Professor Jarrell's evidence. Although parts of Professor Jarrell's evidence were weak and unreliable, his failures did not undermine the credibility and reliability of all his evidence. On a number of issues he had demonstrated the expertise of a properly qualified expert and had given evidence that was reasonable and consistent with the academic and professional literature and accepted methodologies of those qualified in the field of financial valuation and statistical analysis. Nor did Professor Jarrell's failure to raise the points and challenge Mr. Inglis on the issues identified by Mr. d'Almeida mean that Mr. Inglis's evidence must be treated as unsafe.

h. There had been problems caused by serious deficiencies in the factual record that had required the experts and ultimately the court to make certain assumptions or inferences. That had been largely the fault of Shanda; but it was not in any event a sufficient reason for concluding that the expert evidence given at trial was unsafe as a whole or to a material extent. Mr. Inglis had dealt with the evidential deficiencies properly and reasonably and had produced an opinion that was reasonable and reliable and based on reasonable assumptions informed by accepted professional practice. The fact that Shanda had belatedly found an expert who was prepared to support a much lower value for the shares was not sufficient to justify the conclusion that the evidence

at trial was seriously compromised and flawed and that the judgment was unsafe. It would be wrong to permit Shanda to indulge in opinion shopping and to impose on the Dissenting Shareholders the further costs and delays associated with further evidence and a new trial (as well as to cause them the significant prejudice resulting from being deprived of the judgment already delivered).

17. Shanda filed a notice of appeal on 9 August 2017, and on the same day filed a summons in the Grand Court seeking leave to appeal. That summons was not pursued; but in its initial skeleton argument in support of the reopen application Shanda sought leave to appeal from the Court of Appeal, albeit only in paragraphs 50 to 53 of the 54-paragraph document. The Dissenting Shareholders formally objected to the appeal being pursued without leave; and Shanda devoted its reply skeleton (but not its oral submissions, which were directed to the merits of the reopen appeal) to the issue of whether leave was or was not required.

18. Section 6 of the ***Court of Appeal Law*** (2011 Revision) provides that, subject to certain exceptions not presently relevant, no appeal shall lie from an interlocutory judgment of the Grand Court without the leave of that court or of the Court of Appeal. Shanda's contention was that the order dismissing the application to reopen the hearing was not an interlocutory order but a final order. This startling proposition was argued in the reply skeleton in the following way.

   A. Rule 12(3) of the ***Court of Appeal Rules*** (2014 Revision) provides that "*a judgment or order shall be treated as final if the entire cause or matter would (subject only to any possible appeal) have been finally determined whichever way the court below had decided the issues before it*".

   B. Rule 12(4) provides that "*for the purposes of sub-rule (3), where the final hearing or the trial of a cause or matter is divided into parts, a judgment or order made at the end of any part shall be treated as if made at the end of the complete hearing or trial*".

   C. Properly analysed, the petition fell into two parts or stages: identification of the relevant valuation principles, followed by the determination of the fair value by reference to those principles.

D.   Shanda's summons was made "*so that Mr d'Almeida's report could be <u>admitted</u> into evidence at the first stage, but taken into account at the <u>second</u> stage i.e. the stage at which the court (with the assistance of the experts) would determine the actual dollar amount representing fair value*" (original emphasis).

E.   "*It was no part of the Company's case on the Summons that there should be a re-<u>hearing</u> of the first stage.   It sought only to re-<u>open</u> its case prior to the conclusion of the first stage to adduce evidence to be taken into account later*" (original emphasis).

F.   If the judge had allowed Shanda's summons, "*the first stage would still have been at an end at that point.   Any expert evidence in reply by the Dissenters and/or cross-examination by them of Mr d'Almeida would have happened as part of the second stage.   Clearly the first stage was also at an end upon the Summons being dismissed.   In other words, whether or not the orders sought in the Summons were granted, either way the first stage of the trial of the petition was at an end*".

G.   The Dissenting Shareholders were wrong to classify the order as having been made on a summons for directions, since the purpose of such a summons was to make preparations for trial.   They were also wrong to classify the order as one made on an application for a new trial or rehearing; all that Shanda wanted to do was to add to its evidence before judgment.  None of the deeming provisions in Rule 12 applied.

19.   It is in my view plain that the order was interlocutory.   Whilst it is true that the judge determined the fair value and the fair rate of interest separately, with separate evidence being admitted on the latter, and that he left the calculation of Shanda's value to the parties in the light of his determination of the relevant principles, the suggestion that the hearing of the petition was otherwise divided into stages is wholly artificial.   So also is the suggestion that any evidence in rebuttal, or cross-examination of Mr d'Almeida, would have been heard at the stage of turning valuation principles into actual value, rather than at the stage where the expert evidence was being taken.   The refusal to allow Shanda to adduce further evidence was a decision about the conduct of an aspect of the trial, and the judge's order was not in any respect determinative of the parties' substantive rights.   Leave to appeal was required.

20.    Leave to appeal will not be granted unless there is a real prospect of the appeal succeeding, or there is a point at issue that should be considered by the Court of Appeal in the public interest. Shanda contends that it is entitled to leave on both bases.

21.    Shanda's contentions were founded on what it said was the nature of section 238 proceedings. The purpose of such proceedings was to establish a fair value for all the shares, and the court's determination of that value was binding on the entire world. Although in fact in the present case all shareholders who had dissented from the merger were parties to the proceedings, that would not always necessarily be the case; and any shareholder who had dissented from the merger but had elected not to participate in the litigation would be entitled to receive the same fair value for his shares as was due to those shareholders who had litigated. It followed that the proceedings were not ordinary litigation, and the Court's task was not just to do justice between the parties but to determine the fair value of the shares for the benefit of all. That in turn meant that the Court was to have regard to anything which might assist it to arrive at the fair value; and accordingly the only real issue on the reopen application was whether or not Mr d'Almeida's evidence was relevant to the Court's determination of fair value. It was submitted that it plainly was relevant, particularly but not exclusively in areas where the judge had not accepted the evidence of either Professor Jarrell or Mr. Inglis. The judge had mischaracterised the reopen application as being an application to adduce fresh evidence after judgment, and had therefore required Shanda to satisfy a stricter test than was appropriate. The fact that he had delivered a judgment in draft did not make the situation one where a formal judgment had been delivered, so that questions of recalling his decision and disappointing the expectations of the successful party did not arise. Nor were **_Ladd v Marshall_** considerations relevant, even in the modified form in which the judge had dealt with them, since the trial was not at an end. Although the judge had gone on to consider Mr. d'Almeida's evidence, he had done so only in his judgment refusing the reopen application. What he should have done was to appreciate that he was being asked to admit additional evidence during the course of the trial; and had he done so he would have realised that the evidence would assist him in his only task, that of determining fair value, and that any prejudice to the Dissenting Shareholders could be met by an appropriate award of costs.

22.    I do not accept the fundamental premise of Shanda's argument. Whilst it is true that section 238 requires determination of the fair value of the shares, the significance of the determination is limited: the only persons affected by it are the company and dissenting shareholders, whether or not they participated in the litigation. A shareholder who consented to the merger or accepted the merger price cannot claim to be entitled to a different price depending on the outcome of the section 238 proceedings. Essentially, the proceedings affect only those who have taken issue with the merger price, so that there is in reality a lis between them and the company. The purpose of the proceedings is to resolve that lis, and in that respect a section 238 petition is no different from ordinary litigation. Moreover, Shanda's argument ignores the process by which the determination of fair value is to occur. Since the fair value is not necessarily the same as the merger price or the price at which the shares were trading before the market in them was affected by knowledge of the merger, it is inevitable that the determination will involve an assessment of a substantial quantity of information relating to the financial affairs of the company whose shares are to be valued. It is unlikely in the extreme that the court will be able to make that assessment without expert assistance. In the ordinary case, as in this one, both the company and any dissenting shareholders will appoint experts; but even in a case where no dissenting shareholder is prepared to participate in the litigation, the company, and perhaps also the court itself, will instruct an expert. In every case, the court's task will be to assess the utility of the expert evidence to the determination of fair value. Carrying out that task in the context of section 238 proceedings is no different in nature from carrying it out in ordinary inter-partes litigation. In ordinary litigation, and in section 238 proceedings, the court will determine generally, or on an issue by issue basis, whether an expert's evidence is to be accepted in whole or in part and how conflicts are to be resolved. If necessary, the court is entitled to substitute its own view for that of the experts. The process, however, is one that will be familiar to most judges. The fact that the outcome of the process in a section 238 case is capable of affecting persons other than those who participated in the litigation seems to me immaterial: shareholders who do not participate cannot complain if the fair value of their shares is determined by reference to evidence into which they have had no input.

23.    Shanda's argument came very close to amounting to an assertion that the judge had no real discretion and was obliged to take into account any evidence relevant to fair value

presented to him before formal delivery of his judgment. As I have pointed out above, however, the judge's decision related to the conduct of an aspect of the trial, and was plainly a matter for his discretion. It seems to me impossible to fault his exercise of that discretion. Even accepting, as the judge did, that Harneys had not been kept informed of the progress of his draft judgment, Shanda's application was made extremely late. As the judge said, it must have been apparent during the course of the hearing that there were significant problems with Professor Jarrell's evidence; indeed, the only possible explanation for the engagement of Mr. d'Almeida was that Shanda had recognised those problems. Nevertheless, the application was not made until just over four months after the conclusion of the hearing. Moreover, the judge was best placed to assess the extent to which he could place reliance on the evidence of Professor Jarrell and Mr. Inglis, and the extent to which the assistance to be derived from Mr. d'Almeida's evidence justified a resumption of the hearing. The passage from his judgment I have quoted in paragraph 16(2) above demonstrates that the judge had firmly in mind the relevant considerations; and, although on occasion he does appear erroneously to have regarded the application as one for a reopening of the trial after judgment, there was ample material to justify his conclusion that justice did not require him to accede to an application that was too late and too inadequate.

24.     These considerations meant that there was no reasonable prospect of an appeal succeeding, and nothing in the nature of section 238 proceedings to justify an appeal, so that leave to appeal should not be granted. The same considerations justified dismissing the reopen appeal if, contrary to our view, leave to appeal was unnecessary.

*Shanda's substantive appeal*

25.     Shanda's notice and grounds of appeal as originally drawn took issue with several aspects of the methodology used by the judge to arrive at his decision on the fair value of the Dissenting Shareholders' shares. All but one of these was abandoned, however, and before us Shanda's only contention (apart from in relation to interest) was that the judge should have discounted the value of the Dissenting Shareholders' shares to reflect the fact that they had only minority holdings ("the minority discount point").

The minority discount point

26.     The shares held by the Dissenting Shareholders between them amounted to about 1.64% of Shanda's issued share capital. So small a proportion would give them virtually no influence, and still less control, over Shanda's affairs. They would not be able on their own to promote or resist any type of shareholder resolution. This lack of influence and control would ordinarily have an adverse impact on the market price of the shares; and Shanda argued before the judge that this should be reflected by way of a minority discount in the valuation of the Dissenting Shareholders' shares. The experts agreed that, if such a discount were to be incorporated in the valuation, it should be 23%. According to Shanda, this would mean that the value of the Dissenting Shareholders' shares would reduce by about US$16.9m.

27.     The judge held that no minority discount should be applied. His reasoning was as follows.

      (a) In Delaware and Canada, each of which had regimes similar to that contained in section 238 of the ***Companies Law***, it was clear that no minority discount was to be given. The shares of a dissenting minority were to be valued as a proportion of the value of the company, not as a block of shares offered for sale. In Delaware, this was in part a consequence of the rejection of market value as the measure of fair value.

      (b) In ***Re Integra Group*** [2016] 1 CLR 192, Jones J in the Grand Court considered that there should be no minority discount, although the point had not been argued or live.

      (c) The purpose of the fair value standard was to ensure that the dissenting minority was fully protected. That meant that they should be compensated for the full value of their interest in the company, which was their proportionate share in the capital and value of the company.

      (d) This approach was consistent with one aspect of the legal nature of a share and the rights of a shareholder, namely that a shareholder owned an undivided share in the share capital of the company.

      (e) The full value of a dissenting shareholder's interest included the right to a distribution of his share of the company's assets and value following a sale or other realisation of the company's business. This was equivalent to the value of a partner's interest in a partnership, which was based on a notional sale of the

business as a whole to an outside purchaser and the distribution to the partners of their share of the partnership property.

(f) The English and Bermuda cases relied on by Shanda, to which I refer below, were distinguishable.

28. Shanda's principal contention was that the judge should not have followed the Delaware (and Canadian) jurisprudence, but should instead have looked to the English authorities dealing with the compulsory acquisition of shares by way of a scheme of arrangement or a "*squeeze-out*" or in a claim of unfair prejudice – all of which applied or permitted a minority discount. There was nothing in jurisprudential terms to distinguish between a merger, a squeeze-out and a scheme of arrangement as a mechanism for compulsory purchase of shares, and similar principles should apply to all three. The judge should also have had regard to authorities from Bermuda and the British Virgin Islands, both common law jurisdictions, which again recognised the possibility of a minority discount. The Delaware jurisprudence, which was to the effect that a dissenting shareholder was entitled to his proportionate interest in the overall fair value of the corporation appraised as a going concern, was influenced by public policy considerations that had no place in the Cayman Islands, or in England and Wales. It had never been part of the public policy of the Cayman Islands or of England and Wales that there was anything unjust in the compulsory purchase of shares for less than the amount a shareholder would receive on the sale of the company's business and the distribution of the proceeds. Moreover, the language of the Delaware statute required valuation of a dissenter's "*shares of stock*" and so placed the emphasis on the totality of the stock. By contrast, the statutory criterion in section 238 was "*the fair value of his shares*", which focused on what the dissenter owned. A shareholder who had a minority shareholding should receive the fair value of what he possessed, namely a minority shareholding. Applying conventional principles of statutory construction, there was no justification in the wording of the section for valuing the company rather than the shares themselves. Unless the shares, as opposed to the company, were valued, there would be no means of giving effect in the valuation to differences in the rights and obligations attaching to different classes of shares, for example preferential rights to distributions of income and capital or to votes (such as the voting rights of the class B shares in the present case), or liability to calls; but there was no justification for leaving such differences out of account. If it was right to take them into account, however, then the

difference between a majority and a minority shareholding should likewise be taken into account in the valuation exercise.

29.   The principal contentions of the Dissenting Shareholders were as follows. Section 238 required determination of the "*fair value of the shares*", and the focus should be on the expression "*fair value*", not on "*the shares*". Fair value was different from market value, and different from the value at which shares might trade on a stock exchange. The United Kingdom, Bermuda and BVI authorities were distinguishable. There was no provision in the United Kingdom legislation relating to schemes of arrangement, squeeze-out acquisitions or unfair prejudice petitions that required the court expressly to apply a standard of fair value; but that was the criterion in the Delaware and Canadian legislation, and on the grounds both of similarity of the statutory language and because Delaware, like the Cayman Islands, was a substantial financial centre the Delaware jurisprudence should be followed.  That was the course taken in ***Integra***, and the judge was right to follow it. The Delaware principle of valuing the shares as a proportion of the value of the business represented the reality of the situation in a merger, where all the shares were being acquired, whether voluntarily or compulsorily, and the entirety of the business merged in the new structure.

30.   In order to deal with these contentions, it is convenient first to consider the position in other jurisdictions.

*Delaware*

31.   A number of states in the USA have appraisal regimes, but the one that is most used is the one in Delaware.  The relevant statutory provision in Delaware is section 262 of the Delaware General Corporation Law. Subsection (a) provides that any holder of "*shares of stock*" in a Delaware corporation who dissents in defined circumstances from a merger "*shall be entitled to an appraisal by the Court of Chancery of the fair value of the stockholder's shares of stock*" through a defined process.  Subsection (h) provides that through that process "*the Court shall determine the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation, together with interest, if any, to be paid upon the amount determined to be the fair value*".

32.    The Delaware appraisal regime has been the subject of substantial authority.  In relation to the minority discount point, the judge referred to and quoted from three of those authorities: *Cavalier Oil Corp v Harnett* 1988 WL 15816 at first instance, and 564 A.2d 1137 (1989) on appeal to the Delaware Supreme Court; *Re Appraisal of The Orchard Enterprises Inc* 2012 WL 2923305; and *Re Appraisal of Dell Inc* 2016 WL 3186538 (at first instance).  Three points in particular emerge from these decisions.  First, the concept of "*fair value*" in the Delaware jurisprudence, in the words of Laster V.C. in *Dell*, "*derives more from judicial writings than from the appraisal statute itself*", and is "*a largely judge-made creation, freighted with policy considerations*". [*Dell* has very recently been overturned in part on appeal by the Supreme Court of Delaware, primarily on the basis that insufficient weight was given to the merger price.  However, the statement I have quoted was not affected.]  Secondly, the object of a Delaware appraisal is to value the corporation itself and allocate to a dissenting shareholder "*his proportionate interest in the overall fair value of the corporation, appraised as a going concern*" (Jacobs V.C. in *Cavalier*).  Thirdly, and consequent on the second point, no allowance is to be made for the size of a shareholding.  This point is stated most clearly by Walsh J in the Delaware Supreme Court in *Cavalier*:

> "*In rejecting a minority or marketability discount, the Vice Chancellor concluded that the objective of a section 262 appraisal is "to value the corporation itself, as distinguished from a specific fraction of its shares as they may exist in the hands of a particular shareholder". We believe this to be a valid distinction.*
>
> *A proceeding under Delaware's appraisal statute, 8 Del.C. § 262, requires that the Court of Chancery determine the "fair value" of the dissenting stockholders' shares. The fairness concept has been said to implicate two considerations: fair dealing and fair price. Weinberger v. UOP, Inc., 457 A.2d at 711. Since the fairness of the merger process is not in dispute, the Court of Chancery's task here was to value what has been taken from the shareholder: "viz. his proportionate interest in a going concern." Tri-Continental Corp. v. Battye, Del.Supr., 74 A.2d 71, 72 (1950). To this end the company must be first valued as an operating entity by application of traditional value factors, weighted as required, but without regard to post-merger events or other possible business combinations. See Bell v. Kirby Lumber Corp., Del.Supr., 413 A.2d 137 (1980). The dissenting shareholder's proportionate interest is determined only after the company as an entity has been valued. In that determination the Court of Chancery is not required to apply further*

*weighting factors at the shareholder level, such as discounts to minority shares for asserted lack of marketability. ...*

*The application of a discount to a minority shareholder is contrary to the requirement that the company be viewed as a "going concern." Cavalier's argument, that the only way Harnett would have received value for his 1.5% stock interest was to sell his stock, subject to market treatment of its minority status, misperceives the nature of the appraisal remedy. Where there is no objective market data available, the appraisal process is not intended to reconstruct a pro forma sale but to assume that the shareholder was willing to maintain his investment position, however slight, had the merger not occurred. Discounting individual shareholdings injects into the appraisal process speculation on the various factors which may dictate the marketability of minority shareholdings. More important, to fail to accord to a minority shareholder the full proportionate value of his shares imposes a penalty for lack of control, and unfairly enriches the majority shareholders who may reap a windfall from the appraisal process by cashing out a dissenting shareholder, a clearly undesirable result."*

*Canada*

33.   The principal appraisal regime in Canada is that under section 190 of the ***Canada Business Corporations Act,*** although there are also provincial appraisal statutes. Section 190 applies in a number of situations including a resolution by a corporation to carry out a going-private transaction or a squeeze-out transaction.   Subsection (3) provides, so far as relevant, that *"a shareholder who complies with this section is entitled, when the action approved by the resolution from which the shareholder dissents ... becomes effective, to be paid by the corporation the fair value of the shares in respect of which the shareholder dissents"*.

34.   There has been less litigation about the Canadian provisions than about the Delaware provisions, apparently partly because Canada ordinarily allows only a reasonable rate of interest, whereas Delaware now ordinarily awards compound interest at 5% p.a. over the Federal Reserve discount rate, and partly because adverse costs orders are ordinarily available in Canada but not in Delaware.   Moreover, although some Canadian provincial legislation allows a dissenter to acquire shares after the intended transaction becomes public knowledge, as does Delaware, the ordinary rule in Canada is that the dissenters must already have held their shares.   These factors have historically made Canada less attractive to *"appraisal arbitrageurs"* (that is to say, speculators who

purchase shares with the intention of exercising appraisal rights to make a profit), and that in turn has resulted in a lower volume of litigation. However, it is well established in Canada, at least at provincial level, that no minority discount is to be applied in determining fair value. In *Kummen v Kummen-Shipman Ltd* (1983) 19 Man R (2nd) 92, a decision of the Manitoba Court of Appeal, the rationale for the exclusion of a minority discount was said to flow from the context in which appraisals of fair value take place: the shares are effectively being purchased by existing shareholders to consolidate their existing position.

*England and Wales*

35.   England and Wales does not have an appraisal regime similar to section 238 or to those in Delaware and Canada.   There are, however, two circumstances in which majority shareholders may acquire the shares of an unwilling minority; and each of these has a direct parallel in the Companies Law in this jurisdiction.

A.   The first of these circumstances is known as a squeeze-out, under which the offeror in a proposed takeover that has been approved by 90% of the shareholders of the target company may acquire the remaining shares. The current provisions, which are contained in Chapter 3 of Part 28 of the Companies Act 2006, apply where the offeror has acquired or unconditionally contracted to acquire 90% in value and (if the shares are voting shares) by voting rights of the shares or class of shares; and on giving notice the offeror is entitled and bound to acquire the shares on the terms of the offer unless the court, on an application made by the shareholder under section 986, orders that the offeror is not entitled and bound to acquire the shares or that the terms on which he is entitled and bound to acquire them shall be such as the court thinks fit. Section 986(4) provides that the court may not require consideration of a higher value than that specified in the offer unless the holder of the shares shows that the offer value would be unfair. In their earlier, simplified form the squeeze out provisions were contained successively in section 155 of the *Companies Act 1929* and section 209 of *the Companies Act 1948*, and the relevant part of each of these was in identical terms to section 88 of the *(Caymanian) Companies Law*. They applied, as does section 88, where a scheme or contract involving the transfer of shares to another company had been approved by the holders of not less than 90% by value of the shares in the transferor company; and the

transferee company was then *"unless the Court thinks fit to order otherwise"* entitled to acquire the shares of any dissentients on the same terms as were offered to the approving shareholders. This formulation too imported considerations of fairness. Thus in *Re Hoare & Co Ltd* (1933) 150 LT 374 at 375 Maugham J, considering section 155 of the 1929 Act, said this:

> *"I have some hesitation in expressing my view as to when the court should think fit to order otherwise. I think, however, the view of the Legislature is that where not less than nine-tenths of the shareholders in the transferor company approve the scheme or accept the offer, prima facie, at any rate, the offer must be taken to be a proper one, and in default of an application by the dissenting shareholders, which includes those who do not assent, the shares of the dissentients may be acquired on the original terms by the transferee company. Accordingly, I think it is manifest that the reasons for inducing the court to "order otherwise" are reasons which must be supplied by the dissentients who take the step of making an application to the court, and that the onus is on them of giving a reason why their shares should not be acquired by the transferee company.*
>
> *One conclusion which I draw from that fact is that the mere circumstance that the sale or exchange is compulsory is one which ought not to influence the court. It has been called an expropriation, but I do not regard that phrase as being very apt in the circumstances of the case. The other conclusion I draw is this, that again prima facie the court ought to regard the scheme as a fair one inasmuch as it seems to me impossible to suppose that the court, in the absence of very strong grounds, is to be entitled to set up its own view of the fairness of the scheme in opposition to so very large a majority of the shareholders who are concerned. Accordingly, without expressing a final opinion on the matter, because there may be special circumstances in special cases, I am unable to see that I have any right to order otherwise in such a case as I have before me, unless it is affirmatively established that, notwithstanding the views of a very large majority of shareholders the scheme is unfair."*

The fact that the offer price involved a minority discount did not make the scheme unfair. That was established in ***Re Grierson, Oldham & Adams Ltd*** [1968] Ch 17, in which Plowman J (dealing with section 209 of the 1948 Act) said this (at 35F-g, 36G-37A):

> *"Then it is said that the price of 6s. a share does not reflect the advantages to Holts by their obtaining complete control of the company. I agree with Mr Instone [for Grierson] that that might possibly be used as an argument to justify paying a shareholder with a controlling interest a larger price for the shares than the price paid to minority holders. But,*

*in my judgment, __it is not unfair to offer a minority shareholder the value of what he possesses, i.e., a minority shareholding.__ ... [O]n general principle,... in my judgment, the element of control is not one which ought to have been taken into account as an additional item of value in the offer of these shares*" (emphasis added).

B.  The second circumstance in which a minority shareholding may be acquired is under a scheme of arrangement.  Such schemes are dealt with by Part 26 of the ***Companies Act 2006.***  So far as material, section 899 provides for an arrangement between a company and its members that is approved by a majority in number representing 75% of the members by value to bind all members if sanctioned by the Court.  Section 900 applies in the case of an application made under section 899 for sanction of a scheme of arrangement proposed for the purpose of the amalgamation of two companies involving the transfer of the whole or part of the undertaking of one of those companies to the other; and it allows the Court to deal with, among other things, the provision to be made for any persons who dissent from the arrangement.  These provisions are mirrored in sections 86 and 87 of the (Caymanian) ***Companies Law.***  Schemes of arrangement may be utilised in a wide range of circumstances, but are commonly used to effect a merger, consolidation or takeover.  In ***Re Linton Park plc*** [2005] EWHC 3545 (Ch); [2008] BCC 17 Lewison J said this:

> "*[5] A court will usually sanction a scheme if (1) the requirements of the statute have been complied with; (2) the class is fairly represented by those who attended the meeting and the statutory majority were acting bona fide; and (3) the scheme is one which an honest and intelligent person acting in his own interests as a member of the class might reasonably approve. Thus stated the third limb of the test is not whether the opposing shareholders or creditors have reasonable objections to the scheme. A shareholder or creditor may be equally reasonable in voting for or against the scheme. In such a case shareholder democracy or creditor democracy, as the case may be, should normally prevail. ...*
> *[13] The third question is whether the terms of the scheme are fair. The issue here is the price of the shares, not the principle of the scheme. The philosophy underlying s.425 is that the members of the company are better able to pass judgment on what is in their best financial interests than a judge. There are safeguards in the requirement that not only a majority in number of the shareholders vote in favour of the scheme but also that they represent three quarters in value of the shares. Mr Kinch relies on the proposition that the price on offer is at a discount to net*

*asset value which the independent directors did not take into account. The evidence, so far as it goes, shows that the independent directors did take into account the net asset value of Linton Park and also the net asset value of Camellia. Teller and Greenwood, the advisers to the independent directors, in addition reworked Mr Kinch's figures and concluded that the share price of both Linton Park and Camellia traded at a roughly equal discount to net asset value. This is clearly a question upon which different views are possible, indeed a question upon which different views may be equally reasonable. But whether the package on offer is a fair price for the shares is a matter which the shareholders are far better to able to judge than the court, and for that reason the court will be very slow to depart from the majority view".*

This case accordingly establishes that in ordinary circumstances the majority will be regarded as the best judge of the fairness of the price, even if that price is at a discount to the net asset value.

36.  There is a further circumstance in United Kingdom law (although one not directly reproduced in Caymanian law) in which shares may be ordered to be transferred at a discount.  In the context of a petition brought under section 994 of the ***Companies Act 2006*** on the grounds that the affairs of the company are being or have been conducted in a manner unfairly prejudicial to shareholders, section 996(2)(e) provides that the court may order the purchase of the shares of any members of the company by other members or by the company itself.  The general rule is that the court will direct that the shares be purchased at a discount reflecting the size of the holding unless the case is one of quasi-partnership.  The position was summarised in ***Irvine v Irvine (No 2)*** [2007] 1 BCLC 445 in a passage quoted in the Bermudan decision of ***Golar LNG Ltd v World Nordic SE*** (see paragraph 38 below); and was stated as follows in the Court of Appeal in ***Strahan v Wilcock*** [2006] EWCA Civ 13; [2006] BCC 320 by Arden LJ:

*"[17] The burden of the dispute between the parties on this appeal is as to the basis of valuation in the buy-out order. Shares are generally ordered to be purchased on the basis of their valuation on a non-discounted basis where the party against whom the order is made has acted in breach of the obligation of good faith applicable to the parties' relationship by analogy with partnership law, that is to say where a "quasi-partnership" relationship has been found to exist. It is difficult to conceive of circumstances in which a non-discounted basis of valuation would be*

*appropriate where there was unfair prejudice for the purposes of the 1985*
*Act but such a relationship did not exist. However, on this appeal I need not*
*express a final view on what those circumstances might be. "*

Although some doubt has been cast on this general rule by two recent first instance
decisions (***Re Blue Index Ltd*** [2014] EWHC 2680 (Ch) and ***Re Addbins Ltd*** [2015]
EWHC 3161 (Ch), both proceeding on the basis that the oppressing majority should not
ordinarily be rewarded for their oppressive conduct by receiving the benefit of a
minority discount), it appears to me that the rule as I have described it is established at
least at Court of Appeal level in England.

*Bermuda and BVI*

37.     Bermuda and the British Virgin Islands also have appraisal regimes. In Bermuda, the
        relevant provision is section 103 of the ***Companies Act 1981***, which is in the following
        terms:

        "*103(1) The holders of not less than ninety-five per cent of the shares or any*
        *class of shares in a company (hereinafter in this section referred to as the*
        *"purchasers") may give notice to the remaining shareholders or class of*
        *shareholders of the intention to acquire their shares on the terms set out in*
        *the notice. When such a notice is given the purchasers shall be entitled and*
        *bound to acquire the shares of the remaining shareholders on the terms set*
        *out in the notice unless a remaining shareholder applies to the Court for an*
        *appraisal under subsection (2):*
        *Provided that the foregoing provisions of this subsection shall not apply*
        *unless the purchasers offer the same terms to all holders of the shares whose*
        *acquisition is involved.*
        *(2) A shareholder to whom notice has been given under subsection (1) may*
        *within one month of receiving the notice apply to the Court to appraise the*
        *value of the shares to be purchased from him and the purchasers shall be*
        *entitled to acquire the shares at the price so fixed by the Court".*

38.     This provision was considered in ***Golar LNG Ltd v World Nordic SE*** [2011] Bda L R
        9. Ground CJ held at [5] that the shares should be appraised at their fair value; and in
        relation to minority discounts he said this:

*"[23] This was a relatively small shareholding in a quoted public company. In such a case I consider that it is appropriate to apply a minority discount to any share value derived from the pro-rated NAV. It may be that in this respect the law of Canada has diverged from that of England, but if I had to choose I would choose to follow the latter. In that regard I have been helped by the review of the law conducted by Blackburne J in **Irvine v Irvine (No 2) [2007]** 1 BCLC 445, and by his conclusion at 449 [11]:*

*"a minority shareholding, even one where the extent of the minority is as slight as in this case [there the split was 50% plus and minus one share on each side], is to be valued for what it is, a minority shareholding, unless there is some good reason to attribute to it a pro rata share of the overall value of the company. Short of quasi-partnership or some other exceptional circumstance, there is no reason to accord to it a quality that it lacks".*

*Applying that to this case, this was not a quasi-partnership and there are no exceptional circumstances, and so a minority discount should be applied.*

*[24] It is also necessary to keep a sense of perspective, and bear in mind that the NAV is an entirely hypothetical figure which cannot easily be realised, particularly in a case such as this where the sudden sale of the entire tanker fleet at valuation is likely to be unachievable. The reality is that in a case such as this there is no possible way for the NAV to translate into money in a shareholder's pocket without incurring substantial break-up costs and associated losses. It is therefore appropriate to discount the NAV ...."*

39. In BVI the relevant provision is section 179 of the ***BVI Business Companies Act 2004***, which entitles a member of a company to payment of the fair value of his shares upon dissenting from a merger or consolidation, as well as in certain other circumstances. The appraisal mechanism is set out in section 179(9), which is in the following terms:

*"If the company and a dissenting member fail, within the period of 30 days referred to in subsection (8), to agree on a price to be paid for the shares owned by the member, within 20 days immediately following the date on which the period of 30 days expires, the following shall apply: (a) the company and the dissenting member shall each designate an appraiser; (b) the two designated appraisers together shall designate an appraiser; (c) the three appraisers shall fix the fair value of the shares owned by the dissenting*

> *member as of the close of business on the day prior to the date on which the*
> *vote of members authorising the action was taken or the date on which*
> *written consent of members without a meeting was obtained, excluding any*
> *appreciation or depreciation directly or indirectly induced by the action or*
> *its proposal, and that value is binding on the company and the dissenting*
> *member for all purposes; and (d) the company shall pay to the member the*
> *amount in money upon surrender by him of the certificates representing his*
> *shares".*

In **Olive Group Capital Limited v Mayhew,** [2016] ECSCJ No 167, a decision of the Eastern Caribbean Court of Appeal, it was held that the BVI appraisal provisions as a matter of law allowed for the application of a minority discount, but whether or not one should be applied in any given case was a matter for the appraisers to determine.

*The position in the Cayman Islands*

40.    Apart from the present case, there are two Caymanian decisions that do or may bear on the question of the proper approach to minority discounts.

41.    The decision of Jones J in **Integra** is directly to the effect that no minority discount is permissible in a fair value determination under section 238. More generally, since that decision the Delaware and Canadian jurisprudence has been regarded as relevant to such determinations. In his substantive judgment in that case at [16], Jones J cited from an article published in the Canadian Annual Review of Civil Litigation (2011) called *Fair Value – A Common Issue With Surprisingly Sparse Canadian Authority* by Clarke Hunter QC and Clarissa Pearce, which he said he had found to be helpful in a number of respects; and he remarked on the fact that the Canadian legislation was very similar to section 238. At [19] he set out a summary of the comparable United States legislation provided by the expert instructed by the dissenting shareholders and accepted it as a useful summary of the Delaware jurisprudence, which he said he thought could be relied on as a helpful guide to the meaning of "*fair value*" in section 238. At [20] he agreed with the following proposition, expressly based on Delaware and Canadian principles, from an article called *Dissenting Shareholders' Appraisal Rights in Cayman Islands Mergers and Consolidations* by Tony Heaver-Wren and Andrew Jackson:

> *"Fair value is the value to the shareholder of his proportionate share of the*
> *business as a going concern, save where it is worth less on a net assets (i.e.*

*liquidated) basis as at the merger date: ex hypothesi the shareholder has bought into the company as a going concern, not in anticipation of participating in a liquidation, and it follows that, when he elects to dissent from a merger or consolidation brought about at the behest of the majority, he is thereafter deprived of his proportionate share of an active enterprise and is entitled to be compensated for it. In determining the measure of such compensation, the Court should be guided by the following considerations:*

> 1.1   *Fair value does not include any premium for forcible taking (i.e. expropriation of the shares).*
>
> 1.2   *It is neither appropriate nor permissible to apply a minority discount when making the determination. "*

At [27] he expressed his conclusion as follows:

> *"In conclusion, the Court is therefore required to determine the fair value of Integra's business as a going concern as at the Valuation Date, meaning at the point immediately before the merger was approved. The fair value of the Respondents' shares is their proportionate share of this amount without any minority discount or any premium for the forcible taking of their shares. There is no presumption that the fair value offer made by Integra on 2 July 2014 in accordance with section 238 (8) constitutes a minimum price and it is open to the Court to determine that the fair value is less than $10 per share".*

42.   The second case (although the first in time) is the decision of the Privy Council on appeal from this court in ***CVC/Opportunity Equity Partners Ltd v Demarco Almeida*** [2002] 2 BCLC 108. That case arose in the following way. As I have indicated in paragraph 36 above, section 994 of the ***Companies Act 2006***, which gives a remedy in cases of unfair prejudice, has no direct parallel in Cayman law. In this jurisdiction, the only remedy available to a minority shareholder who alleges that the company's affairs have been conducted in a manner oppressive to him is to petition for the winding-up of the company on the just and equitable ground; although section 95(3) of the ***Companies Law*** now gives the court power to make a range of alternative orders, including an order for a buy-out of shares, on a just and equitable winding-up petition. A threat to present

such a petition will often have the effect that the majority shareholders make an offer to buy the shares of the minority in order to avert the risk that the company will be put into liquidation. The purpose of the offer will be to encourage the court to make an order for the acquisition of the shares under section 95(3). So long as the offer is of an "*appropriate*" amount, the court will restrain presentation of a petition. That is what happened in *CVC/Opportunity*. There, the issue was as to the appropriateness of the offered price; and the outcome was that the minority shareholder was entitled to an offer that reflected his interest in the business as a going concern and was not subject to a minority discount. The opinion of the Board was delivered by Lord Millett, and it is necessary to quote a substantial part of what he said under the heading "*The basis of the valuation*":

> "*[36] The parties cannot be expected to agree upon the monetary value of Mr Demarco's interest. This is a matter of judgment and opinion, and their respective advisers may be expected to disagree. But there should be no difficulty in agreeing the basis of valuation and the machinery for resolving any disagreement.*
>
> *[37] There are essentially three possible bases on which a minority holding of shares in an unquoted company can be valued. In descending order these are: (i) as a rateable proportion of the total value of the company as a going concern without any discount for the fact that the holding in question is a minority holding; (ii) as before but with such a discount; and (iii) as a rateable proportion of the net assets of the company at their break up or liquidation value.*
>
> *[38] Which of these should be adopted as the appropriate basis of valuation depends on all the circumstances. The choice must be fair to both parties, and it is difficult to see any justification for adopting the break-up or liquidation basis of valuation where the purchaser intends to continue to carry on the business of the company as a going concern. This would give the purchaser a windfall at the expense of the seller.*
>
> *[39] If the going-concern value is adopted, a further question arises: whether a discount should be applied to reflect the fact that the holding is a minority one. An outsider would normally be unwilling to pay a significant price for a minority holding in a private company, and a fair price as*

*between a willing seller and a willing purchaser might be expected to reflect this fact. It would seem to be unreasonable for the seller to demand a higher price from an unwilling purchaser than he could obtain from a willing one. Small private companies commonly have articles which restrict the transfer of shares by requiring a shareholder who is desirous of disposing of his shares to offer them first to the other shareholders at a price fixed by the company's auditors. It is the common practice of auditors in such circumstances to value the shares as between a willing seller and a willing buyer and to apply a substantial discount to reflect the fact that the shares represent a minority holding.*

*[40] The context in which the shares fall to be valued in a case such as the present is, however, very different. Mr Demarco is not desirous of disposing of his shares; he would rather keep them and continue to participate in the management of the company. It is Opportunity's conduct in excluding him from management that has driven him, however reluctantly, to seek to realise the value of his investment. In this situation the case law in England is that normally the shares should be valued without any discount: see for example* **Re Bird Precision Bellows Ltd** *[1985] 1 BCLC 493; [1986] Ch 658;* **Virdi v Abbey Leisure Ltd, Re Abbey Leisure Ltd** *[1990] BCLC 342 ; and* **O'Neill v Phillips** *[1999] 2 BCLC 1, [1999] 1 WLR 1092. In* **Re Bird Precision Bellows Ltd** *[1985] BCLC 493 at 498, [1986] Ch 658 at 667 Oliver LJ cited with evident approval the observations of Nourse J at first instance where he said:*

> *'I would expect that in a majority of cases where purchase orders are made under s. 75 in relation to quasi-partnerships the vendor is unwilling in the sense that the sale has been forced upon him. Usually he will be a minority shareholder whose interests have been unfairly prejudiced by the manner in which the affairs of the company have been conducted by the majority. On the assumption that the unfair prejudice has made it no longer tolerable for him to retain his interest in the company, a sale of his shares will invariably be his only practical way out short of a winding-up. In that kind of case it seems to me that it would not merely not be fair, but most unfair, that he should be bought out on the fictional basis applicable to a free election to sell his shares in accordance with the company's articles of association, or indeed on any other basis which involved a discounted price. In my judgment the correct course would be to fix the price pro rata according to the value*

*of the shares as a whole and without any discount, as being the only fair method of compensating an unwilling vendor of the equivalent of a partnership share. Equally, if the order provided, as it did in **Re Jermyn Street Turkish Baths Ltd.** [1971] 1 WLR 1042, for the purchase of the shares of the delinquent majority, it would not merely not be fair, but most unfair, that they should receive a price which involved an element of premium.'*

To require Mr Demarco to submit not only to his exclusion from the company but to the acquisition of his shares at less than their going-concern value by a purchaser which intends to carry on the business is hardly less unfair.

[41] The rationale for denying a discount to reflect the fact that the holding in question is a minority holding lies in the analogy between a quasi-partnership company and a true partnership. On the dissolution of a partnership, the ordinary course is for the court to direct a sale of the partnership business as a going concern with liberty for any of the former partners who wish to bid for the business to do so. But the court has power to ascertain the value of a former partner's interest without a sale if it can be done by valuation, and frequently does so where his interest is relatively small: see *Syers v Syers* (1876) 1 App Cas 174 . But the valuation is not based on a notional sale of the outgoing partner's share to the continuing partners who, being the only possible purchasers, would offer relatively little. It is based on a notional sale of the business as a whole to an outside purchaser.

[42] In the case of a company possessing the relevant characteristics, the majority can exclude the minority only if they offer to pay them a fair price for their shares. In order to be free to manage the company's business without regard to the relationship of trust and confidence which formerly existed between them, they must buy the whole, part from themselves and part from the minority, thereby achieving the same freedom to manage the business as an outside purchaser would enjoy.*"*

43.    The Dissenting Shareholders placed great reliance on this passage. They pointed out that they were no more "*desirous of disposing of* [their] *shares*" than Mr. Demarco had been in that case: under the terms of section 238(7) the consequence of their dissent

was that they automatically ceased to be shareholders in the Company, and the offer subsequently made to them by the Company was unacceptable. They were being forced to give up their investment in the Company, whereas following the merger the business would continue as a going concern. To require them to submit not only to their exclusion from the Company but to the acquisition of their shares at less than their going-concern value by a purchaser which intended to carry on the business would, just as in Mr. Demarco's case, be most unfair. The passage demonstrated that, at least so far as concerned minority discounts, the public policy of the Cayman Islands coincided with that of Delaware.

44.     In my judgment, neither the passage I have cited, nor *CVC/Opportunity* read as a whole, supports the Dissenting Shareholders' case. The statements on which the Dissenting Shareholders rely are all premised on the existence of a relationship of trust and confidence that means the company is to be regarded as a quasi-partnership: see in particular paragraph [41], but also the references to quasi-partnership in the quotation from Nourse J's judgment in *Bird Precision Bellows*, to exclusion from management in paragraph [40], and to the relationship of trust and confidence in paragraph [42]. As I have said when discussing the English unfair prejudice cases, it is established as a general rule that a minority discount will be applied unless the case is one of quasi-partnership; and *CVC/Opportunity* is consistent with that general rule. It is, however, only "*in the case of a company possessing the relevant characteristics*" that the shares will be valued as a proportion of the value of the company itself; and it is plain that Shanda is not a quasi-partnership company.

*Discussion*

45.     As the authorities I have cited demonstrate, the position in relation to the availability of minority discounts differs between Delaware and Canada on the one hand and England and Wales and Bermuda (and to an extent BVI) on the other.   In Delaware and Canada it is established that no minority discount is to be applied; in England and Wales, the fact that shares are to be acquired at a discount is no obstacle to a squeeze-out or scheme of arrangement, and the application of a discount is the general rule where shares are purchased in the context of an unfair prejudice claim unless the company is a quasi-partnership.   The position in Bermuda follows the English rule in unfair prejudice cases, and BVI permits (although does not prescribe) a minority discount.  Although

the English cases do not concern an appraisal mechanism, or deal with a statutory standard of fair value, they are concerned with fair value of the shares: see the explicit references to fairness in *Re Hoare, Re Grierson*, paragraph [13] of *Re Linton Park* and in paragraph 38 of *CVC/Opportunity*. The same applies in Bermuda (see paragraph [5] of *Golar*) and explicitly in the BVI legislation.

46.     In paragraph 75 of his judgment in the present case, the judge recorded that when section 238 was introduced the Honourable G Kenneth Jefferson noted, when moving the second reading of the *Companies (Amendment) Bill 2009* in the Legislative Assembly, that ".. *this Bill responds to requests from the private sector in relation to merger and consolidation provisions and reflects extensive consultation with the private sector as well as the review of Bermuda, BVI, Delaware and U.K. legislative precedents*" [Official Hansard Report for 20 March 2009]. In paragraph 76 he said that it therefore appeared that Delaware was one of the jurisdictions whose statutory merger law was reviewed, although there was no indication that section 238 was intended to implement or closely follow the Delaware model in particular; and in paragraph 79 he said that "*Delaware was perhaps particularly in mind since it was mentioned as being one of the jurisdictions whose laws had been reviewed and the jurisdiction with the most substantial and sophisticated jurisprudence in the area*". For my part, I do not think that the statement made in the Legislative Assembly provides any assistance in the interpretation of section 238. The jurisdictions said to have been reviewed do not necessarily provide consistent answers to the problems capable of arising from an appraisal regime, and in the case of minority discounts they provide different answers. Moreover, the appraisal regime to which section 238 bears most similarity is that of Canada, but its legislation is not said to have been reviewed. That is not to say that the Delaware jurisprudence is incapable of being of help in the interpretation of section 238: it is, as the judge remarked, frequently used and has given rise to a large number of cases and a well-developed jurisprudence.  So long as that jurisprudence does not conflict with Caymanian law and practice, it is sensible to look to Delaware for assistance in solving problems that are novel to Cayman but not to Delaware.  There is no point in trying to reinvent the wheel.  I think, however, that the judge went too far when he said in paragraph 79 that "*when this Court comes to consider the meaning under Cayman law of the terms used in and language of section 238 it is entirely appropriate to have regard to and pay close attention to the decisions of the courts in*

*CICA 12 and 13 of 2017 – In the matter of Shanda Games Ltd - Judgment*

Delaware (and Canada)", and that it was "preferable, where possible, to ensure consistency of approach by focusing on one rather than a multiplicity of jurisdictions".

47.    As the judge himself recognised, again in paragraph 79, "it will also be necessary always to take care and be satisfied that the law and practice developed by such other courts fits and is consistent with other relevant parts of Cayman law and practice". The judge appears not to have been alerted to the possible relevance of the squeeze out and scheme of arrangement regimes, and in relation to English law was taken only to the unfair prejudice regime – which he held was clearly distinguishable, on the ground that it assumed a sale of the shares, whereas section 238 required an assessment of fair value and so was not predicated on a sale. Since the English cases are concerned with fair value, this does not seem to me to be an adequate ground of distinction. It is possible that, had the judge been directed to the other regimes, he would have taken a different view; but be that as it may, it appears to me that in relation to the question of minority discount the judge failed to ensure that his application of the Delaware rules was consistent with other relevant parts of Cayman law.

48.    As is made clear by the quotation from **Dell** set out in paragraph 32 above, the Delaware approach to fair value is heavily influenced by, if not based on, considerations of public policy. The relevant policy appears to be that stated at the end of the quotation, also set out in paragraph 32 above, from **Cavalier**:

> "More important, to fail to accord to a minority shareholder the full proportionate value of his shares imposes a penalty for lack of control, and unfairly enriches the majority shareholders who may reap a windfall from the appraisal process by cashing out a dissenting shareholder, a clearly undesirable result."

So stated, the policy is in direct conflict with what was said in **Re Grierson** (paragraph 35(a) above):

> "Then it is said that the price ... does not reflect the advantages to Holts by their obtaining complete control of the company. ... But, in my judgment, it is not unfair to offer a minority shareholder the value of what he possesses,

> *i.e., a minority shareholding. ... [T]he element of control is not one which ought to have been taken into account as an additional item of value in the offer of these shares".*

49.     In my judgment, it is the latter policy which should prevail. As I have pointed out, the squeeze-out provisions interpreted in ***Re Grierson*** and ***Re Hoare,*** and the scheme of arrangement provisions considered in ***Re Linton Park***, are replicated in sections 86, 87 and 88 of the ***Companies Law*** in this jurisdiction. Those provisions are capable of being used to acquire the shares of a dissenting minority on a takeover, merger or consolidation. The position in the Cayman Islands is accordingly that there are now three mechanisms contained in the ***Companies Law*** by which the shares of dissentients may be acquired: by squeeze-out with a 90% majority, by scheme of arrangement with a 75% majority, and under section 238 with a two-thirds majority. Assuming, as I do, that the English approach to squeeze-out and scheme of arrangement acquisitions would be applied in the Cayman Islands, those two mechanisms allow a minority discount to be applied to the cost of acquisition of dissentients' shares. It seems to me unlikely in the extreme that the simplified merger and consolidation regime introduced as Part XVI of the ***Companies Law*** was intended to depart from that approach: it is to be presumed that the three mechanisms, contained in the same piece of legislation and capable of serving the same purpose in different ways, are to be construed from the same standpoint. Nothing in the wording of section 238 suggests that a different approach was intended; indeed, as Shanda pointed out, there is nothing in the wording of the section that suggests that the focus is to be on the value of the company rather than on the value of the shares. The absence of such wording is overcome in Delaware by the application of policy considerations; and in Canada the rationale for the exclusion of a minority discount is said to lie in the context, which is in effect that the majority are purchasing the shares of the minority in order to consolidate their existing position (see ***Kummen***, referred to in paragraph 34 above). However, that is also the context in which shares may be purchased by squeeze-out or scheme of arrangement, and in England that context does not have the effect of requiring the shares to be valued as a proportion of the value of the company itself.

50.     For these reasons, it appears to me that section 238 requires fair value to be attributed to what the dissentient shareholder possesses. If what he possesses is a minority

shareholding, it is to be valued as such.  If he holds shares to which particular rights or liabilities attach, the shares are to be valued as subject to those rights or liabilities.  As a matter of mechanics, this can be done by adjusting the value that the shares would otherwise have as a proportion of the total value of the company; but failing to make such adjustments means that particular rights or liabilities will often be ignored, and the shares will be valued as something they are not.  It follows that the judge (and Jones J in *Integra* before him) was wrong to hold that a minority discount should not be applied in the assessment of the value of the Dissenting Shareholders' shares.  I would allow Shanda's appeal on the minority discount point.

Interest

51.    Shanda's other complaint is about the judge's award of interest.

52.    The rate of interest awarded by the judge was 4.295%, being the mid-point between 3.5% (being the rate at which he decided Shanda could have borrowed the amount representing the fair value of the Dissenting Shareholders' shares in order to pay it to them) and 5.09% (being the rate which he decided prudent investors in the position of the Dissenting Shareholders could have obtained, had they had the money to invest).

53.    In adopting a mid-point approach the judge followed the approach taken by Jones J in *Integra* and by the Delaware courts.  He recorded that Jones J had said that the provision for a fair rate of interest appeared to have been reproduced from an earlier version of section 262(h) of the ***Delaware General Corporations Law***, and then cited the following passage from ***Integra***:

> *"72. The Delaware courts interpreted this provision in a way which involves balancing the rate which the surviving corporation would have had to pay to borrow funds and the rate which a prudent investor could have earned on cash or cash equivalents during the relevant period. The 'legal rate' payable on judgment debts was treated as a useful default rate in cases where the parties failed to adduce any relevant evidence. (**Cede & Co., Inc v. Medpoint Healthcare, Inc** 2004 Del. Ch, Lexis 124 at page 21).*
> *73. The 'legal rate' under Delaware law is the equivalent of the 'prescribed rates' payable on judgment debts under the Judgment Debts (Rates of*

*Interest) Rules in the sense that it is the statutory rate payable on judgment debts, but I have no evidence about the way in which the Delaware rate is fixed. The prescribed rates applicable in this jurisdiction are fixed from time to time by the Rules Committee for a basket of different currencies using the following formula: 3- month LIBOR (or equivalent) rounded to the nearest one eighth per cent plus two percentage points or increased by 125%, whichever is the greater. The prescribed rate for US$ has been fixed at 2.375% since 1 February 2013....*

*76. The Respondents [dissenting shareholders] have not adduced any evidence about the effective rate of interest which they actually earned or which a prudent investor could reasonably have expected to earn on cash or cash equivalents during the relevant period. Integra's audited consolidated financial statements reflect that it had the equivalent of US$59,468,000 in cash and cash equivalents as at 31 December 2013 but the notes do not disclose the results of its cash management operations. ... In the absence of any affidavit evidence about the way in which Integra has actually been managing its treasury operation during the period since the merger, I think that it is reasonable to assume that it was generating around 0.2% per annum.*

*77. Counsel for the Respondents submits that the Court should adopt a mid-rate between the prescribed rate for US$ (2.375%) and Integra's assumed USS borrowing rate (9.7%), which would be 6.0375% per annum. There is no obvious logic to this submission. The prescribed rate does not reflect the rate which a judgment creditor can expect to earn on cash deposits. The mid-rate between Integra's assumed return on cash (0.2%) and Integra's assumed USS borrowing rate (9.7%) is 4.95% per annum. I conclude that this is a "fair rate of interest" which should be awarded to the Respondents from 2 July 2014 until payment."*

54. The judge also cited, as representing the proper approach for him to adopt, the following passage from the judgment of Noble VC in **Cede v Medpoint Healthcare**, referred to by Jones J:

> *"The award of interest serves two important purposes. First, 'it compensates the plaintiff for the loss of the use of his money during this period,' and thus*

*'endeavours to place the dissenting shareholder in the position she would have been in had the corporation promptly paid the value of her shares.' Second, 'it forces the surviving corporation to disgorge the benefit it received from having the use of the plaintiff's funds.' 'In determining the fair rate of interest, the Court may consider all relevant factors, including the rate of interest which the surviving or resulting corporation would have had to pay to borrow money during the pendency of the proceeding.' In addition to looking to the company's cost of borrowing, or 'borrowing rate', the Court 'has historically examined the return that a prudent investor would have received if he had invested the judgment proceeds at the time of the merger.' The Court may also consider the legal rate of interest; indeed, 'the legal interest rate serves as a useful default rate when the parties have inadequately developed the record on the issue.' The Petitioners' argument that the interest rate should be based solely on the borrowing rate or the rate 'a prudent investor would require to provide a substantial unsecured loan to the Respondent' must be rejected. As noted above, this Court traditionally looks at both the 'prudent investor rate' and the 'borrowing rate' in fixing the interest rate and the Petitioners have provided no compelling argument as to why this Court should deviate from this practice. Awarding the proposed [unsecured loan] interest rate of 9.940% would grant an 'undeserved windfall' given the volatility of the market."*

55.     The judge then said this, starting at paragraph 19 of the fair interest ruling:

*"The Vice Chancellor's explanation of the purpose of the statutory right to an award of a fair rate of interest seems to me to be consistent with the nature and purpose of the statutory jurisdiction and language - to protect the dissenting shareholders from the effects of the forced merger and in particular to compensate them for being out of their money and to fix a "fair" rate of interest. Furthermore, the need to take into account all relevant factors having regard to the facts of the case also seems to me to be what is required in order to ensure that a fair rate is used.*

*20. It also seems to me that the balancing of interests and positions involved in the midpoint approach is consistent with the statutory mandate to*

*establish a fair rate. Interest should address the dissenting shareholders'
financial disadvantage of being out of their money. The disadvantage
materialises either in loss of earnings on the funds or in the costs of having
to borrow a loan to substitute for the funds not received. Equally the debtor
gains a financial advantage through withholding the sums payable to the
dissenting shareholders. In the meantime he or she can yield returns from
investing the funds or avoid the cost of a loan. Therefore the non-payment
of a sum of money results in what can be described loosely as an unjustified
enrichment of the debtor. It follows that for the assessment of the financial
consequences of the delay two different perspectives have to be borne in
mind. The mid-point approach achieves this. In some respects the exercise
which the Court is required to undertake is similar to that which the Court
undertakes when exercising its discretion under section 34(1) of the
**Judicature Law (2013 Revision)** to award interest on a debt or damages in
respect of which a judgment is awarded.*

*21. I accept that the Court may have regard to the prescribed rate (that is
the statutory rate of interest payable on judgment debts which is 2.375% for
U.S. dollars, as set out in the Judgment Debts (Rates of Interest) Rules 2012)
as a reference point, particularly in cases where there is no or insufficient
evidence filed by the parties. However, it does not seem to me appropriate
to place much weight on it. Had the intention been to use the prescribed rate
section 238(11) could easily have referred to it. Furthermore, the statutory
requirement to establish a fair rate, as I have noted, does seem to me to
involve taking into account the purpose of the requirement to pay interest
and to balance the position of and impact of the delay in payment on both
the company (debtor) and the dissenting shareholders."*

56.    It was common ground before the judge that the mid-point approach was the correct
one to adopt. On appeal, however, Shanda asserted that that approach was inconsistent
with the purpose of an award of interest under English (and hence Caymanian) law, and
that the judge had accordingly erred in principle. He should instead have awarded a
rate representing only the cost to the Dissenting Shareholders of being deprived of their
money, which was conventionally to be assessed as equivalent to the rate which they
would have had to pay to borrow money to replace the unpaid fair value of their shares.

*CICA 12 and 13 of 2017 – In the matter of Shanda Games Ltd - Judgment*

The rationale for that conventional basis was that the payee could by borrowing an equivalent sum have done exactly the same as he would have done if the money had been paid, so that his loss was not the lost opportunity to deploy the money but the cost of making the borrowing. In the present case, neither party had led any evidence of the cost to the Dissenting Shareholders of borrowing: instead, working on the basis that the mid-point approach applied, they had supplied information about Shanda's cost of borrowing and the likely investment return to a prudent investor in the position of the Dissenting Shareholders. This meant that, if the Court of Appeal accepted that the judge had erred in principle, there would be no material on which it could arrive at a proper interest rate. It could therefore either remit the matter to the judge, or in default of anything else award interest at the judgment rate of 2.375% for US dollars.

57.  The cornerstone of Shanda's argument on this point was the following passage from the judgment of Steyn J concerning interest on damages in *Banque Keyser Ullman SA v Skandia (UK) Insurance Co Ltd* [1987] Lexis Citation 1106:

> "*The issue of the appropriate rates of interest must now be considered. The selection of an appropriate interest rate is a matter of discretion. But it is not an entirely open textured discretion. A practical and consistent approach has emerged. The purpose of the award of interest is to achieve restitutio in integrum. The enquiry does not focus, in a case such as the present, on the profit to the defendant of the use of the money. It is directed to an estimation of the cost to the plaintiff of being deprived of the money which he should have had. But for practical reasons courts will not allow an enquiry into the plaintiff's actual loss. To do so might sometimes involve enquiries, in relation to the ancillary relief of interest, approximating the length of the trial. Instead, in cases such as the present, courts award a commercial rate of interest or the rate which somebody in the position of the plaintiff would have had to pay to borrow the money. In the interests of a cost effective administration of civil justice, the courts must adopt a fairly broad brush approach to the award of interest. On the other hand, in the light of the overriding criterion of fairness, the courts are vigilant to ensure that the broad brush approach does not become too blunt an instrument. On this question I have been assisted by a judgment of Forbes J in* **Tate &**

*Lyle Food and Distribution Ltd v Greater London Council [1981] 3 All ER716, [1982] 1 WLR 149.* In dealing with the approach to be adopted Forbes J said (at p 154C-E):

> "I feel satisfied that in commercial cases the interest is intended to reflect the rate at which the plaintiff would have had to borrow the money to supply the place of that which was withheld. I am also satisfied that one should not look at any special position in which the plaintiff might have been: one should disregard, for instance, the fact that a particular plaintiff, because of his personal situation, could only borrow money at a very high rate or, on the other hand, was able to borrow at specially favourable rates. The correct thing to do is to take the rate at which plaintiffs in general could borrow money. This does not, however, to my mind, mean that you exclude entirely all attributes of the plaintiff other than that he is a plaintiff. There is evidence here that large public companies of the size and prestige of these plaintiffs could expect to borrow at 1 per cent over the minimum lending rate, while for smaller and less prestigious concerns the rate might be as high as 3 per cent over the minimum lending rate. I think it would always be right to look at the rate at which plaintiffs with the general attributes of the actual plaintiff in the case (though not, of course, with any special or peculiar attribute) could borrow money as a guide to the appropriate interest rate."

That is, if I may say so, a sensible and practical approach. All I would respectfully add is that an issue as to the appropriate categorisation of a particular plaintiff involves the exercise of judicial discretion."

58. I accept that this statement accurately represents the position in England. It is important, however, to appreciate that it is a statement about the principles to be applied in assessing interest on damages. Such an assessment can of course be made only when damages have been awarded, and damages can be awarded only when some right of the plaintiff has been infringed. The purpose of an award of interest will be to ensure that the plaintiff is put back, so far as money can, in the position he would have been in had his right not been infringed. That inevitably places the focus solely on the plaintiff: it is only his position that is of relevance. A section 238 determination, however, does not proceed on the basis that any right of the dissentient shareholder has been infringed by the company. The legislative concern is not to restore him to some anterior position

but to ensure that he receives fair value for what he is obliged by statute to give up. In my view, that has the effect when it comes to an assessment of the fair rate of interest of removing the entire focus from the dissentient and instead placing it on the entirety of the circumstances. When those circumstances are considered, it is right to say – as the judge did – that both the disadvantage to the dissentient and the advantage to the company should be taken into account. To adopt the mid-point approach is a logical way of balancing the advantage and disadvantage, with a fall-back reliance on the judgment rate – which must theoretically itself represent a rate deemed to be fair – if the evidence supports no other conclusion. Although it is possible to take the view that the cost of borrowing is a better measure of the dissentient's loss than the putative investment returns a prudent investor in his position could have achieved, both measures represent the dissentient's lost opportunity and consequently the disadvantage to the dissentient of being out of his money. Overall, it seems to me that Jones J and the judge were right to adopt the (former) Delaware practice in relation to the award of interest. That practice, as explained in *Cede*, provides a principled approach that is not in conflict with Caymanian law or practice. Accordingly, I consider that the judge did not err in principle in his approach to the assessment of a fair rate of interest. It was accepted by Shanda that, if the judge had applied the right principle, there was evidence on which he was entitled to reach the conclusion he did about the fair rate.

59. For these reasons, I would dismiss Shanda's appeal in relation to interest.

*The Dissenting Shareholders' appeal*

60. The Dissenting Shareholders complain about three aspects of the judge's judgment, each of them relating to an element of the methodology to be applied in determining the fair value of Shanda's business, and hence of the Dissenting Shareholders' shares. These elements are (1) a component - known as beta - of the discount rate to be applied in the discounted cash flow analysis adopted by the experts as the appropriate method of valuing Shanda's business; (2) the measure of market capitalisation to which to apply a Small Stock Risk Premium ("**SSRP**"); and (3) the growth rate during the terminal period.

*Context*

61.     Professor Jarrell and Mr. Inglis agreed that Shanda's business was to be valued by use
        of a discounted cash flow ("**DCF**") model. As its name indicates, a DCF analysis
        contains two main elements: a prediction of future cash flows, and the application to
        those cash flows of a discount rate so as to translate the future cash flows into a present
        capital value. In effect, the exercise is designed to identify how much it would have
        cost at the valuation date to buy an investment with a rate of return and a risk profile
        equivalent to that of the company's business.

62.     As a result, the discount rate will generally be taken as the expected rate of return on
        equivalent investment opportunities in the capital markets, also known as the weighted
        average cost of capital ("**WACC**") of the company.  The weighting exercise implicit in
        determining the WACC involves estimating the cost of equity of a company and its
        debt.  It was common ground in the present case that Shanda would have no debt, so
        the only assessment required was of the cost of its equity.  Assessment of the cost of
        equity is ordinarily done, and was in this case done, through use of a capital asset pricing
        model ("**CAPM**").  A CAPM starts by assessing the rate of return on a risk-free
        investment, and then adjusting that rate upwards to take account of risk factors.  One
        such factor is systematic risk, which is the risk represented by the relevant market as a
        whole.  This systematic risk is reflected in an equity risk premium; and the equity risk
        premium is in its turn multiplied by a factor, beta, which measures the risk represented
        by a particular investment relative to the risk of the market as a whole.  A further factor
        which may be added is a size premium, reflecting the possibility that equity investors
        will require a higher expected return from small companies to compensate for the
        greater risk associated with them.  Each of these factors has the effect of increasing the
        discount rate and consequently decreasing the value; but because beta is used to
        multiply one of the factors, rather than being added as a separate factor, small changes
        to it are capable of having large effects on the discount rate, and consequently on the
        value.  I take as an example of the operation of a CAPM Mr. Inglis's initial report, in
        which he proposed a discount rate of 10.24% derived from a CAPM made up as
        follows: 2.27% as the risk-free rate, equal to the yield on 10-year US government
        bonds; plus 6.00%, being (a) an equity market risk premium of 6.00% as the expected
        rate of return of the market in excess of the risk-free rate, multiplied by (b) 1.00, his
        estimate of Shanda's equity beta, based on the betas of Chinese games companies listed
        on the NASDAQ; plus a small stock risk premium of 1.07%; plus 0.90% as a country

risk premium for perceived additional economic, financial, or political risk associated with investment in China. The values given by Professor Jarrell to the various factors were different; but the most significant difference was his use of a beta of 1.78 as opposed to Mr. Inglis's 1.00, a difference which is said on its own to have had the effect of reducing the value of each of Shanda's ADSs by US$9.06.

63.    Predicting future cash flows typically involves estimating cash flow in two, or sometimes three, periods: a finite future period, at the end of which the company will ordinarily be expected to have achieved a steady state or maturity; perhaps a transitional period, designed to iron out possible future volatility in the cash flows; and a terminal period. Cash flows in the first period, and to some extent in the transitional period, will be based on, or at least have regard to, the company's past performance and its own estimates of its likely future earnings; whereas cash flows in the terminal period will usually be derived from a formula designed to project indefinitely into the future as a constant the rate of growth identified at the conclusion of the prior stage or stages, by which time the rate of increase or reduction in cash flow will have stabilised.

64.    In the present case, the judge had to resolve disputes between the experts relating to whether cash flows should be estimated in two stages or three; as to whether cash flows in the first period should be based on the Company's own management projections or on figures derived from the performance of similar companies; as to how certain elements of the Company's business, in particular the likely performance of one of its Internet games, should be reflected in the cash flow estimates; and as to how the discount rate should be ascertained. Only three of his conclusions on valuation methodology are now disputed, all of them by the Dissenting Shareholders.   The first two concern the judge's assessment of beta ("**the beta point**") and the small stock risk premium ("**the SSRP point**") in the ascertainment of the discount rate; the third of them arises out of his decision to adopt a three-stage approach to the assessment of cash flows ("**the transitional period point**").

*The beta point*

65.    As I have said, beta is a measure of the risk of a particular investment relative to the systematic risk of the market as a whole. Because it focuses on the special risk attaching

to a particular investment, it requires identification and assessment of particular elements of risk associated with that investment. In this case, the notional investment was Shanda's business, and the exercise involved identifying and valuing risk factors associated with that business.  At paragraph 147 of his judgment, the judge identified six differences of approach to this topic between the experts as follows:

(a).   should Shanda's beta estimate be based solely on data relating to the period (and has Mr Inglis established that Professor Jarrell's beta estimate is unreliable because of his use of a measurement period) that ended prior to the public announcement of the First Buyer Group's proposal on 27 January 2014 (is Professor Jarrell's beta estimate out of date) (the staleness point)?

(b).   should Shanda's beta estimate ignore (and has Professor Jarrell established that it is appropriate to use) data relating to the period of the China effect in U.S. markets occurring from early 2011 to late 2013 (the China effect point)?

(c).   should Shanda's beta estimate be based only on directly measured betas or only on indirectly measured betas and if indirect betas can be used is the peer group selected by Mr Inglis sufficiently comparable so that they can be used in the estimate of Shanda's beta (the direct/indirect betas point)?

(d).   what should the measurement period be – should it be 4.3 years or two years (the measurement period point)?

(e).   should weekly or monthly returns be used (the weekly/monthly returns point)?

(f).   if monthly returns are otherwise preferable, should Shanda's beta be estimated using monthly returns measured from month end to month end (the month end measurement point)?

66.   The judge considered these points in turn and expressed a conclusion on each of them as follows:

The staleness point: "*It seems to me this issue is finely balanced. Mr Inglis has raised a serious doubt as to the reliability of Professor Jarrell's use of and sole reliance on the pre-deal announcement data. Professor Jarrell's response does provide some evidence that Shanda's beta is unlikely to have*

changed in the period between that announcement and the Valuation Date but that is not conclusive or completely convincing for the reasons given by Mr Inglis. The gap between the date of the observations and the Valuation Date and the failure to use any more recent data does in my view raise doubts about the reliability of Professor Jarrell's beta estimation. While it would be possible to show that there was no problem if there was sufficient evidence to demonstrate that Shanda's beta had or was likely to have remained constant (and I agree that the peer companies otherwise relied on by Mr Inglis to support his estimate of Shanda's beta are a good guide for doing so), Professor Jarrell's analysis, and the results of his comparison with the betas of the peer companies, did not seem conclusive or clear-cut". (Paragraph 149(e))

The China effect point: *"Once again the evidence is finely balanced. But I am satisfied that there is sufficient evidence of the problem identified by Mr Inglis to raise material concerns that the data derived during the relevant period has been subject to exceptional and distorting effects such that it might be unreliable and result in an error in the beta estimate".* (Paragraph 150(f))

The direct/indirect betas point: *"In my view NetEase Inc (despite the revenue differences highlighted by Professor Jarrell) is sufficiently comparable with Shanda to be a useful and reliable peer company for the purpose of calculating Shanda's beta. Changyou also has a significant number of points in common and on balance I am satisfied that it is appropriate to use it in the estimate of Shanda's beta. I find it more difficult to assess, on the evidence, how close the comparison is with the U.S. companies but I have not been convinced by the evidence of Professor Jarrell that Mr Inglis's opinion is unreasonable and that they are of no assistance and therefore to be ignored."* (Paragraph 151(q))

The measurement period point: *"As with so many issues that arise in relation to the estimate of a company's beta, there are trade-offs between different approaches and it is necessary to make a judgment about which approach is most appropriate on the facts of the particular case. In this case Mr Inglis's use of the shorter two year period has been driven by his view that the data*

*relating to a longer period is tainted. As I have already noted, it seems to me that this is not an unreasonable view in the circumstances. The question then becomes whether a two year period is too short to be reliable and it seems to me to be clear from the cited textbooks and literature that it is not. The further question then arises as to whether the use of a 4.3 year period (ending with the public announcement in January 2014) is clearly preferable. I do not think it is, but neither is two year period clearly preferable either. While the longer period offers the benefits noted in the extract from Professor Damodaran's book quoted in paragraph 152(c) above, and is clearly a measurement period which can be reliable and consistent with the literature, it is in this case subject to the risks of error that Mr Inglis has identified and which I have found to be credible and incapable of being dismissed."* (Paragraph 152(d))

The weekly/monthly returns point: *"in the present case the R-squareds [one of two statistical bases for assessing the reliability of a beta estimate, the other being standard error] for the monthly betas were significantly higher than those for the weekly betas. This means that they support the view that the monthly betas* [used by Professor Jarrell] *capture more of the Shanda specific risk and are therefore more reliable. However the monthly betas have a higher standard error than the daily and weekly betas that* [Mr Inglis] *presents and therefore can be considered to be less reliable (since this weekly and daily data is likely to be closer to Shanda's true beta). I see that both these statistical measures are helpful in making the comparison between weekly and monthly measurement period but it seems to me that in this case neither is determinative. R-squared is focussing on how much risk comes from the company rather than the market; standard error focusses on how far away from the true beta the estimated beta could be. The monthly betas are strong on one measure and weaker on the other. However, that does not, in my view, mean that the application of the statistical measures entitles the Court to conclude that one is clearly to be preferred and more reliable than the other."* (Paragraph 153(d))

The month end measurement point: *"I have quoted the extract from Professor Jarrell's answer at length because it seems to me to involve a candid admission that he has been unable to dismiss or find a convincing*

*solution to Mr Inglis's challenge to his use of month end observations, which he agrees is "troubling" and which suggests that there is an arbitrary element in the estimate of beta on such a basis. It appears that this is not an issue that has yet been adequately addressed in the literature or seriously been raised before. The Court is not in a position to resolve the dispute but must assume that there is a material doubt over this approach to calculating betas. It is, on the other hand, correct to say, as Professor Jarrell does, that reliance on monthly betas calculated by reference to month end observations is a frequent and perhaps standard practice but that does not, to my mind, remove the risk that Professor Jarrell's methodology is subject to error."* (paragraph 154(b))

67.     At paragraphs 155 to 160, the judge set out his conclusions on the beta point. It is sufficient to quote paragraphs 155 and 160, omitting at this stage a discussion of two Delaware cases (including a decision of Chancellor Bouchard in ***In re Appraisal of DFC Global Corp*** (2016) WL 3753123 (Del. Ch.):

> "*155.   I have carefully considered the opinions of both experts, their respective challenges to the reliability of each other's beta measurement and the extensive arguments and submissions made by Mr Meeson and Mr Levy and reached the following conclusions:*
>
> > *(a)   it seems to me that both experts have adopted methodologies which are consistent with accepted practice and the literature and to that extent each is, prima facie, reliable. But each of their estimates is subject to certain risks and problems which the Court is unable to ignore or completely dismiss,*
> >
> > *(b)   as I have explained, in my view there are risks of error associated with a beta estimate for Shanda based solely on the use of (i) data gathered in the period before the announcement of the First Buyer Group proposal in January 2014; (ii) data gathered during the period between 2011 and 2013 affected by the US market undervaluation of the shares in Chinese companies and (iii) monthly betas based on month end observations. There are also risks of error associated with a beta estimate based solely on (i) a small peer group, some of whose members are only just comparable with Shanda and where there remains some room for argument as*

> *to the extent of their compatibility since there are a number of points of difference between members of the group and Shanda and (ii) weekly betas measured over a two year period where on some statistical measures the weekly betas are clearly less reliable that the monthly betas.*
>
> (c) *it therefore seems to me that in such circumstances it is not safe to rely on just one estimate on its own but preferable (as a way of reducing the risk of error and to take the widest sample available) to use and rely on both estimates. The right course is for the Court to use and combine both estimates and use the average of the two for its beta. It does seem to me to be more reliable in this case to blend and use both the directly and the indirectly measured betas. ...*
>
> 160.    *In the present case, because the issues and uncertainties affecting each expert's calculation of beta relate not just to the use of direct or indirect beta I consider that the preferable approach is to use an average of Mr. Inglis's beta of 1 and Professor Jarrell's beta of 1.78; that is 1.39. Had I used the blending approach applied by Chancellor Bouchard and simply added Professor Jarrell's directly measured beta to the seven peer companies identified by Mr Inglis the result would have been 1.2925. The difference in this case will no doubt have a not immaterial effect on the amount payable to the Dissenting Shareholders but for the reasons I have given I prefer and will adopt the former approach. "*

68.    Before I come to the Dissenting Shareholders' complaints about the judge's decision on the beta point, I think it desirable to point out some of the key features of the passage I have just quoted. First, as appears from paragraph 155(a), the judge took the view that both experts had adopted methodologies that were prima facie reliable, but the estimates of both were nevertheless subject to risks and problems that could not be ignored or completely dismissed. Secondly, paragraph 155(b) falls into two parts: the first part, from the beginning to the words "*month end observations*", identifies problems with views expounded by Professor Jarrell; the second part, from the words "*There are also risks of error*" to the end, does the same with views expounded by Mr. Inglis.    Thirdly, the opening words of paragraph 160 make explicit that there were issues and uncertainties affecting the calculation of beta put forward by both experts. All of this is consistent with the phraseology used by the judge when setting out his

conclusions on the six differences of approach. In essence, the judge's position was that there was something to be said for the methodology and outcome adopted by each expert, but neither of them was immune from criticism. As he put it in paragraph 158:

> "*Of course, I have not concluded on the beta issue that each approach is realistic and without risk. Instead, I have taken the view that both approaches are essentially or prima facie reasonable but because of risks identified in relation to each the best approach, which minimises the risk involved, is to use and combine both estimates.*"

69. The Dissenting Shareholders contended that the judge was wrong to arrive at his figure for beta by averaging the beta figures put forward by the two experts. He should instead have disregarded Professor Jarrell's beta in its entirety and simply adopted Mr. Ingles' figure; but, if there was a basis for taking account of Professor Jarrell's beta figure, the judge should either have adopted the blending approach suggested by the Delaware jurisprudence or averaged the share values resulting from using each figure for beta. What he had in fact done had unduly favoured Shanda, since averaging the betas did not achieve an equal split in the ultimate value.

70. The foundation for the first part of the complaint, namely that the judge was wrong to place any reliance on Professor Jarrell's beta methodology or outcome, was the assertion that there was no credible support for Professor Jarrell's beta, whereas there was no criticism or identified error in Mr. Inglis's analysis. Professor Jarrell's evidence was described by the judge as "*not conclusive or completely convincing*", as not seeming "*conclusive or clear cut*", and on the month end measurement point as involving "*a candid admission that he has been unable to dismiss or find a convincing solution*" and as being unable to "*remove the risk that* [his] *methodology was subject to error*".

71. Whilst it is the case that these remarks were made by the judge about Professor Jarrell's evidence, their selection fails to give anything like the full picture. It is simply impossible to claim that the judge concluded all of the points of difference in favour of Mr. Inglis. The true position, as I have identified in paragraph 68, was that the judge had found the issues finely balanced, with appropriate methodologies adopted by both

experts but with both - not just Professor Jarrell - open to some criticism. Although I accept that the overall impression given by the judgment is that Professor Jarrell came off rather worse than did Mr. Inglis (an impression fortified by the attitude taken by Shanda on the reopen application), in relation to the assessment of beta honours were broadly even. In my judgment, the judge was in those circumstances entitled to approach the assessment of the appropriate beta figure by balancing the proposals put forward by the two experts.

72.    The question then becomes whether he chose the correct method of balancing the opposing views. The Dissenting Shareholders contended that, because of the impact the choice of beta can have on the outcome of a DCF analysis, averaging the two figures unduly favoured Shanda – a result that, even on the basis that there was overall nothing to choose between the experts, could not have been the judge's intention.    The first alternative proposed by the Dissenting Shareholders was a blending approach. This method, which involved blending the company's beta with that derived from a peer group, was adopted in **DFC**, and was explained as follows in a passage quoted by the judge:

> "*I agree that using DFC's beta in isolation would expose the discounted cash flow model to measurement error. At the same time, the most comparable company to DFC is DFC itself, and in my view it is appropriate to factor DFC's beta into the analysis, a proposition that Dages supports and Beaulne did not rebut. The simplest way to do so is by adding it as a seventh beta in the peer analysis. Although commentary on this approach is somewhat sparse, constructing a beta that blends the company's beta with a peer group's betas finds some support in financial literature and this Court's precedent.*
>
> *In the Golden Telecom case, this Court supported the theory in two ways. First, the Court used as a peer group an index of NASDAQ-traded telecommunications companies, which the Court noted included the subject company itself. Second, and more importantly, the Court's final beta was a blend of the Company's observed beta, weighted 2/3, and the industry peer group's beta, weighted 1/3. By adding DFC as a seventh "peer" in the beta calculation, I am essentially performing the same exercise, albeit with a*

*smaller peer group and a more modest weight applied to the subject company than in Golden Telecom, to arrive at a final beta weighted 14% (1/7) to DFC's beta and 86% (6/7) to the peer group's beta. Because DFC's own observed beta is a meaningful input alongside the betas of its peers, I consider this weighting preferable to the 0% weighting DFC would receive in the peer-only analysis. I therefore use DFC and its six peers to estimate DFC's beta."*

73. The judge's reason for rejecting this balancing method, given in paragraph 160, was that *"the issues and uncertainties affecting each expert's calculation of beta relate not just to the use of direct or indirect beta"*. As a matter of fact, the judge was plainly right about that: the direct/indirect beta point was one of the six differences between the experts, and it was only one element in their overall estimates of Shanda's beta. Using the blending method by adding Professor Jarrell's direct beta to the betas derived from Mr. Inglis's peer group would have meant that one component of the calculation was treated as determinative of the entire beta, and in my view the judge was entitled to take the view that some other method of resolving the overall difference between the experts would be preferable.

74. The Dissenting Shareholders' alternative suggestion, that the ultimate values put on the shares by the experts should have been averaged, also suffers from the defect that it places the focus too narrowly. Although the value attributed to beta has a significant effect on a DCF analysis, it is far from being the only element in the analysis. To average the outcome of the entire analysis to reflect an inability to resolve differences affecting one element of it lacks logic. Moreover, the experts had dealt with the components of the valuation on a step-by-step basis, and the judge had no sensible option but to resolve the differences arising at each step. Even so, it was important that he should keep a general eye on the likely effect, individual and cumulative, of his decisions; but it is apparent from paragraph 160 that he was aware of the potential impact of his decision to average beta, since he said that the difference between the result of averaging and the result of blending would no doubt have a not immaterial effect on the amount payable to the Dissenting Shareholders.

75.     In the circumstances, it appears to me that the judge was entitled to take the view that he could not fairly distinguish between the beta figures suggested by the two experts and that in the absence of a more nuanced solution to the dilemma the most appropriate method of resolution was by averaging the two figures. Accordingly, I would dismiss the Dissenting Shareholders' appeal so far as it relates to the beta point.

The SSRP point

76.     As I have indicated, a small stock risk premium reflects the greater risk perceived to be associated with investment in smaller companies. It is ordinarily calculated by reference to Ibbotson tables, now called Duff & Phelps tables. These tables divide companies into categories and ascribe a size premium to each category. There were originally three broad categories; but the tables now also have ten equally-populated portfolios, or deciles, based on the market capitalisation of listed equity securities from 1926 to 2014. There was no dispute between Professor Jarrell and Mr. Inglis that the tables should be used, but they differed in how to use them in two respects: what value to attribute to Shanda, and whether to place it within the broad categories or within the deciles. Professor Jarrell took the view that Shanda's value should be derived from its last market price before the price was affected by the merger, and that the resulting value should be placed in the appropriate decile. On that basis, he proposed a SSRP of 1.71. Mr. Inglis's position was that Shanda's value should be the value resulting from his DCF analysis, that value being placed in the appropriate broad category. That resulted in a SSRP of 1.07.

77.     The judge accepted Professor Jarrell's figure. He quoted extracts from a further Delaware authority, *Merion Capital LP v 3M Cogent, Inc* 2013 WL 3793896 (Del. Ch. July 8, 2013), a decision of Parsons VC that points out that the Ibbotson tables look at the statistical relationship between market capitalisation and equity size premium and assume knowledge or estimation of a company's market capitalisation, which determines which decile the company falls into. At paragraph [175], he expressed his conclusion as follows:

> *"Vice Chancellor Parson's analysis and the commentary from the other*
> *Delaware cases seem to me to provide a convincing explanation of the basis*
> *of the Ibbotson tables and support Professor Jarrell's view that their*

> *application must be based on the use of market capitalisation established before calculating and without reference to the expert's DCF."*

78.  The Dissenting Shareholders contended that the judge had misunderstood Professor Jarrell's evidence, which was in fact that use of an appraised value resulting from a DCF calculation was an acceptable option. He had also misunderstood the effect of the Delaware authorities, and had failed to take into account the changes to Shanda's business occurring during the nearly 2 years between the last market valuation unaffected by the merger and the valuation date.

79.  In his first report, Professor Jarrell explained his approach as follows:

> *"Because Duff & Phelps' empirical study of size premiums is based entirely on a ranking of market capitalizations calculated from publicly-traded stock prices, I generally believe it to be most appropriate to rely on the unaffected market value of a subject-company when choosing a size premium, so that I am using exactly the same "apples-to-apples" basis that Duff & Phelps uses in the construction of those size premiums."*

80.  Having seen what Mr. Inglis said in his own first report, Professor Jarrell said this in paragraphs 71 to 73 of his supplemental report:

> *"71. In my opinion, when performing a valuation of a publicly-traded company such as Shanda, the first step in determining the appropriate decile size classification is to use the unaffected stock price of that company to obtain a market-based measure for the overall market capitalization of that firm's equity. As stated in the Jarrell Report, this is critically important because Duff & Phelps' empirical study of size premiums is based entirely on a ranking of market capitalizations calculated from publicly-traded stock prices. Duff & Phelps does not perform separate DCF valuations for the thousands of companies in its study. Instead, it simply uses the market capitalizations indicated by publicly traded "unaffected" stock prices.*
> *72. If the Duff & Phelps' size classifications were somehow based on DCF-implied fair values, instead of on market trading prices of all publicly-*

*traded companies, then the boundaries of the size classifications would need to be elevated above what is reported by Duff & Phelps. Using Shanda's DCF-implied fair value to determine a size category that is based on trading prices of publicly-traded companies, as Mr. Inglis does, does not result in an apples-to-apples comparison. Mr. Inglis's mismatched comparison renders his selected size premium unreliable.*

*73. By using Shanda's unaffected stock price for the determination of its appropriate size premium, I am using exactly the same "apples-to-apples" basis that Duff & Phelps uses in the construction of those size premiums. In my opinion, this is a much more scientifically valid selection process for a publicly-traded firm than performing "circular" valuations."*

81.     Notwithstanding these apparently clear statements, the Dissenting Shareholders suggested that Professor Jarrell had changed his position in cross-examination so as to accept that Mr Inglis's use of the fair value derived from his own DCF valuation was permissible. The relevant passage is as follows:

*"Q. Yes, there are three possibilities aren't there. There's market cap 22 months before the valuation date.*

*A. Yes.*

*Q. Then there is merger price -- and that, we say, is bad because nobody contends that that is actually the correct value of the company as at the valuation date.*

*A. Well, at least it is an objective measure of value.*

*Q. It is a measure, I agree with that.*

*A. But I agree with you.*

*Q. It is an objective measure but it is 22 months old and no one says that is the actual value as at the valuation date.*

*A. True.*

*Q. Then you have the merger price. Nobody says that's the actual value at the valuation date?*

*A. Correct.*

*Q. It is a measure but everyone says it is wrong.*

*A. Right.*

*Q. Then you can have -- the third alternative, it seems to me, is to use the appraised price as at the valuation date. So the court actually works out what is the value of the company at that date and to use that number to determine the size premium. Those are the only three alternatives, aren't they?*

*A. Sounds reasonable.*

*Q. It is a matter for his Lordship, I do not think we need spend a great deal of time --*

*A. All of this is a matter for his Lordship.*

*Q. I agree, but his Lordship can choose one of those three or he may come up with a fourth; it is his job to determine it.*

*A. Correct".*

82.   I do not consider that this passage bears the weight the Dissenting Shareholders wish to place on it. To start with, it is confused: it is unclear whether the first six exchanges relate to the unaffected market price or to the merger price. The answer "*sounds reasonable*" is hardly a wholehearted acceptance of the proposition being put; and it is unclear whether the final answer, "*Correct*", relates to the whole proposition or merely to the suggestion that it is for the judge to determine matters. Moreover, nothing in the passage I have quoted or in Professor Jarrell's cross-examination taken as a whole suggests that he was intending in this apparently casual way to abandon his central thesis that only use of the unaffected market price was consistent with the way in which the Duff & Phelps tables were compiled.

83.   Professor Jarrell had in fact identified precisely what was wrong with Mr. Inglis's proposal when he spoke in his supplemental report of circular valuations: what Mr. Inglis was doing was relying on the outcome of a DCF analysis in order to determine what small stock risk premium should be used in the course of the same DCF analysis. Mr. Inglis was asked about this in the following passage from his cross-examination:

*"Q. On the other hand, your DCF approach involves the illogicality of using your output to size one of your inputs.*

*A. I accept there is a theoretical issue there but in fact, and I have checked this, were I to apply Professor Jarrell's small company stock premium as*

*opposed to my own, I would still be in the same range and still have the same small company stock premium. So while it is a theoretical issue, in this particular case, it is not an actual issue.*

*Q. But isn't the reason for that that you are using the three broad categories of stock rather than the ten deciles?*

*A. Yes, well, although funnily enough I have checked the ten decile one, and in fact it is the same conclusion and I would in fact have a slightly smaller company stock premium were I to use the ten decile one."*

84.     This exchange was said to show that there was no circularity in fact. The argument was that, if Professor Jarrell's SSRP of 1.71 were substituted in Mr. Inglis's DCF calculation for Mr. Inglis's own 1.07, the outcome of the analysis would value Shanda in the same category or decile as Mr. Inglis had chosen in the first place. It was said that another way of demonstrating the point was to assume that the judge had taken Mr. Inglis's SSRP instead of Professor Jarrell's, the effect being to increase Shanda's appraised value from US$4.6 billion to US$4.9 billion without affecting the category or decile in which a company of that size fell. In my view, this is merely sleight of hand. In both cases, what is happening is that the ultimate result of the discounted cash flow analysis – whether that carried out by Mr. Inglis or that decided on by the judge – is being used to determine one of the factors in the analysis. That is where the circularity lies; and that it does make a difference in fact is demonstrated by the difference between the US$4.6 billion that Shanda was valued at on the basis of the judge's decision to adopt Professor Jarrell's SSRP and the US$4.9 billion that would have been the consequence of adoption of Mr. Inglis's SSRP. The judge approached the DCF analysis on a step-by-step basis, as did the experts, and he was entitled to resolve disputes at each step. He was well aware that the last unaffected quoted price for Shanda's ADSs was arguably out of date, since that was the thrust of the staleness point; but he had held that point to be finely balanced, with evidence going either way on the reliability of the market price; and I do not consider that he can be criticised for taking the view, which was supported by the Delaware authorities he cited, that the way in which the Duff & Phelps tables were compiled meant that the market capitalisation was the appropriate measure of Shanda's size and that the unaffected share price was sufficiently reliable to be used for the purpose of ascertaining the SSRP.

85.     Accordingly, I would dismiss the Dissenting Shareholders' appeal on the SSRP point.

The transitional period point

86.     I have explained the context of the transitional period point in paragraph 63 above. The judge adopted a three-stage estimation of future cash flows, as Mr. Inglis had proposed, and that approach is not in itself controversial; but the Dissenting Shareholders complain that the judge's failure to adopt Mr. Inglis's proposal in its entirety, in particular so far as concerns the length of the transitional period, has meant that the overall cash flow figures have been illegitimately understated.

87.     The judge's reasons for adopting a three-stage approach were stated in paragraph 136 of his judgment as follows:

> "*As I have noted, the experts agree that a transitional period should be used when the projected revenue growth in the last year of the forecast period is much greater than the constant growth rate assumed for all years thereafter into perpetuity. In the present case, Shanda's forecast assumes growth of 18.5% in 2019 but since Shanda assumes that its business would enter steady state growth thereafter Shanda estimates a range of constant growth rates from 1% to 2%. The implicit drop in growth rate is dramatic and not credible. It seems to me that it is reasonable to treat the last year of the forecasts as being 2019 and to compare the projected growth rate for that year with the constant rates assumed for the perpetuity period. When that is done in the present case it is clear that the difference is large and therefore that the usual justification for a transitional period is satisfied*".

88.     Having considered Professor Jarrell's and Mr. Inglis's respective proposals (two or three years in Professor Jarrell's case, if a transitional period were to be adopted at all, and ten years in Mr. Inglis's case) and the methodologies underlying them, the judge concluded at paragraph 140 that the preferable approach was to follow Mr. Inglis's basic methodology but to reduce the transitional period to five years. He did not, however, say anything about what impact, if any, this ruling would have on the rate of growth to be adopted in the terminal period – as to which Professor Jarrell had suggested a rate of 5.4% from 2020, Mr. Inglis a rate of 4.5% from 2029.

89.  Following circulation of the judge's draft ruling, the parties corresponded with the court about the value to be attributed to the shares in the light of the judge's decisions as to the principles to be applied. Ultimately, the only issue on which they could not agree was as to the growth rate in the terminal period, and it is accordingly necessary only to set out what was said about that issue.

A.  The correspondence started with a letter dated 28 March 2017 from Maples and Calder (for the Dissenting Shareholders), which included the following statement:

"*Inglis's Terminal Growth Rate of 4.5% related to a period in time running from after 2029 into perpetuity; Jarrell's Terminal Growth Rate of 5.4% related to a period of time running from after 2019/2020 into perpetuity; the terminal period following a 5 year transition period runs from after 2024 into perpetuity. Inglis has therefore taken the midpoint between his previous Terminal Growth rate and Professor Jarrell's terminal growth rate.*" Attached to the letter were a letter and worksheet prepared by Mr. Inglis, in the former of which he explained that "*Because the terminal period (after 2024) is between mine (after 2029) and Professor Jarrell's (after 2019/2020), I use the midpoint of our terminal growth rates of 4.95%".*

B.  Harneys (for Shanda) dealt with these materials in a letter dated 6 April 2017, enclosing an amended worksheet, and stating:

"*From a review of Mr Inglis's worksheet, it would appear that Mr Inglis applied an average of his own and Professor Jarrell's long-term growth rate, presumably as it resulted in a higher-growth rate and, as a consequence, a higher ADS per share. The long-term growth rate has been amended to 4.5% which is consistent with the contents of his Lordship's draft judgment ".*

C.  On 12 April 2017 Maples and Calder responded as follows:

"*That leaves a single issue between us, which per point 1 of your letter is the terminal growth rate ("TGR"). This accounts for the remaining different US$0.47 per ADS. Mr Inglis has used a TGR of 4.95% which is the midpoint between his own TGR at trial of 4.5% and Professor Jarrell's TGR of 5.4%. This is not, as you unfairly "presumed", because it resulted in a higher growth rate and so a higher fair value. Rather, Mr*

> *Inglis has very clearly explained why he adopted that approach. To reiterate, Mr Inglis's TGR at trial related to a terminal period running from 2029 (i.e. using a 10 year terminal period), whereas Professor Jarrell's evidence at trial supporting a 5.4% TGR related to a period running from 2019/2020. However, in the draft judgment, Segal J has rejected Mr Inglis's contention for a 10 year terminal period, and has instead found that it is appropriate to "reduce the terminal period to five years", such that the terminal period runs from after 2024 (see paragraph 140). You are therefore incorrect when you assert that the TGR of 4.5%, which was self-evidently tied to the rejected 10 year terminal period, is "consistent with its Lordship's draft judgment". To the contrary, that amounts to an attempt on your client's part to take the "good" without the "bad". In light of the above, we invite your client either to accept this change, or to explain clearly why it is not accepted."*

D.   Harneys replied on 19 April 2017, saying this:

> *"As for your clients' approach to the terminal growth rate (TGR), our client does not agree that this is correct. It appears that your clients/Mr Inglis are conflating the terminal period and the applicable TGR. Paragraph 140 of the draft judgment reads as follows:*

>> *"In these circumstances it seems to me that the preferable approach is to follow Mr Inglis's basic methodology and to reduce the terminal period to five years as calculated by Mr Inglis".*

> *In order to give effect to this paragraph, Mr Inglis's methodology must be applied (i.e. the TGR of 4.5%) to the reduced terminal period of five years. At no point in the draft judgment is there a suggestion that the difference in TGR be split and a mid-point applied when calculating the TGR."*

E.   Also on 19 April 2017, Maples and Calder wrote to the Court, attaching and summarising the relevant correspondence and saying this:

> *"This morning, 19 April, we received a belated response from Harneys to our 12 April letter, which suggested that our clients and Mr Inglis had conflated the issue of the terminal and applicable TGR. To the extent this brief letter adds anything of substance to the discussion, it misses the point. The length of the terminal/transitional period and therefore the*

> *start date of the period covered by the TGR are inextricably linked. The 4.5% number that Mr Inglis had previously used was based on a period of time starting after the end of a 10 year transitional/terminal growth period. The Honourable Judge has not accepted Mr Inglis's 10 year transitional/terminal growth period, but has instead applied a transitional/terminal period of 5 years. As Mr Inglis has explained (and as it set out in the above-mentioned correspondence), that finding then has an impact on the TGR as it now begins 5 years earlier than the period for which his 4.5% TGR relates. As Mr Inglis has explained he has applied a TGR of 4.95% in the calculation being the midpoint of his TGR which related to a period of time starting after a 10 year transitional period and Professor Jarrell's TGR which began after no transitional period. The Petitioner and its advisors have wholly failed to address that point, such that they must now be taken to have no further answer to it."*

90.   The judge dealt with this issue in his Note dated 6 May 2017, and upheld Harneys' contentions. In paragraph 3 of the Note, he said this:

> *"My conclusion was that there should be a transitional period of 5 years (to 2024) with the terminal period starting thereafter and that Mr Inglis's methodology and calculations (as presented in his evidence at trial) as to the revenue during the transitional period and the growth rate during the terminal period should be applied. That results in a growth rate of 4.5% during the terminal period. I have held that Shanda enters a steady state after 2024 and it seems to me that the growth rate that Mr Inglis had used at trial for Shanda during that period (i.e. in a steady state) still should be applied. This is 4.5%. Therefore the fair value is US$16.68 per ADS. I did not intend that, as a result of my decision that the transitional period be reduced to 5 from 10 years, there should, nor do I consider it to be necessary for there to, be a revision to Mr Inglis's evidence and opinion on the growth rate for the terminal period. It seems to me once a date is established on which Shanda enters a steady state (earlier on my view than on Mr Inglis's approach) the projected growth rate for the terminal period can then be*

> *applied and it is appropriate to use Mr Inglis's estimate as given in his evidence at trial".*

91. The Dissenting Shareholders complained that in reaching this conclusion the judge had failed to have proper regard to, or properly to apply, the evidence in relation to the growth rate. The only evidence as to the appropriate terminal growth rate in a transitional period of five years was that provided by Mr. Inglis in the post-hearing correspondence; and in the absence of contrary evidence from Professor Jarrell (or Mr. d'Almeida) the judge was bound to accept Mr. Inglis's view.

92. I do not accept that the judge was wrong on this aspect of the matter. The express foundation for his view was the evidence given by Mr. Inglis at trial. That evidence was directed to a terminal period starting after a transitional period of 10 years, but nowhere in his evidence did Mr. Inglis suggest that the growth rate he proposed would be different if the transitional period were shorter. The material he supplied after circulation of the draft judgment cannot sensibly be described as evidence: although it may no doubt be inferred that he thought that the growth rate of 4.95% was appropriate, that rate was no more than the product of a mechanical exercise of averaging the rates that he and Professor Jarrell had originally proposed. In their reply skeleton, the Dissenting Shareholders sought to provide a more reasoned basis for the 4.95% figure. They pointed out that both Mr. Inglis and Prof Jarrell had arrived at their original figures by using the OECD long-term projections of GDP for China (and, in Prof Jarrell's case, for Korea), and suggested that – since China's GDP was projected to decline gradually over time – the earlier the starting point for the terminal period the higher the growth rate. That was because basing the growth rate on a 10 year terminal period took into account declining performance in the latter years of that period, whereas the adoption of a five-year period automatically included only the superior performance in the earlier years and excluded the later declining performance. However, this material was not available to the judge; and, even before us, was not evidence but submission. In circumstances where the only material capable of informing the judge's decision was Mr. Inglis's evidence at trial (which cast no doubt on the validity of a growth rate of 4.5% in a terminal period starting after five years of transition) and his subsequent adoption without stated reasons of an average of the experts' original proposals, I consider that the judge was entitled to reach the conclusion he did.

93. Accordingly, I would dismiss the Dissenting Shareholders' appeal so far as it relates to the transitional period point.

*Disposition*

94. We have already dealt with the reopen application by refusing leave or, if leave was not required, by dismissing it.

95. . As to Shanda's substantive appeal, I would allow it so far as concerns the minority shareholding point but dismiss it so far as it relates to interest.

96. I would dismiss the Dissenting Shareholders' appeal.

GOLDRING P:

I agree.

MORRISON JA:

I agree.

